<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| RICHARDS MANUFACTURING COMPANY, et al., | : : : : | |
| Plaintiffs, | : : | Hon. Stanley R. Chesler Civ. No. 01-4677 |
| v. | : : | |
| THOMAS & BETTS CORP., | : : | **AMENDED OPINION** |
| Defendant. | : : | |

<u>**CHESLER, District Judge**</u>

**THIS MATTER** comes before the Court upon plaintiffs Richards Manufacturing Company ("Richards") and Glen Luzzi's motion for partial summary judgment regarding defendant Thomas & Betts Corporation's ("T&B") claim that Mr. Luzzi misappropriated 90 items of confidential information when he left T&B's employ to join Richards. [Docket Entry No. 96.] Having considered the parties' arguments, both in their motion papers and oral argument on August 15, 2005, for the reasons set forth below, and for good cause shown, the Court sets forth herein the applicable standard in determining whether or not the each of the 90 items qualify as protectible confidential material. The Court further denies plaintiffs' motion for partial summary judgment regarding the 90 items without prejudice to their right to renew such motion. If renewed, the parties are directed to marshal the evidence of record with respect to each of the 90 items, or groups thereof, and apply the standard set forth herein in accordance with the ordinary summary judgment standard.

1

**I.     BACKGROUND**

In this declaratory judgment action, defendant T&B seeks to enforce a confidentiality agreement against its former employee, Mr. Luzzi, and his current employer, Richards.

Plaintiff Glen Luzzi worked at Elastimold, currently a division of T&B, for approximately 20 years under Amerace and Eagle Industries. (Final Pretrial Order ("FPO") at 14.) In October, 1978, Mr. Luzzi joined Elastimold as a product engineer in its Hackettstown, New Jersey Development Center, designing 600-amp connector lines. (FPO at 14, 16.) On October 23, 1978, Mr. Luzzi signed a "Non-Competition, Invention and Secrecy Agreement" with Amerace Corporation, which owned Elastimold at that time. (Id. at 15.) The '78 Agreement provides in relevant part as follows:

> (2)   I will not during and after the period of my employment by the Corporation use or disclose, otherwise than as directed by the Corporation, any of the customer lists of the Corporation; any information relating to any novel process employed by the Corporation in the manufacture, fabrication, assembly, installation, testing or inspecting of any article, apparatus, or material made, used or sold by the Corporation; information concerning any improvement, invention or discovery belonging to the Corporation; nor any other confidential information or trade secret of the Corporation.

(Certification of William W. Robertson, Esq. ("Robertson Cert."), Exh. 1.)

After three or four years, Mr. Luzzi was promoted to Product Manager where he maintained his product engineer responsibilities and, additionally, the model shop, draftsmen, engineers, and staff reported to him. (FPO at 14.) In or about 1992, he was promoted to Director of Engineering at the Development Center, where he was responsible for the design of all of the products at issue and was a member of the committee that reviewed and approved all Elastimold

tooling.  (Id. at 14-15.)  An oil-resistant formula at issue in this case was developed at

Elastimold's laboratory during Mr. Luzzi's tenure as Director of Engineering.  (Id. at 15.)

In 1996, Mr. Luzzi signed another employment agreement (the "'96 Agreement") with

T&B, the company that owned Elastimold at that time.  (Robertson Cert., Exh. 5.)  The '96

Agreement provides in relevant part as follows:

> 4. I shall not disclose or cause others to disclose to the Company, or induce the Company to use any information or material which is the property of other individuals or companies and which to the best of my knowledge is of a proprietary or confidential nature.
>
> 5. Since the work for which I am employed and upon which I shall be engaged will include Company knowledge and information of a private, confidential, or secret nature, I shall not during the period of my employment by the Company or after termination of such employment without regard for the causes thereof, except as required by the Company, publish, idscose, or make use of, or authoize anyone else to publish, disclose or otherwise make us of any such knowledge or information, of a confidential nature to and the secret property of the company or other information which in any way relates to the business of the Company or the design, construction, manufacture or sale of the company's products or services.

(Id., Exh. 5.)  The parties dispute whether the '78 Agreement or the '96 Agreement (collectively

the "Employment Agreements"), both, or neither, controls the instant matter.[1]

---

[1] T&B makes two principle arguments as to why summary judgment regarding the 90 items should be denied.  First, it argues "plaintiffs have waived their right to argue the Employment Agreements are unenforceable" because they did not plead such an affirmative defense pursuant to Fed. R. Civ. P. 8(c) in response to T&B's counterclaim for violation of an employment agreement.  (Opposition Brief at 6-7.)  In the FPO, however, plaintiffs reference both the '96 and '78 Agreements, and argue the '96 Agreement "is the only employment agreement between Mr. Luzzi and T&B."  (FPO at 37.)  Plaintiffs state elsewhere in the FPO that "[b]ecause paragraph 5 of the Employment Proprietary Information and Invention Agreement purports to prohibit Mr. Luzzi from sharing information that is not legally protectable, the

On October 4, 2001, plaintiffs filed this action seeking a Declaratory Judgment that they did not misappropriate trade secret or confidential information [Docket Entry No. 1] and filed an Amended Complaint on January 14, 2003 [Docket Entry No. 26]. On January 16, 2005, T&B filed an Answer to the Amended Compliant [Docket Entry No. 27] and, on May 5, 2003, filed an Amended Counterclaim against Luzzi in his individual capacity [Docket Entry No. 38] for breach of contract (Count I), breach of the duty of loyalty (Count II), and fraud (Count III); against Richards for tortious interference with prospective economic advantage (Count IV), and misappropriation of trade secrets (Count VI); and against both Luzzi and Richards for misappropriation of trade secrets (Count V). (See T&B's First Amended Answer and Counterclaim; FPO at 517-18.)

After discovery, T&B identified 90 items of confidential information that it claims Luzzi misappropriated when he left T&B to join Richards. It is undisputed that the 90 items are not "trade secrets" but the parties disagree over whether or not T&B has a contractually protectible

---

provision is over broad thus rendering the non-disclosure provision unenforceable." (FPO at 506.) The agreement referenced at page 506 is the '78 Agreement, although paragraph 5 therein deals with restrictions on employment with competitors, not confidentiality. Given that the FPO "control[s] the subsequent course of action unless modified by a subsequent order," R. 26(d), Price v. Inland Oil Co., 646 F.2d 90, 95 (3d Cir. 1981) (stating that a pretrial order "supercedes the pleadings and directs the future course of the action"), T&B's arguments regarding plaintiff's failure to plead under Rule 8(c) are moot.

Second, T&B argues plaintiffs are not entitled to summary judgment because the '78 Agreement, which plaintiffs ignored in their papers, is enforceable independent of the '96 Agreement. (Opposition Brief at 10-11.) The Court need not decide which confidentiality provision controls because, as discussed herein, neither shall restrict the plaintiffs beyond that which is reasonable under New Jersey law. Moreover, "even in the absence of an agreement, . . . the law protects confidential and proprietary information." Larmorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 298 (2001). Thus, at this time, the Court need only establish the standard by which it will determine whether or not T&B can claim a protectible interest in each of the 90 items.

interest such that their misappropriation by Mr. Luzzi and Richards would violate the one or both of the Confidentiality Agreements.

Plaintiff now moves for partial summary judgment "dismissing Counts I, II, IV and VI [of defendant's counterclaim] to the extent these counts rely on the 90 items of confidential information." (Plaintiff's Moving Brief at 1.) Plaintiffs argue, inter alia, that New Jersey law, and specifically the case of Ingersoll Rand v. Ciavatta, 110 N.J. 609 (1988), sets up a spectrum of protectibility that includes three categories: general knowledge, confidential information, and trade secrets. (Id. at 20-23.) Plaintiffs argue that, to show that any of the 90 items are legally protectible under Ingersoll Rand, T&B must provide evidence showing it is "highly specialized, current information not generally known in the industry." (Id. at 22.)[2] Plaintiffs argue the record cannot support such a showing and, accordingly, seek summary judgment.

In its opposition, defendant argues that plaintiffs misstate New Jersey law and that "[t]here are three unique categories of business-related information that may have legal protection afforded to it – trade secrets, confidential and proprietary information, and – under Ingersoll-Rand – creative brainstorming information." (Opposition Brief at 16.) Defendant argues the appropriate standard here is found in Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285 (2001). Defendant argues that, to withstand summary judgment, Lamorte Burns requires only that it prove "the

---

[2]Under this standard, plaintiffs argue that, even if the Confidentiality Agreements are enforceable, the 90 items are not protectible because (1) T&B did not have procedures in place to inform its employees that certain information, including the 90 items, was considered confidential (id. at 23-24); (2) the "vast majority" of the 90 items were not marked as confidential and no restrictions were placed on who within the company had access to them (id. at 27), (3) many of the 90 items were readily observable in the products themselves (id. at 28), and (4) T&B never conducted exit interviews with departing employees to advise them of the information that it expected would remain confidential (id. at 29).

information (i) [was] provided to an employee by the employer, (ii) in the course of employment, (iii) for the sole purpose of conducting the employers' business . . . ." (Id. at 19.)

In short, the parties disagree about the standard by which this Court must decide whether or not the 90 items are "confidential" and, therefore, protectible. Incidentally, neither party applied its respective proposed standard to the 90 items. The Court, therefore, turns to the standard by which it will decide whether or not T&B has made a factual showing sufficient to withstand summary judgment.

## II.   DISCUSSION

New Jersey law recognizes employers' right to protect themselves contractually from the misappropriation of trade secrets and other confidential information. Ingersoll - Rand Co. v. Ciavotta, 110 N.J. 609, 635-36 (1988); Whitmer Bros. Inc. v. Doyle, 58 N.J. 25, 33 (1971). The enforceability of any post-employment restrictive covenant depends, however, upon its reasonableness under the circumstances. Under New Jersey's Solari/Whitmer test, such a covenant is reasonable where it: (1) is reasonably necessary to protect the employer's legitimate interest, (2) causes no undue hardship on the employee, and (3) does not impair public interest. Whitmer Bros., 58 N.J. 32-33; Solari Indus., Inc. v. Malady, 55 N.J. 571, 576 (1970).

Consideration of the first two elements of Solari/Whitmer requires a balancing of the competing interests of the employer and the employee. As a general matter, an employer is not entitled to enforce a restrictive covenant principally directed at lessening competition. Raven v. A. Klein & Co., Inc., 195 N.J. Super. 209, 212 (App. Div. 1984). Thus, as the New Jersey Supreme Court has stated,

> In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive agreement. A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 66 A.2d 319 (1949). Conversely, in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable. See Whitmyer Bros., Inc. v. Doyle, supra, 58 N.J. at 35, 274 A.2d 577; Irvington Varnish and Insulator Co. v. Van Norde, 138 N.J. Eq. 99, 106, 46 A.2d 201 (E. & A. 1946) (Bodine, J., dissenting).

Ingersoll-Rand, 110 N.J. at 635. Moreover, "matters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection nor will routine or trivial differences in practices and methods suffice to support restraint of the employee's competition." Whitmyer Bros., 58 N.J. at 34. Thus, restrictive covenants that purport to prohibit a former employee from divulging "any information" with respect to the employers business are unenforceable. See Hudson Foam Latex Prods., Inc. v. Aiken, 82 N.J. Super. 508, 516 (App. Div. 1964) (holding post-employment covenant was unenforceable because restricting former employee from divulging "any information" learned in the course of his employment was tantamount to prohibiting employee from ever using in another job the experience he obtained during his employment).

Where restrictive covenants are found to violate the Solari/Whitmer test, rather than deem the covenant void ab initio, Courts will enforce them to the extent reasonable under the circumstances. See Hudson Foam, 82 N.J. Super. at 516 (citing Chas. S. Wood & Co. v. Kane, 42 N.J. Super. 122, 128 (App. Div. 1956)). This principle of partial

enforcement does not depend upon "mechanical divisibility" of a contract clause, but rather asks whether or not "partial enforcement is possible without injury to the public and without injustice to the parties." See Solari Indus., 55 N.J. at 579

The Confidentiality Agreements in this case are overly broad. The '78 Agreement purports to define the information that Mr. Luzzi may not disclose as "information concerning any improvement, invention or discovery belonging to the Corporation; . . . [and] any other confidential information or trade secret of the Corporation." The '96 Agreement purports to restrict any "information which in any way relates to the business of the Company or the design, construction, manufacture or sale of the company's products or services." These purported restrictions would appear to prohibit Mr. Luzzi from using information, or rather the experience, he gained from his 20-year employment at Elastimold, regardless of whether or not that information is legitimately protectable. At best, the Confidentiality Agreements are sufficiently ambiguous so as to prohibit Mr. Luzzi's ability to work in his field of expertise without the fear of a suit such as this. Accordingly, these agreements do not comport with the Solari/Whitmer test and the Court finds them, as written, to place an undue burden upon Mr. Luzzi and to have a stifling effect upon competition.

Given the overbreadth of these clauses, the Court will blue pencil those covenants and will deem protected only that information in which T&B has a legitimate secrecy interest.[3] In undertaking this exercise, the Court must identify a standard by which it will

---

[3]Richards argues that granting T&B the equitable remedy of "blue penciling" the restrictive covenant would be to permit deliberate overreaching. (Pl. Br. at 17-20.) Richards argues that T&B knew since the 1999 decision by the Federal District Court for the Northern

determine whether or not T&B has such an interest. While the contours of this interest are not defined in the caselaw, the Court finds the relevant considerations in the Ingersoll-Rand and Lamorte Burns cases.

In Ingersoll-Rand, the New Jersey Supreme Court held that a post-employment "holdover" agreement that required an employee to assign to the employer his rights in any post-termination invention that was "conceived as a result of and is attributable to work done during such employment" was overly broad and, therefore, unenforceable. 110 N.J. at 640. The court recognized that, like trade secrets, information in which an employer has a protectible right does not lend itself to definition. Id. at 638. In discussing an employers' protectible interest, however, the court stated:

> employers may have legitimate interests in protecting information that is not a trade secret or proprietary information but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been "exposed" and "enriched" solely due to his employment. We do not attempt to define parameters of that protectable interest.

---

District of Illinois in Thomas & Betts Corp. v. Panduit that a similar covenant was overbroad, and that T&B took no steps to educate its employees or change the terms of existing employment contracts. (Id. at 18-19.) Accordingly, Richards argues, the restrictive covenant should be stricken in its entirety under the doctrine of unclean hands. (Id.) In support of this argument, Richards cites language in Solari that states equitable relief should not be available "[w]hen an employer, through superior bargaining power, extracts a deliberately unreasonable and oppressive noncompetitive covenant he is in no just position to seek." 55 N.J. at 576, 264 A.2d at 56. The record does not warrant invalidation of the restrictive covenant based upon the unclean hands doctrine. Moreover, the Court is not willing to invalidate a contract based upon the non-binding interpretation of a similar employment contract. This is particularly so where that interpretation was made under the law of another state. Accordingly, the Court will blue pencil the covenant in this case and enforce T&B's legitimate secrecy rights to the extent reasonable.

Id. (citations omitted) (emphasis added).  The Ingersoll Rand court further recognized the difficulty in distinguishing between trade secrets, otherwise protectible information, and the "general skills and knowledge of a highly sophisticated employee." Id. at 638. Moreover, given the potentially limiting effect such agreements have on employees, the Ingersoll-Rand court admonished courts to construe an employer's protectible interest narrowly.  Id. at 638-39.  The court, therefore, held (1) holdover agreements are enforceable to the extent they are reasonable; (2) employers may protect by way of contract certain information that is not trade secret or confidential; and (3) courts should construe this interest narrowly.

Although Ingersoll-Rand dealt with a hold-over agreement, rather than a confidentiality agreement such as in this case, the protectible interest of the employer was balanced against the restrictive effect on a former employee.  This Court finds the Ingersoll-Rand court's analysis persuasive because it must strike the same balance in determining the enforceability and scope of a post-employment restrictive covenant.

In Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285 (2001), the New Jersey Supreme Court held that employees of an insurance claims adjuster violated their employment non-disclosure agreements.  In Lamorte Burns, defendants, before resigning, gathered client information, including names, addresses, phone and fax numbers, claimant names, accident dates, details of accidents, and file numbers, for the sole purpose of soliciting those clients to compete with their employer.  Id. at 298.  The court held that "[t]he specific information provided to defendants by their employer, in the course of employment, and for the sole purpose of servicing plaintiff's customers, is

legally protectible as confidential and proprietary information." Id. at 301.  The court stated "the key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information." Id. at 299 (citing Platinum Mgmt. v. Dahms, 285 N.J. Super. 274, 295 (Law Div. 1995)).  The Court observed that the stolen information included specific information about the clients' claims, which "gave [defendants] an advantage in soliciting plaintiff's clients once they resigned," but which was available to defendants only by virtue of their employment, and solely for the purpose of serving these clients on behalf their employer. Id.  Accordingly, the Lamorte Burns court held that claim file information that the defendants took to compete with the plaintiff was confidential and proprietary such that plaintiff had a contractually protectible interest in it. Id. at 302.

While this Court will not attempt to define the contours of an employer's protectible interest, at a minimum, T&B must adduce some evidence that the information embodied in the 90 items meets the criteria set forth in these cases.  In determining whether or not this burden is met, the Court will consider the following factors:  (1) the degree to which the information is generally known in the industry; (2) the level of specificity and specialized nature of the information; (3) the employer/employee relationship and circumstances under which the employee was exposed to the information; and (4) whether or not the information is "current."

First, the Court will consider whether or not the allegedly misappropriated information was generally known in the industry. See, e.g., Ingersoll-Rand, 110 N.J. at 641 (holding employer's holdover agreement unenforceable, in part, because "[a]ll of the

11

specifications and capabilities of the Ingersoll-Rand split set stabilizer were widely publicized."). Relatedly, the Court will consider whether or not the information was publicly available. Lamorte Burns, 167 N.J. at 301 (holding client information was protectible, in part, because it "was not generally available to the public, but was shared between plaintiff and its clients."). For example, to the extent information embodied in the 90 items was known in the industry, such as through T&B's advertising, or if the information was easily discoverable, there is no protectible interest. Within this factor, the Court will further consider the extent to which the information was maintained in a secretive manner within the organization. See, e.g., Ingersoll Rand, 110 N.J. at 641-42 (finding "Ingersoll Rand has done little to guard the details of its [technology] or maintain a secretive atmosphere surrounding corporate development and marketing of the product."). Failure to maintain the purportedly confidential information in a secretive manner would weigh against a finding of a protectible interest.

Second, the Court will consider whether or not the information is specific and "highly specialized." Ingersoll-Rand, 110 N.J. at 638. Confidential information, "cannot merely be the facility, skill or experience learned or developed during an employee's tenure with an employer." Id. at 629-630. Specific, highly specialized information would likely be an aspect of defendant's business process that is unique to its facility. Thus, if purportedly confidential information, or substantially similar information, exists within a competitor's facility, it would likely not be protected. Accordingly, to the extent the plaintiffs can demonstrate that the information embodied in an item was used by competitors, or that it was used by Richards before Mr. Luzzi's arrival, T&B has no real

12

interest in protecting that item from disclosure.  On the other hand, if T&B evinces proof that its confidential information consists of a specific, particular form or articulation of, for example, a manufacturing process or design that is generally known, plaintiffs are not free to copy that specific, particular form or articulation merely because a general principle is known in the industry.  Indeed, while the general principle may have been known, that particular iteration may not have.

Third, the Court will consider the employer/employee relationship and circumstances under which the employee was exposed to the information.  In the context of client information, "[t]he key to determining misuse of [such] information is the relationship of the parties at the time of disclosure and the intended use of the information."  Lamorte Burns, 167 N.J. at 299.  Inherent in the relationship of the parties are their expectations with respect to the information.  See id. at 300-301 (citing Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441 (11th Cir. 1991) (holding that "[a] confidential relationship is distinguished by the expectations of the parties involved . . . .")).  For example, evidence that the allegedly misappropriated information was "created and stimulated by the research environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment" would be probative of a protectible interest.  Ingersoll-Rand, 110 N.J. at 638.  On the other hand, if protected information comes from an aspect of the company to which the employee is not exposed, or a subsidiary for which he did not work, the agreement would be overly broad and unenforceable.  See id. at 643, n.6.

Fourth, the Court will consider whether or not the information was "current."

Ingersoll-Rand, 110 N.J. at 638.  With respect to this consideration, the Court rejects plaintiffs' argument that such information be limited to that which was developed in the last two years of Mr. Luzzi's employment at T&B.  Rather, information is "current" if it has current value to the employer.  The Court will not hold, as plaintiff would have it, that "current" information should be limited to information to which Mr. Luzzi was exposed during his final two years of employment at T&B.  (See Letter of Steven B. Pokotilo dated August 19, 2005 at 2.)  Creating such a limitation would nullify an employer's secrecy interest in valuable confidential information merely because of the passage of time.  Indeed, it is the information's value, not its age, from which an employer's secrecy interest arises.  Current information, therefore, shall be considered information of current value to the employer, regardless of how old it is.

### III.   CONCLUSION

Because nothing before the Court applies the standard set forth in this opinion, or the respective standards set forth by the parties, to the 90 items, the Court is unable to determine whether or not summary judgment is appropriate.  Accordingly, the motion for summary judgment with respect to the 90 items is denied without prejudice to plaintiffs' right to renew it.  If renewed, the parties are directed to marshal the evidence of record with respect to each of the 90 items, or groups thereof, and apply the standard set forth herein in accordance with the ordinary summary judgment standard.

Date: October 7, 2005

s/ Stanley R. Chesler<br>United States District Judge