<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

:
THOMAS & BETTS CORP.,                    :
                                         :
            Plaintiff,                   :           Hon. Stanley R. Chesler
                                         :           Civ. No. 01-4677
            v.                           :
                                         :
RICHARDS MANUFACTURING                   :
COMPANY, et al.,                         :
                                         :           **OPINION**
            Defendants.                  :
_____  :

<u>**CHESLER, District Judge**</u>

**I.      INTRODUCTION**

        This matter comes before the Court by way of <u>in limine</u> motions by plaintiff Thomas &

Betts Corporation ("T&B") and defendant Richards Manufacturing Company ("Richards") to bar

expert testimony.  T&B moves to bar the expert reports and testimony of Richards's proposed

experts Lloyd Covill, Walter Koroluk, Harold Hervig, [Docket Entry No. 75] and Arthur

Grossman.  [Docket Entry No. 74.]  Richards moves to bar the expert report and testimony of

T&B's proposed expert Van T. Walworth.  [Docket Entry No. 93.]  Upon review of these

motions, the Court held five days of <u>Daubert</u> hearings.[1]  The Court ordered supplemental

_____

[1]Citation to the <u>Daubert</u> hearing transcripts are as follows:
"T1" shall refer to the transcript from the hearing on November 21, 2005;
"T2" shall refer to the transcript from the hearing on November 22, 2005;
"T3" shall refer to the transcript from the hearing on December 12, 2005;
"T4" shall refer to the transcript from the hearing on December 13, 2005; and
"T5" shall refer to the transcript from the hearing on January 13, 2006.

briefing, which the parties submitted and the Court has reviewed.  For the foregoing reasons, the

motions are **GRANTED IN PART**.

II.    **FACTS**

   A.    **Background**

T&B seeks damages from Richards and Glenn Luzzi, the former employee of a T&B

subsidiary, Elastimold, for misappropriation of trade secret and confidential information

regarding manufacturing processes for their products.  Both Elastimold and Richards

manufacture 600 Amp, or high voltage, "disconnectable connectors," called I-joints, Y-jont, H-

joint, and separable elbow connectors, which are used by public utilities to carry electrical

current through underground electrical grids.  (Final Pretrial Order ("FPO") at 13.)  Defendant

Luzzi worked at Elastimold for approximately 20 years and served as its Director of Engineering

for his final six years.  (FPO at 14.)  During his employment, Mr. Luzzi signed a "Non-

Competition, Invention and Secrecy Agreement" containing confidentiality provisions that T&B

claims prohibit him from using or disclosing certain information he learned while working at

Elastimold.  (Id. at 276.)

T&B alleges Mr. Luzzi left Elastimold in January of 1999 to work for Richards, which at

that time did not manufacture high-voltage connectors.  (FPO at 277.)  It alleges in the spring of

2000 Richards introduced a line of products that were identical to T&B's products.  (Id.)  When,

in the spring of 2001, Richards introduced another high-voltage underground power connector,

the elbow, T&B raised its concerns that Mr. Luzzi had breached the confidentiality provisions

and misappropriated their proprietary information.  (Id.)  T&B claims that Mr. Luzzi stole a

substantial quantity of Elastimold's proprietary information, including product drawings,

compound formulations, standard operating procedures, manufacturing parameters, and detailed customer information.  (Id. at 277-78.)  In short, T&B claims Mr. Luzzi took this information, which it describes as ten trade secrets and 90 items of confidential information, to Richards and applied it to create a knock-off line of high-voltage connector products, resulting in harm to T&B.  (Id. at 278.)

Richards claims, inter alia, that the allegedly misappropriated information is not protectible because it is well-known and commonly used in the high voltage-rubber molded connector industry (FPO at 19) and the products at issue could readily be reverse engineered (id. at 27-28).

### B.    Procedural History

On October 4, 2001, Richards filed this action seeking a declaratory judgment that it did not misappropriate trade secret or confidential information [Docket Entry No. 1] and filed an Amended Complaint on January 14, 2003 [Docket Entry No. 26].  On January 16, 2005, T&B filed an Answer to the Amended Compliant [Docket Entry No. 27] and, on May 5, 2003, filed an Amended Counterclaim against Luzzi in his individual capacity [Docket Entry No. 38] for breach of contract (Count I), breach of the duty of loyalty (Count II), and fraud (Count III); against Richards for tortious interference with prospective economic advantage (Count IV), and misappropriation of trade secrets (Count VI); and against both Luzzi and Richards for misappropriation of trade secrets (Count V).  (See T&B's First Amended Answer and Counterclaim; FPO at 517-18.)

On September 22, 2003, T&B supplemented its discovery responses to identify some 90 items of confidential information that it claims Luzzi misappropriated when he left T&B to join

Richards.  It is undisputed that the 90 items are not "trade secrets" but the parties disagree over whether or not T&B has a contractually protectible interest such that their misappropriation by Mr. Luzzi and Richards violated the confidentiality provisions.  Richards and T&B have both proffered experts in support of their position with respect to whether or not the alleged trade secrets and confidential information at issue is protectible.

### C.      Richards's Experts

T&B seeks to bar expert testimony of Richards proposed experts Lloyd Covill, Walter Koroluk, Harold Hervig, and Richard Grossman.  Richards offers Messrs. Covill, Koroluk, and Hervig as experts in mold design, product design, and process development for high voltage products such as those involved in this litigation.  (FPO at 475, ¶ 2 (regarding Koroluk); 475, ¶ 3 (regarding Covill); and 476, ¶ 4 (regarding Hervig).)  Richards offers Mr. Grossman as an expert in the development of rubber compounds and analytical methods for formula reconstruction. (FPO at 474-75, ¶ 1.)  Richards tenders all of these witnesses as experts in (1) the use of the trade secrets and items of confidential information asserted by T&B by third parties in the industry, (2) alternatives to each of the trade secrets and items of confidential information asserted by T&B for use in manufacturing the products at issue, (3) the reverse engineerability of each of the products at issue, and (4) the opinions and facts set forth in any reports they submitted.  (FPO at 474-75, ¶ 1 (regarding Grossman); 475, ¶ 2 (regarding Koroluk); 475, ¶ 3 (regarding Covill); and 476, ¶ 4 (regarding Hervig).)

### i.      Lloyd Covill

In his expert report, dated August 4, 2003, Mr. Covill stated that he was asked by attorneys for Richards to:

> present an opinion as to whether each of the alleged trade secrets
> was well known and/or commonly used in the rubber molding
> industry and whether Richards' use of the items in question was
> consistent with how these methods or designs have been used by
> others, and whether T&B's high impulse Elbow could be reverse
> engineered.

(Covill Report at 1, ¶ 4.)  Mr. Covill's report states that he has seen the concepts that T&B

claims are trade secrets employed by competing companies and, therefore, opined that they are

well known and cannot be trade secrets.[2]  Mr. Covill further opined that, based on his experience

with reverse engineering, T&B's high impulse elbow could be reverse engineered and that it

would take about 12 months.  (Id. at ¶¶ 48-54.)

In his supplemental report, Mr. Covill gave a similar analysis with respect to T&B's 90

items of allegedly confidential information.  He stated the purpose of reviewing such items "was

to present an opinion as to whether each of the alleged items . . . was well known and/or

commonly used in the rubber molding industry, and whether T&B's and Richards' use of the

items in question was consistent with how these methods or designs have been used by others."

(Supplemental Expert Report of Lloyd Covill ("Covill Supp. Report") at 1.)  Mr. Covill reviewed

these items and opined that each was well known in the industry.

---

[2]See, for example, the Covill Report at ¶¶ 12-4 (stating he designed and used a "fill port"
with a "flipper pin" similar to the "flip pins" used by Richards, which T&B claims are
confidential); ¶¶ 16-21 (stating he designed and used a "fill port" similar to the "injection ports"
used by Richards, which T&B claims are confidential); ¶¶ 23-25 (stating, while working for a
competitor, he experimented with hollow point drill bits, which T&B claims are confidential); ¶¶
27-30 (stating, while working for competitors, he used wire brushes and other methods of
abrasion, which T&B claims are confidential); ¶¶ 31-37 (stating the "nested modular inserts" that
T&B claims are confidential are well known and have been used since the 1970s); ¶¶ 38-41
(stating he has used the "uncured rubber plugs" that T&B claim are confidential during his
employment with other manufacturing companies); and ¶¶ 42-47 (stating he has used the "scribe
lines" that T&B claim are confidential during his employment with other manufacturing
companies).

At the Daubert hearing, Richards offered Mr. Covill as an expert:

> with respect to whether the trade secrets and other items of confidential information at issue in this case are well-known in the underground electrical connector industry.  Mr. Covill will also be offering opinions regarding whether certain of the items are evident on Elastimold's products and that certain of the items would be of no value or assistance to Richards in developing its products.

(T4, 64:21-65:4.)  Richards further stated Mr. Covill would testify regarding:

> whether the trade secrets and other items of confidential information at issue in this case are evident on T & B's products. We also tender Mr. Covill as an expert with respect to issues of whether certain of the items at issue would be obvious to one skilled in the art, the differences between Richards products and manufacturing processes as compared to those at Thomas & Betts, whether the practices of T & B in the design and manufacturing of its products are unique or specialized in any manner, the practices in the industry with regard to maintaining secrecy, whether Richards independently developed its products, the value of the items at issue, including whether certain of the items would be of any value to Richards in developing a competing product line.
>
> Mr. Covill will also be offering an opinion regarding how long it would take to reverse engineer the [sic] Elastimold's products, specifically based on his development of competitive underground electrical products during his career at various manufacturers of underground electrical products, including his actual reverse engineering and development of a substitute for the Elastimold high-impulse elbow as described earlier, which is one of the products at issue in this case.  Mr. Covill will testify that in his opinion, it would take about one year to reverse engineer the Elastimold products at issue and we tender Mr. Covill as an expert in this area.

(T4, 79:4-80:6.)

### ii.    Walter Koroluk

In his expert report, Walter Koroluk stated that the purpose of his retention was to present an opinion:

6

> as to whether each of the alleged trade secrets was well known
> and/or commonly used in the rubber molding industry and whether
> Richards' use of the items in question was consistent with how
> these methods or designs have been used by others, and whether
> T&B's high impulse Elbow could be reverse engineered.

(Expert Report of Walter Koroluk ("Koroluk Report") at 1, ¶4.)  Mr. Koroluk's report goes on to describe his experience with other rubber molding companies and opines, based upon this experience, that the alleged trade secrets were well known in the electrical connector manufacturing industry.[3]  Mr. Koroluk's report states that he is experienced in the reverse engineering process and opines that it would take between 6 and 12 months to reverse engineer T&B's I, Y, H and High Impulse Elbow connectors.  (Id. at ¶ 59.)

In his supplemental expert report, Mr. Koroluk stated he expected to testify as an expert in the field of design and manufacture of molds for rubber molded electrical connector products.  (Koroluk Supp. Report at 1-2.)  The Supplemental Report was drafted in response to T&B's disclosure of 90 items of allegedly confidential information.  (Id.)  In his Supplemental Report, Mr. Koroluk generally opines based on his experience with other companies that each of the items were commonly known in the industry.

At the hearings, Richards tendered Mr. Koroluk as an expert witness regarding "whether

---

[3]See, for example, ¶¶ 9-15 (describing experience with other companies that use the "flip pin" that T&B claims is confidential to manufacture 600 amp elbows); ¶¶ 16-25 (stating that Richards' use of the "injection ports" that T&B claims are confidential was an obvious use and is well-known in the industry); ¶¶ 26-33 (stating that Richards' use of hollow point drill bits is obvious and commonly used in the rubber molding industry); ¶¶ 34-37 (stating that he has employed a process similar to Richards' method of matted texturing, and has observed other manufacturers do so); ¶¶ 38-44 (stating the practice of "nested mold inserts" is well known and common to the rubber molding industry); ¶¶ 45-50 (stating that Richards' use of "uncured rubber plugs" is common to the rubber molding industry and his has been and is currently involved with such use); and ¶¶ 51-58 (stating the use of "scribe lines," which T&B claims is confidential, is commonly used in the rubber molding industry).

the trade secrets and other items of confidential information in this case are well-known in the underground electrical connector industry."  (T5, 18:25-19:3.)  Richards further offered Mr. Koroluk's testimony on the following issues:

> whether the trade secrets and other items of confidential information at issue in this case are evident on T & B's products.
>
> We also tender Mr. Koroluk as an expert with respect to issues of whether certain of the items would be obvious to one of skill in the art, the differences between Richards' products and manufacturing processes as compared to those at T & B, whether the practices of T & B in the design and manufacture of its products are unique, whether Richards independently developed its products, the value of the items at issue, including whether certain of the items would be of any value to Richards in developing a competing product line.
>
> We also offer Mr. Koroluk as an expert with regard to the elements of plastic injection molding and which of those elements carry over to rubber injection molding.
>
> And finally, Mr. Koroluk will be offering an opinion regarding how long it would take to reverse engineer Elastimold's products, specifically, based on his development of competitive underground electrical products during his career at various manufacturers, including his work at the mold houses that have built tooling for many underground electrical connector products. Mr. Koroluk will testify that, in his opinion, it would take about six to 12 months to reverse engineer the Elastimold products at issue and we tender Mr. Koroluk as an expert in that area.

(T5, 34:17-35:17.)

### iii.    Harold Hervig

In his expert report, Mr. Hervig stated he expected to testify as an expert in the field of manufacturing of injection molded rubber electric products.  (Hervig Report at 1, ¶ 1.)  He stated he reviewed T&B's allegations with regard to the "v-vent" venting mechanism to "present an

8

opinion as to whether such a venting mechanism was common in the industry, as well as whether the venting mechanism used by T&B was subject to reverse engineering." (Id. at 2, ¶2.) Mr. Hervig's report discusses his experience with the allegedly confidential venting mechanism while working at another company that manufactures electrical connectors and opines that they are common knowledge in the industry. (Id. at 4-6, ¶¶ 14-20.) Mr. Hervig also opines that lower impulse products similar to T&B's high impulse Elbow, which is the subject of this litigation, are made by other companies and that a higher impulse rating is easily achievable, thus, it is easily reverse engineerable. (Id. at 7-8, ¶¶ 24-27.)

In his Supplemental Expert Report, Mr. Hervig submitted an opinion regarding T&B's alleged 90 items of confidential information. He opined, based on his experience with other companies that made underground connectors, that each of the items are commonly used in the rubber molding industry. (Hervig Supplemental Report at 2-19.)

At the hearing, Richards tendered Mr. Hervig as an expert "with respect to whether certain of the trade secrets and other items of confidential information in this case are well-known in the underground electrical connector industry." (T5 at 150.) Richards also tendered Mr. Hervig:

> as an expert with respect to whether the trade secrets and other items of confidential information at issue in this case are evident on T & B's products or would be obvious to one skilled in the art. We also tender Mr. Hervig as an expert with respect to issues concerning that certain of the other items would be obvious to one skilled in the art the differences between Richards' products and manufacturing processes as compared to those at T & B, what are the practices of T & B, that the design and manufacturing of its products are unique, the value of the items at issue, including whether certain of the items would be of any value to Richards in developing competing product line, what elements of plastic

> injection molding carry over to rubber injection molding, secrecy
> in the underground electrical connector industry, and Mr. Hervig
> would also be offering an opinion regarding how long would it
> take to reverse engineer the Elastimold products and specifically he
> will offer an opinion that it would take about one year to reverse
> engineer the Elastimold products.

(T5, 151:3-23.)

### iv.    Richard Grossman

In the FPO, Richards stated that Mr. Grossman would testify regarding:

> his experience in working with Richards and other third parties in
> developing rubber compounds, the facts surrounding Richards
> development of certain rubber compounds, the reverse
> engineering/development of competitive electrical and other
> products by third parties in the industry, third party use of each of
> certain of the trade secrets and items of confidential information at
> issue in this case, and the facts expressed in the various expert
> reports submitted in this action by Dr. Grossman.

> The witness will provide a tutorial using demonstrative
> exhibits to teach and describe to the finder of fact the technology,
> the products, and the way in which the products are made and will
> also describe each of the alleged trade secrets and items of
> confidential information.

(FPO at 446.)

At the Daubert hearing, Mr. Grossman testified generally about his experience and

observation of the alleged confidential items in companies other than Elastimold and Richards.

He also testified about his experience reverse engineering a compound using a test he developed

in cooperation with Akron Development Labs specifically for this case.  (T1, 156:4-156:18.)  He

stated this test was not previously available, it was no the subject of published materials, and was

not subject to peer review because it was confidential.  Based on this test, he opined that the

rubber compound at issue in this case could be reverse-engineered.

After the hearing, Richards narrowed the areas for which it tenders Mr. Grossman to (1) establishing the reverse-engineerability of T&B's rubber compounding formula; and (2) Bruce Beir's compounding capabilities.  (Richards' Brief in Response to T&B's Supplemental Brief at 15-16.)

### D.    T&B's Expert, Van T. Walworth

The FPO does not summarize Mr. Walworth's testimony, but it is evident from the objections lodged by Richards that he is offered to testify as to the existence of Elastimold's confidential information resident in Richards's facility and processes and that the items at issue are not obvious or commonly used in the industry.

Mr. Walworth's expert report states that he was retained to "offer expert opinion and testimony . . . related to the technical merits of this case, in particular, elements surrounding tooling, molding, product design, and the rubber molding processes at issue."  (Walworth's Expert Report at 2.)  He stated:

> At issue in this case is whether Elastimold's manufacturing processes, practices, materials, and date with respect to high voltage products constitute trade secret and/or confidential and proprietary information.  Also at issue, is whether Richards independently developed a process to manufacture their high voltage products as opposed to misappropriating Elastimold's trade secrets and confidential and proprietary information.  In addition, I have estimated the reasonable amount [sic] time and costs required to develop a process to manufacture high voltage products using proper reverse engineering means.

(Id. at 4.)  The report goes on to define "trade secret" under New Jersey law and the Restatement of Torts, and opines that Elastimold has ten different trade secrets.  (Id. at 4-10.)  He further states that he inspected the facilities of Elastimold and Richards and identified 39 different items

11

of Elastimold's confidential information resident in Richards's facility.  (Id. at 11-13.)  Through

an analysis of the documents in this case and his inspection of the Elastimold and Richards

facilities, Mr. Walworth generally opines that Mr. Luzzi took confidential and trade secret

information from Elastimold and applied it at Richards.  (Id. at 14-32.)

      At the hearing, T&B offered Mr. Walworth as an expert:

> with respect to the issues of what is knowable products [sic] themselves, an examination of physical products, what information is publicly available relative to the trade secrets and confidential information in this case, whether the trade secrets or confidential information are generally known in the rubber industry, the elements, process elements that are resident in both the Elastimold process and the Richards process and as to how elements contained in the Elastimold documents in Richards' possession are also resident in the Richards Manufacturing process.
>
> We offer him on the subject of what is generally done in the rubber molding industry with respect to maintaining secrecy with respect to manufacturing operations, as well as opinions on that subject as to whether Elastimold's efforts were consistent with the industry practices.
>
> We offer him on the issues of reverse engineering, specifically whether Richards did reverse engineer these products, and also on the issue of what it would take to reverse engineer and develop a manufacturing process for these products using proper means.  And finally, on the subject of the transferability of processing plastics, injection molding plastics and how that know-how, if you will, transfers to manufacturing rubber products.

(T2, 82:24-83:24.)  T&B also seeks to offer Mr. Walworth's expert opinion as to whether or not

information that Mr. Luzzi allegedly took with him to Richards is protectible trade secret

information.  (T2, 84:5-14.)

## III.   DISCUSSION

### A.   Testimony Beyond the Scope of the Final Pretrial Order

As an initial matter, the Court notes instances in which the parties apparently sought to

expand the scope of their proposed experts' testimony beyond that preserved in the FPO or their

expert reports.  Rule 16(e), which governs final pretrial orders, provides that a pretrial order

"shall control the subsequent course of the action unless modified by a subsequent order" and

that "[t]he order following a final pretrial conference shall be modified only to prevent manifest

injustice."  The Court of Appeals for the Third Circuit has recognized the role of the FPO:

> Particularly important in complex civil cases such as this, pretrial
> procedures provide the district courts with a useful tool to harness
> unwieldy litigation by simplifying the dispute and narrowing the
> issues for trial. For this reason, pretrial orders bind the parties
> unless modified by the court to prevent manifest injustice.  Fed. R.
> Civ. P. 16(e).

Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 842 F.2d 1466, 1476 (3d Cir. 1988); see also

Basista v. Weir, 340 F.2d 74, 84 (3d Cir. 1965) (holding "a Pretrial Order when entered limits the

issues for trial and in substance takes the place of pleadings covered by the Pretrial order.").  This

case presents a prime example of why Courts must adhere to the bounds of the final pretrial order

to prevent unwieldy litigation.

For example, in the FPO, T&B lists Elastimold's "Matted Finish On The Outside of

Inserts, Which Reduce Scrap And Increase Bonding" as a trade secret and item of confidential

information.  (FPO at 287, 289.)  T&B claims that, "[o]ver the years," Elastimold learned that the

use of a rough surface can "improve both bonding and the elimination of flash" and that it has

implemented techniques to roughen the surface, such as "cryogenic deflashing, buffing with a

wire brush, and the texturing of the mold surface to create a textured surface on the outside diameter of the insert." (Id. at 287.) It claims that Mr. Luzzi misappropriated this information and applied it at Richards in that "Richards wire brushed inserts as part of its initial trials on the insulation molds." (Id.) The FPO makes no mention about Richards copying Elastimold's actual molds or texturing the mold surface to create the textured surface on the insert.

When confronted with the testimony of other witnesses that the bonding characteristics of abraded surfaces, as opposed to smooth surfaces, was a known concept of rubber molding, Mr. Walworth's testimony shifted. He conceded that the properties of abraded versus smooth surfaces could be found in industry literature and, therefore, are commonly known and he adopted the Court's example of a common bicycle tire patch kit. (T2, 168:21-169:18.) He stated, however, that the "primary portion" of the allegedly misappropriated trade secret was not that Richards brushed its inserts but that the trade secret "has to do with putting texture on the mold surface that actually forms the insert to start with, so that the insert has a textured surface on it." (T2, 170:11-16, emphasis added.) The colloquy went on:

> Q.    I see. And so, therefore, the trade secret is not about roughening the surface of the insert. It's about -- you're asserting it's really about using a textured surface?
>
> A.    That's correct.

(T2, 170:17-20.)

This subtle shift represents but one example of the Court's concern. First, the statement that Elastimold learned of the benefits of abraded versus smooth surfaces "[o]ver the years" suggests that this method was developed by, and exclusive to, Elastimold. Yet, at the Daubert hearing, Mr. Walworth conceded that the bonding properties of abraded surfaces was widely

known.  Moreover, T&B's switch from the wire-brush-abraded insert to the abraded mold that creates the insert is exactly the kind of "moving target" testimony that the final pretrial order process proscribes.  The principles underlying the final pretrial order are crucial where, as here, the scope of the claims are broad and complicated.  Such cases are especially susceptible to testimony shifting, as in the above example, surprise on the part of the parties, and confusion to the jury.  At this advanced stage of the litigation, the parties' claims should be sufficiently defined.  Accordingly, all of the witnesses are barred from testifying to issues beyond the scope of what is preserved in the FPO.

Specifically, Mr. Walworth is barred from testifying about the use of an abraded mold, as opposed to a wire brushed insert, in connection with its trade secret and confidential information claim of "Matted Finish On The Outside of Inserts, Which Reduce Scrap And Increase Bonding."  This testimony would be inconsistent with the claim embodied in the FPO and is impermissible under Rule 16.  Given Mr. Walworth's concessions regarding the common use of abraded surfaces in the industry, the Court will consider at the appropriate time whether or not to dismiss this claim.

A comparison of the subjects for which Richards's witnesses were offered to testify, versus those preserved in the FPO, also reveals overreaching.  To that end, Mr. Covill is barred from testifying regarding "the practices in the industry with regard to maintaining security."  (T4, 79:14-15.)  Further, Mr. Koroluk is barred from testifying regarding "the elements of plastic injection molding and which of those elements carry over to rubber injection molding."  (T5, 35:5-7.)  Mr. Hervig is barred from testifying as to what elements of the plastic injection molding industry carry over to rubber injection molding as well as secrecy in the underground electrical

connector industry.  (T5, 151:16-18.)  Mr. Grossman is barred from testifying as to Mr. Beir's

compounding ability.  (See Richards' Brief in Response to T&B's Supplemental Brief at 15-16.)

This proposed testimony exceeds that preserved in the FPO and is, therefore, barred.

**B.    The Standards for Expert Testimony Under Rule 702,**
**        Daubert, and Kumho Tire**

The Court initially notes that much of the expert testimony proposed by each party utterly

lacks that which the Court must evaluate under Daubert and Kumho Tire:  a methodology.  In

large part, the parties seek expert status for their witnesses simply to compare the conduct of the

parties at issue to that of the companies with which they have worked, and make generalizations

based on those observations.  For this reason, and those discussed below, such testimony is

impermissible under Evidence Rule 702.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Rule 702

provides:

> If scientific, technical or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training or education, may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court in Daubert imposed upon district courts the role of a gatekeeper, in

order to "ensure that any and all scientific testimony or evidence is not only relevant, but

reliable."  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).  When "faced with a

proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to

Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. This gatekeeping function of the district court extends beyond scientific testimony to "testimony based on . . . 'technical' and 'other specialized' knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).

Federal Rule of Evidence 702 provides three substantive restrictions on the admission of expert testimony:  qualifications, reliability, and fit. Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000).  The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence. See Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999).

### i.       Qualification

Qualification under Rule 702 requires that the witness possess the requisite "knowledge, skill, experience, training or education" with regard to the subject matter of the testimony for which he or she is offered.  Fed. R. Evid. 702.  The Third Circuit has interpreted the "qualification" requirement liberally and has held that "a broad range of knowledge, skills, and training qualify an expert as such."  In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994).  While liberal in qualifying experts, the Third Circuit has "also set a floor with respect to an expert witness's qualifications."  Elcock, 233 F.3d at 742.  For example, in Aloe Coal Co. v. Clark Equip. Co., 816 F.2d 110 (3d Cir. 1987), the Third Circuit held that a district court abused its discretion in allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire.  The court noted that the salesman was not an engineer, had no experience in designing construction machinery, had no knowledge or experience in determining the cause of

17

equipment fires, had no training as a mechanic, and had never operated construction machinery in the course of business.  Id. at 114 (citations omitted); see also Diaz v. Johnson Matthey, Inc., 893 F. Supp. 358, 373 (D.N.J.1995) (holding a doctor produced to testify about plaintiff's allergic condition and its possible long-term health effects of the condition was not qualified because he had limited experience and knowledge of the literature regarding the illness at issue); Higginbotham v. Volkswagenwerk Aktiengesellschaft, 551 F. Supp. 977, 982-83 (M.D. Pa. 1982) (holding that an investigating officer was not qualified to offer an expert opinion regarding the movement of a person inside a vehicle during an accident because the officer only had minimal training in accident reconstruction, physics, and the movement of bodies); Globe Indem. Co. v. Highland Tank & Mfg. Co., 345 F. Supp. 1290, 1291-92 (E.D. Pa. 1972) (holding that neither an electrical engineer nor an industrial hygienist was qualified to testify as an expert regarding the design of a molasses storage tank where neither had any experience or knowledge in the field of storage tank design).  In short, to be qualified as an expert witness under Rule 702, the witness must demonstrate, through his or her knowledge, skills, training, or education, specialized knowledge that will assist the trier of fact determine a fact in issue.

### ii.     Reliability

702 further requires that the expert's testimony be reliable.  When an expert testifies to "scientific knowledge," the opinions "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  In re Paoli, 35 F.3d at 742 (citing Daubert, 509 U.S. at 590, 113 S.Ct. 2786).  In considering whether there are "good grounds" for the expert's opinions, district courts should look at a series of factors, including:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In re Paoli, 35 F.3d at 742 n.8.  This list "is non-exclusive and . . . each factor need not be applied in every case."  Elcock, 233 F.3d at 746.

As the Supreme Court in Kumho Tire noted, the district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.  A trial court should consider the Daubert factors where they are reasonable measures of the reliability of expert testimony."  526 U.S. at 152.  With regard to non-scientific opinions, the "relevant reliability concerns may focus upon personal knowledge or experience," as opposed to "scientific foundations."  Id. at 150; ProtoComm Corp. v. Novell Advanced Serv., Inc., 171 F. Supp. 2d 473 478-79 (E.D. Pa. 2001).

### iii.    Fit

The final prong requires that the expert testimony "fit" by assisting the trier of fact.  See Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000).  "Admissibility thus depends in part upon 'the proffered connection between the . . . test result to be presented and particular disputed factual issues in the case.'"  Id. (quoting In re Paoli, 35 F.3d at 743).  The "fit" standard does not require plaintiffs to "prove their case twice."  Id.  They need not "demonstrate to the judge by a preponderance of evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that they are reliable."  In re Paoli, 35 F.3d at 744.

Thus, the test does not require that the opinion have "the best foundation" or be "demonstrably correct," but only that the " 'particular opinion is based on valid reasoning and reliable methodology.' " Oddi, 234 F.3d at 146 (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir.1997)).

### C.    The Standard for Lay Opinion Testimony Under Rule 701

Rule 701 provides that lay opinion is admissible if it is (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.  See U.S. v. Polishan, 336 F.3d 234, 242-43 (3d Cir. 2003). With regard to business operations, for example, a witness may testify about "inferences that he could draw from his perception" of a business's records, or "facts or data perceived" by him in his corporate capacity.  Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403, 404 (3d Cir. 1980).  With respect to technical issues, the Court of Appeals for the Third Circuit has permitted individuals who are not qualified as experts, but who possess "experience or specialized knowledge about particular things, to testify about technical matters that might have been thought to lie within the exclusive province of experts."  Asplundh Mfg. v. Benton Harbor Eng'g, 57 F.3d 1190, 1193 (3d Cir. 1995).  Such testimony is only permitted where it is based on the proponent's personal experience and is helpful to the jury.  Id.; Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3d Cir. 1993).  If the witness fails to describe the opinion's basis, through, for example, descriptions of specific incidents, the opinion testimony will be rejected in that it is not based on the witness's perceptions.  U.S. v. Anderskow, 88 F.3d 245, 250 (3d Cir. 1996) (noting that opinion evidence must be "rationally based" on witness's perceptions). Accordingly, "lay opinion evidence concerning the knowledge of a third party is not *per se*

20

inadmissible, [but is] . . . difficult to admit."  Polishan, 336 F.3d at 242.

> **D.** **T&B's Motion to Exclude Messrs. Covill, Koroluk, and Hervig**

T&B moves to bar the testimony of Messrs. Covill, Koroluk, and Hervig regarding whether or not the information at issue is commonly known in the industry.  The Court has concluded that Richards has not demonstrated that any of these witnesses has sufficient experience with a large enough number of companies to substantiate an expert opinion that an item is commonly known.  Defining the "relevant industry" broadly as the rubber molding industry, or more narrowly as the underground connector manufacturing industry, does not affect this conclusion.  The Court lacks evidence of the number of companies with which Richards's witnesses have experience versus the number of companies manufacturing underground connectors.  Thus, the Court cannot find these witnesses qualified to opine on what is common in the industry.  Rule 701 further does not allow such opinion to the extent the witnesses seek to make a generalization about "the industry," however they define that term, because they purport to testify about matters outside their personal experience.

Moreover, there has been insufficient testimony regarding whether or not Richards's witnesses' employers have interposed confidentiality restrictions on what information from their employment can be disclosed.  Assuming they are permitted under the terms of their former or current employment, the Court will allow Messrs. Covill, Koroluk, and Hervig to testify about what they observed in their personal experiences with competing companies, to the extent such information is relevant.  This information may be relevant and helpful to the jury on the issue whether or not a particular process or item is "common knowledge."  They will be barred, however, from giving an opinion, expert or otherwise, as to that conclusion.

21

The Court has already barred testimony regarding security as outside the scope of the FPO.  The Court further notes, however, that even if such testimony was properly preserved, it would find these witnesses unqualified to render expert opinions on this subject.  There has been little, if any, evidence of experience in corporate security such that any of these witnesses could render an expert opinion regarding the security practices of any company and whether or not Elastimold treated the information at issue appropriately.  For this further reason, the Court bars any proposed expert testimony in this regard.  To the extent generalized security and secrecy issues arise in general manufacturing processes with which the witness has personal experience, and assuming the terms of their prior employment permit, these witnesses may testify regarding those personal experiences and what types of security measures they witnessed.

Finally, each of these witnesses is barred from testifying about how long it would take to reverse engineer a particular part.  One recurring theme in the testimony is that the time it would take to reverse engineer an item would depend on the knowledge of those attempting to do it.  No witness has demonstrated a sufficient foundation to opine as to how long it might take Mr. Luzzi, an industry veteran, to reverse engineer any of these products.  Any attempts to guess how long it would take would be speculative would likely mislead and confuse, rather than help, the jury.  Accordingly, any testimony about the length of time it would take to reverse engineer a product is barred.  To the extent these witnesses have relevant experience, they may testify about the general process of reverse engineering, but not about the length of time it would take to reverse engineer the alleged trade secrets and items of confidential information at issue.

In short, Messrs. Covill, Koroluk, and Hervig are barred from giving expert or lay opinions regarding issues of common knowledge in the industry, security matters and whether or

not Elastimold treated the information at issue appropriately, and issues of reverse engineering. These witnesses may provide lay testimony regarding their personal experiences during their employment, to the extent they are permitted under the terms of their employment, and generalized testimony, not opinion, regarding molding processes and operations based upon their personal experience and observations from the properly admitted evidence in this case.

### E.    T&B's Motion to Exclude Mr. Grossman

T&B concedes that Mr. Grossman is qualified to testify as a compounding expert but not as a process engineer.  T&B argues Mr. Grossman cannot provide testimony about whether or not Richards actually reverse-engineered the formula.  (T&B's Supplemental Memo. In support of its In Limine Motions at 16-17.)  T&B further argues Mr. Grossman's testimony about Mr. Beir's capabilities is "classic ipse dixit" in that it represents merely his subjective opinion based on no scientific methodology.  (Id. at 17.)

Richards argues Mr. Grossman's opinion regarding the reverse engineerability of T&B's rubber compound is reliable and founded on personal experience because he in fact reverse-engineered the compound.  (Richards's Supplemental Opposition at 15.)  Richards argues Mr. Grossman's opinion as to Mr. Beir's compounding capability is based on his personal experience and records produced by Richards.  (Id. at 15-16.)

### i.    Rubber Compounding

T&B does not contest Mr. Grossman's expertise as a compounding expert and, based upon his experience and testimony, the Court will allow his testimony as an expert in that area. His compounding testimony will be limited to testimony about the elements of the oil-resistant rubber compound that T&B alleges was misappropriated, the similarities between Elastimold's

and Richards's compounds, and the general process of compound development.

### ii.    "Common Knowledge" in the Industry

Mr. Grossman's testimony with respect to what is common knowledge in the industry shall be limited to facts about things he actually observed. Mr. Grossman purports to support his testimony that some or all of T&B's claimed trade secrets and confidential information are common knowledge, in large part[4], by his experience in calling on various companies in a sales capacity. (See, e.g., T1, 138:11-25.) These observations are insufficient to support an expert opinion that they are indeed common knowledge. Based on his testimony, however, Mr. Grossman appears to have sufficient experience to give general testimony about the nature of the rubber molding business, and about particular practices used at particular places that he has observed, to the extent such facts are relevant.

### iii.    Reverse Engineering

Mr. Grossman opined that the compound that plaintiff claims was misappropriated could be reverse engineered. His method in reaching that conclusion is based upon a test to determine rubber formula that was created and applied to rubber compounds for the first time in connection with this case. (T1, 152:25-154:6.) He testified that his methodology was not subject to peer review or published because it was an innovative method he developed in cooperation with Akron Development Labs that was "confidential." (T1, 156:4-156:18.) Moreover, to the Court's knowledge, this methodology has not been disclosed to the plaintiffs and, therefore, they have not had the opportunity to test its reliability. Mr. Grossman could not opine whether or not a

---

[4]Mr. Grossman further relies upon his observation and operation of one injection molding machine at a trade show. (T1, 139:4-8.)

compound is easily reverse engineerable and, with respect to how long it would take, he stated "[i]t would actually depend on who's working with me." (T1, 185:19-20.) Thus, the Court cannot determine – through peer review, literature, etc. – that Mr. Grossman's methodology in reaching his conclusion about reverse engineering is reliable under its Daubert/Kumho Tire analysis. Accordingly, Mr. Grossman's proposed expert testimony regarding the reverse engineerability of the rubber compound is barred.

### iv.     Mr. Beir's Expertise

While the Court has already barred Mr. Grossman's testimony regarding Mr. Beir's compounding abilities, it would also bar this testimony under Daubert and Kumho Tire. Mr. Grossman conceded there is no objective test by which to measure Mr. Beir's abilities. (T1, 177:21-178:13.) He further conceded that he did not know about Mr. Beir's affiliation with industry organizations or educational background. (T1, 178:25-179:6.) He stated that he evaluated Mr. Beir and based his conclusions on criteria that he made up.[5] (T1, 179:2-12.) In this regard, the Court agrees with the plaintiff's that his opinion with respect to Mr. Beir is "ipse

---

[5]In addition, Mr. Grossman stated:

> I think Bruce Bier is an intelligent man with a lot of experience in the field and good retention; also that he keeps up with the literature supplied from ingredients suppliers and is aware of current developments and when we work together, which is on more than one occasion, we work together on new products. I think that it was a very satisfactory relationship and that we were able to develop, for example, the sulfa-cured EPDM low-voltage compound which actually at that time was quite a remarkable compound cooperatively, with his input as well as mine.

(T1, 186:17-187:2.) Mr. Grossman has offered no foundational evidence that might qualify him to make expert assessments of one's intelligence and ability to retain information.

dixit." Although Mr. Grossman could testify as a fact witness to his experiences with Mr. Beir, he cannot make an opinion in an expert capacity as to his abilities. The Court can discern no standard or methodology by which Mr. Grossman reaches his conclusions about Mr. Beir. For this further reason, any proposed expert testimony by Mr. Grossman regarding Mr. Beir is barred.

### E.    Richards's Motion to Exclude Mr. Walworth

Richards argues Mr. Walworth's opinions are unreliable and unhelpful for a panoply of reasons. Most notably, it argues Mr. Walworth is not qualified to testify as to any of the issue for which he is offered because he lacks experience in the underground electrical connector manufacturing industry. In response, T&B argues the relevant industry is the rubber molding industry in general.

While the Court need not categorically define the relevant industry, it notes that the law of trade secrets is intended to promote fairness among competitors. Indeed, Elastimold's alleged damages consist, in large part, of the value of the loss of the Con Edison contract to manufacture high-voltage electrical connectors to its competitor, Richards. (PTO at 353.) Richards argues against T&B's allegations of misappropriation by seeking to prove the allegedly confidential information is commonly known among its competitors, namely companies that make underground connectors. Showing that non-competing companies use such information would, of course, be irrelevant to whether or not it is known in the industry in which the parties compete. Conversely, showing that the information is not used, for example, in the manufacturing of the rubber soles for shoes does not tend to prove that such information is not commonly known in the industry in which the parties compete. Accordingly, the relevant inquiry – whether or not the information at issue is commonly known in the industry – must be directed to the parties'

competitors.

Mr. Walworth's lack of experience in the industry in which the parties compete is problematic in view of the issues for which his testimony is offered.  T&B tenders his expert testimony on the following issues:  (1) what is knowable from the products themselves, (2) an examination of physical products, (3) the process elements that are resident in both Elastimold's and Richards's facilities and how information in Elastimold documents are also resident in the Richards manufacturing process; (4) what is generally done in the "rubber molding" industry with respect to maintaining secrecy in manufacturing operations, and opinions as to whether Elastimold followed such practices; (5) issues of reverse engineering, such as whether or not Richards reverse engineered Elastimold's products and what it would take to reverse engineer and develop a manufacturing process for the products at issue; (6) the transferability of processes regarding injection molding plastics to manufacturing the products at issue (see T2, 82:24-83:24); and (7) whether or not information that Mr. Luzzi allegedly took with him to Richards is protectible trade secret information (id. at 84:5-14).

At the hearing, Mr. Walworth testified that, before T&B retained him in this case, he had no experience in the underground electrical connector industry, the molding of products within that industry, the parties' competitors (including their facilities, practices, and products), the products at issue in this case or their function.  (T2, 85:1-87:9.)  Nor had Mr. Walworth ever seen documents that related to the products at issue.  (Id., 99:13-20.)  Mr. Walworth stated he never tested for similarities between Elastimold's and Richards's products (id., 89:21-90:3), and he was unable to determine the purpose of, or make inferences from, certain features of the products (id., 72:11-73:12).  An example of his unfamiliarity with the allegedly confidential information at

27

issue was Mr. Walworth's lack of experience with "injection ports," an item of confidential information that T&B alleges was misappropriated.  He stated that "[p]rior to this case, [he] had never done any work related to injection ports."  (Id., 128:4-5.)  Given his lack of experience in the narrow field in which the parties compete, the Court finds that Mr. Walworth is not qualified to offer expert testimony regarding the issues in this case.

Even if Mr. Walworth had been qualified to render the expert opinions for which he is tendered, the Court is unsatisfied that his methodology adequately insures their reliability.  For example, Mr. Walworth opined that the information at issue is not generally known in the industry.  He based this conclusion, in part, on a search of "the body of literature that is generally relied upon by people in the rubber industry to see what was produced in those books."  (Id., 60:1-3.)  This "body of literature" consisted of books and papers regarding the molding of rubber products in general (id., 61:7-23) that he maintained in his personal library (id., 62:10-14).  Nothing in the record, however, shows that Mr. Walworth's personal library is broad enough to include a sufficient sample of the processes and information regarding injection molding processes within the rubber molding industry.  Moreover, even if his library did contain an adequate sample of the literature on "rubber molding," the fact Mr. Walworth did not find the information at issue is not probative regarding whether or not it is generally known within the specialized segment of the rubber molding industry in which the parties compete.  Given the lack of evidence regarding its breadth, Mr. Walworth is barred from testifying about his search of the literature.

Mr. Walworth is further barred from testifying about what is generally done in the rubber molding industry with respect to maintaining secrecy in manufacturing operations and whether or

not Elastimold's efforts were consistent with the industry practices.  It is not clear from the testimony that Mr. Walworth's experience qualifies him to provide expert testimony on issues of corporate security and secrecy.  Moreover, as discussed above, what is done generally in the rubber molding industry is not necessarily material to what is done among the competitors in the market in which the parties compete.  Stated differently, his testimony and expertise does not "fit" the issues in this case.  Relatedly, given his lack of knowledge and experience within this market, Mr. Walworth is not qualified to opine regarding security issues within the parties specific industry segment.  Thus, his testimony about what is done in the "rubber molding industry" is not helpful to the jury and will be barred.

Mr. Walworth is further barred from testifying as to the transferability of plastic injection molding techniques to rubber molding.  His testimony regarding runner shut off valves, in particular, casts grave doubt upon his overall reliability.  In its supplemental response to Richards's Interrogatory Number 10, T&B listed examples of ways in which Richards allegedly used its proprietary information, including the "[u]se of specific Elastimold runner shut off devices in cable adapter molds . . . ."  (T&B's September 22, 2003 Supplemental Responses to Richards's Interrogatory Number 10, at 6.)  When confronted with the language of T&B's supplemental interrogatory response at the <u>Daubert</u> hearing, Mr. Walworth stated "I probably should have said the <u>specific use</u> of Elastimold's runner shut off . . . ."  (T3, 147:23-148:4, emphasis added.)  He testified that runner shut off valves are widely and effectively used in the plastics industry[6] (T3, 43:16- 44:8; 53:11-23) and that they are used for rubber molding but do

_____

[6]Indeed, Mr. Walworth testified in his 14 to 15 years of teach teaching at the University of Wisconsin, the topic of runner shut off valves come up in every class and that "a lot of people have tried them."  (T3, 45:21-7.)

not work as well as they do for plastic molding (id., 44:1-8, 45:22-46:7).  He stated that

Elastimold does not claim the general concept of a runner shut off valve as an item of

confidential information (id., 46:24-47:3) but rather that it has developed a specialized way of

using a runner shut off valve that makes it successful in rubber molding and that specialized use

is confidential (id.).

When asked to describe Elastimold's specialized use of runner shut off valves, however,

Mr. Walworth responded "[i]t was not employed by Richards so I did not disclose it in here . . . ."

(Id., 54:4-12.)  He conceded that Richards did not use Elastimold's specialized method, but

rather the same runner shut off valve that was widely known in the plastics industry, used

without much success in the rubber molding industry, and which, in his opinion, should not have

worked.  (Id., 57:2-14.)  His testimony continued as follows:

> THE COURT:      So, as I understand your testimony, the same
>
>                 basic plastic runner shutoff device that other
>
>                 rubber molders have tried in the past, in your
>
>                 experience, was what Richards used?
>
> THE WITNESS:    That's correct.
>
> THE COURT:      And not the Elastimold runner shutoff
>
>                 device?
>
> THE WITNESS:    That is correct.
>
> THE COURT:      Okay.

(Id., 57:15-23.)

T&B's shift in theory from the "specific Elastimold runner shut off devices" described in

its interrogatory answers to the "specialized use" of common runner shut off devices presents

another example of its "moving target" theories.  Moreover, Mr. Walworth's reluctance to

disclose the specialized nature of T&B's allegedly confidential method because "it was not

employed by Richards," and his statement that Richards used the same runner shut off device that

other rubber molders have used, seriously undermines T&B's claim that Richards

misappropriated this confidential information.  In short, this testimony does not support T&B's

position and would not assist the jury.  For this further reason, the expert testimony for which

Mr. Walworth is offered is barred.  The Court will consider whether or not to dismiss T&B's

claim with respect to runner shut off valves at the appropriate time.

 Mr. Walworth is further barred from providing an opinion, lay or expert, as to whether or

not the items at issue in this case are, as a general matter, trade secrets or confidential.  Generally,

experts may not testify on issues of law.  Casper v. SMG,  389 F. Supp. 2d 618, 621 (D.N.J.

2005); Whitmill v. City of Philadelphia, 29 F. Supp. 2d 241, 246 (E.D. Pa. 1998) (quoting United

States v. Bilzerian, 926 F.2d 1285, 1294 (2nd Cir.1991) and holding "an expert's testimony on

issues of law is inadmissible.").  The Court recognizes that an expert's opinion may "embrace[]

an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704(a).  That issue, however,

must be a factual one, rather than a legal one.  See, e.g., Berry v. City of Detroit, 25 F.3d 1342,

1353 (6th Cir. 1994) (holding that expert could testify that discipline procedures in defendant

police department was lax, but not that the lax policies indicated that the city was "deliberate

indifferent" to the welfare of its citizens); Whitmill, 29 F. Supp. 2d at 246 (holding expert's

opinion that "this was not a proper Terry stop" was a matter for the jury to decide after proper

instruction from the court and, therefore, an inadmissible expert opinion).  Whether or not the

claimed information is "trade secret" or "confidential" information under New Jersey law is an issue that the jury must decide by weighing the evidence presented and applying the law as the Court instructs.  Mr. Walworth's opinions on these issues constitute testimony on issues of law and are, therefore, inadmissible.

Even assuming Mr. Walworth's testimony could be seen as simply "embracing" a factual issue for the jury, it would not assist the jury given his lack of expertise in the specific area for which he offers his testimony.  Moreover, aside from his dubious research efforts, the Court notes that, in considering whether or not Richards misappropriated T&B's trade secrets, Mr. Walworth did not examine any of Richards's processes in the development of its products before Mr. Luzzi commenced working for the company.  (T2, 160:19-161:9.)  Mr. Walworth's colloquy with the Court went as follows:

> THE COURT:        I don't understand.  Did you purport to be examining what Richards had done in prior development of its product lines in different areas apart from these elbows?
>
> THE WITNESS:        I wasn't shown any of those things.
>
> THE COURT:        Okay.  So, in short, if they were using, in the course of manufacturing other products which are not the subject of this lawsuit, various of these particular techniques or procedures, that would not have been within the purview of the scope of your examination.  Is that my understanding?
>
> THE WITNESS:        That's correct.
>
> THE COURT:        Okay.  Therefore, you would not have been in a position to know whether or not they were or were not using those techniques.
>
> THE WITNESS:        That is correct.

(Id. at 160:19-161:9.)  In short, Mr. Wahlworth's testimony, at best, relates to a mixed question

of law and fact, using his own self-defined parameters as a methodology.  For these further

reasons, any opinion by Mr. Walworth as to whether or not the information at issue in this case is

trade secret and confidential information is unreliable, unhelpful to the jury, and will be barred.

Further, for the reasons set forth above in connection with Messrs. Covill, Koroluk, and

Hervig, Mr. Walworth may not opine as to how long it might take to reverse engineer any of the

alleged trade secrets or items of confidential information.  First, the Court notes that Mr.

Walworth has never reverse engineered an underground electrical connector.  (T2, 146:10-14.)

Second, his testimony does not account for the extent to which Mr. Luzzi's legitimate, non-

confidential expertise could speed the reverse engineering process for him, as opposed to others

who do not have such experience in this particular market.  For these reasons, and considering

his general lack of experience with the specific products and industry at issue, the Court cannot

find his opinion reliable.  Accordingly, any opinion in this regard would be speculative and is

barred.

Nor may Mr. Walworth convey these opinions as a "lay opinion" witness under Rule 701.

 Such testimony must be based on the witnesses own experience, helpful to the jury, and the

proponent of the testimony must show the requisite "experience or specialized knowledge about

[the] particular things" to which he is testifying.  Asplundh Mfg., 57 F.3d at 1193.  For the

reasons set forth above, the Court concludes that Mr. Walworth's testimony regarding the issues

for which he is tendered is would not help the jury.  Moreover, under Asplundh, he does not

possess the requisite specialized knowledge of molding processes within the industry in which

the parties compete.

Mr. Walworth's testimony shall be limited to general concepts within the rubber molding

industry, his personal observations of Elastimold's and Richards's processes, and his observations of the materials in this case such as design drawings, only to the extent such evidence is properly admitted.  Stated differently, he may testify only as to the extent to which he observes similarities between T&B's manufacturing and design elements and Richards's, and the extent to which he observes such similarities in the documents that are in evidence.  He may not give an opinion as to whether or not they are the same or whether or not they were stolen.  Mr. Walworth may further give generalized testimony regarding the process of reverse engineering through examples of his own personal experience, to the extent it is relevant.

## IV.   CONCLUSION

For all of the foregoing reasons, the witnesses are barred from testifying to issues beyond the scope of what is preserved in the final pretrial order, to wit:

1.    Mr. Walworth is barred from testifying about the use of an abraded mold, as opposed to a wire brushed insert, in connection with T&B's trade secret and confidential information claim of "Matted Finish On The Outside of Inserts, Which Reduce Scrap And Increase Bonding";

2.    Mr. Covill is barred from testifying regarding "the practices in the industry with regard to maintaining security";

3.    Mr. Koroluk is barred from testifying regarding "the elements of plastic injection molding and which of those elements carry over to rubber injection molding";

4.    Mr. Hervig is barred from testifying as to what elements of the plastic injection molding industry carry over to rubber injection molding, and issues involving secrecy in the underground electrical connector industry; and

34

5.      Mr. Grossman is barred from testifying as to Mr. Beir's compounding ability.

T&B's Motion to Bar the Expert Reports and Testimony of Richards's proposed experts Lloyd Covill, Walter Koroluk, Harold Hervig, and Arthur Grossman [Docket Entry No. 75] is **GRANTED IN PART**, to wit:

1.      Messrs. Covill, Koroluk, and Hervig are barred from giving expert or lay opinions regarding issues of common knowledge in the industry, security matters and whether or not Elastimold treated the information at issue appropriately, and issues of reverse engineering;

2.      These witnesses may provide lay testimony regarding their personal observations during their employment, to the extent they are permitted under the terms of their employment, and generalized testimony regarding molding processes, operations, and reverse engineering based upon their personal experience, and observations from the properly admitted evidence in this case;

3.      Mr. Grossman is hereby granted expert status under Rule 702, insofar as plaintiffs concede such status, on the limited issue of rubber compounding;

4.      Mr. Grossman's testimony with respect to what is common knowledge in the industry shall be limited to lay opinion testimony about facts and things he has actually observed;

5.      Mr. Grossman's proposed lay or expert testimony regarding the reverse engineerability of the rubber compound at issue in this litigation and any proposed expert testimony or lay opinion testimony regarding Mr. Beir is barred; and

35

Richards's Motion to Bar the Expert Report and Testimony of T&B's proposed expert, Van T. Walworth [Docket Entry No. 93], is **GRANTED**, to wit:

1.      Mr. Walworth is barred from giving lay or expert testimony with regard to (a) what is commonly known in the "rubber molding industry," (b) what is generally done in the "rubber molding" industry with respect to maintaining secrecy in manufacturing operations, and whether Elastimold's efforts were consistent with such practices; (c) whether or not Richards reverse engineered Elastimold's products and what it would take, or how long it would take, to reverse engineer and develop a manufacturing process for the products at issue; (d) the transferability of processes regarding injection molding plastics to manufacturing the products at issue; and (e) whether or not information that Mr. Luzzi allegedly took with him to Richards is protectible trade secret information; and

2.      Mr. Walworth's testimony shall be limited to his observations from the parties' products, manufacturing processes, and documents that were properly admitted into evidence; general manufacturing concepts within the rubber molding industry; and general concepts regarding the process of reverse engineering through examples of his own personal experience, to the extent they are relevant.

Date: April 3, 2006

                                   s/  Stanley R. Chesler
_____
                                   United States District Judge

36