**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                          :
THOMAS & BETTS CORPORATION,               :
                                          :
                    Plaintiff,            :       Civil Action No. 01-4677 (SRC)
                                          :
            v.                            :       **OPINION**
                                          :
RICHARDS MANUFACTURING CO.,               :
et al.,                                   :
                                          :
                    Defendants.           :
_____ :

**CHESLER, U.S.D.J.**

This matter comes before the Court on three motions: 1) Defendants Richards

Manufacturing Company and Glenn Luzzi (collectively, "Richards") move for partial summary

judgment, pursuant to FED. R. CIV. P. 56; 2) Plaintiff Thomas & Betts Corporation ("T&B")

cross-moves to strike parts of the motion and certain evidence; and 3) Richards moves to exclude

the Walworth declaration.  For the reasons stated below, the cross-motion to strike and the

motion to exclude will both be **GRANTED IN PART** and **DENIED IN PART**.  The motion for

partial summary judgment will be **GRANTED**.

## BACKGROUND

This case arises from a dispute concerning allegations of misappropriation of trade secrets

and confidential information relating to the design and manufacture of certain high-voltage

electrical connectors.  The background is discussed in greater detail in this Court's previous

Opinions.

Briefly, the following are undisputed facts.  This case involves four broad categories of high-voltage electrical connector products: I-joints, Y-joints, H-joints, and elbows.  The joints connect sets of cables, while an elbow terminates a single cable at a switch or transformer.  Final Pretrial Order ("FPO") 14, 16.  The joints are connected to cables in combination with sleeves.  FPO 13.  The sleeve consists of three main parts: an insert, an insulating layer, and an outer jacket.  FPO 52.  T&B refers to a sleeve as a "BSR."  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 62.)  T&B refers to an elbow as a "BLR."  (Walworth 2006 Dec. ¶ 11(f).)

Glenn Luzzi ("Luzzi") was employed by Elastimold, a division of Thomas & Betts Corporation, for approximately 20 years.  FPO 14.  For several years, Luzzi had design responsibility for the 600-amp connector line.  Id.  During the last six years of employment with Elastimold, Luzzi served as Director of Engineering.  Id.

In 1978, Luzzi had signed the "Non-Competition, Invention, and Secrecy Agreement."  FPO 15.  T&B released Luzzi from only the non-compete restriction of this Agreement.  FPO 18.  In 1996, Luzzi signed the "Employment Proprietary Information and Invention Agreement."  (Def.'s Reply to T&B's Stmt. Addl. Facts ¶ 29.)  Luzzi left Elastimold at the end of the second week of January of 1999 and went to work for Defendant Richards Manufacturing Company the following Monday.  Id.

Before 1999, Richards had never used injection molding to manufacture a product.  Id.  Prior to Luzzi's employment change, Elastimold was the only company that manufactured the I, Y or H components at issue.  (Def.'s Reply to T&B's Stmt. Addl. Facts ¶ 24.)  Other companies manufactured elbow connectors, but none manufactured connectors with an oil-resistant jacket.  Id.  Prior to 1999, Richards had manufactured a high-voltage molded connector for Consolidated

Edison ("Con Ed"), but not using an injection molding process.  FPO 18.

Con Ed is the largest purchaser of the products in question.  (Def.'s Reply to T&B's Stmt. Addl. Facts ¶ 25.)  Before 1999, Con Ed had approached Richards to discuss Richards' becoming a second source for the products at issue.  Id. at ¶ 35.  Richards states that it began selling sleeves to Con Ed in 2000.  (Defs.' 56.1 Stmt. ¶ 211.)

It is undisputed that Luzzi had at his home approximately six hundred pages of Elastimold documents pertaining to the design and manufacture of Elastimold products; T&B calls these the "Closet Documents."  The parties dispute the source of these documents, with T&B contending that Luzzi took them from Elastimold during employment, and Richards contending that it provided many of these documents to Luzzi after he became employed with them.

The entire procedural history of this litigation need not be reviewed here, but the decision on the instant motion relies considerably on two previous Opinions.  On October 7, 2005, this Court denied Richards' previous motion for partial summary judgment.  This Court examined the Confidentiality Agreements at issue and held that, while they were overly broad, this Court would "blue pencil" them and "deem protected only that information in which T&B has a legitimate secrecy interest."  (Opinion of October 7, 2005 at 8.)  The Court then set forth a four-factor standard which it would use to determine whether T&B had this legitimate secrecy interest in particular items of information.  (Id. at 9-14.)  The Court denied the motion without prejudice and directed the parties, if the motion was renewed, to marshal the evidence and apply this four-factor standard.  (Id. at 14.)  The instant motion is thus Richards' renewed motion for summary judgment, and the parties have briefed the motion to comply with the Court's directive.

On April 4, 2006, after five days of hearings, the Court issued its Opinion on a group of motions relating to evidentiary issues (the "Daubert Opinion").  This Court ruled on the admissibility of particular testimony from proposed experts Walworth, Covill, Koroluk, Hervik, and Grossman.

On September 8, 2006, Richards filed the instant motion.  T&B cross-moved to strike both certain parts of the motion, contending that they are outside the scope of this Court's authorizing Order of August 1, 2006, as well as certain pieces of evidence, contending they are inadmissible under the Daubert Opinion.  Richards then moved to exclude the most recent Walworth declaration, contending it was inadmissible under the Daubert Opinion.

## LEGAL STANDARD

### I.  Summary Judgment

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show

4

affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex,

477 U.S. at 322-23).

## II.    Misappropriation of trade secrets

Under New Jersey law, a plaintiff must establish six elements of a claim for

misappropriation of trade secrets:

> (1) a trade secret exists; (2) the information comprising the trade secret was
> communicated in confidence by plaintiff to the employee; (3) the secret
> information was disclosed by that employee and in breach of that confidence; (4)
> the secret information was acquired by a competitor with knowledge of the
> employee's breach of confidence; (5) the secret information was used by the
> competitor to the detriment of plaintiff; and (6) the plaintiff took precautions to
> maintain the secrecy of the trade secret.

Rycoline Prods. v. Walsh, 334 N.J. Super. 62, 71 (N.J. Super. Ct. App. Div. 2000).  The instant

motion for partial summary judgment concerns the first element, whether a trade secret exists.

To determine whether a trade secret exists, New Jersey has adopted the definition set

forth in the Restatement of Torts: "A trade secret may consist of any formula, pattern, device or

compilation of information which is used in one's business and which gives him an opportunity

to obtain an advantage over competitors who do not know or use it." Rohm & Haas Co. v. Adco

Chemical Co., 689 F.2d 424, 431 (3d Cir. 1982) (quoting Restatement of Torts § 757 comment b

(1939)).  A trade secret must "be the secret of a particular employer and not a matter of general

knowledge in the industry." Id.  The party asserting the trade secret bears the burden of proving

that the information is a secret of a particular employer and not a matter of general knowledge in

the industry.  Id. at 432.

6

The New Jersey Supreme Court has noted six supplementary considerations that are given in the Restatement:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 637 (N.J. 1988).  The Court has described these as "additional considerations that we find useful."  Hammock by Hammock v. Hoffmann-Laroche, 142 N.J. 356, 384 (N.J. 1995).

The New Jersey Supreme Court has quoted approvingly the Third Circuit's position on reverse engineering: "information that is in the public domain or which has been 'reverse engineered,' – i.e., garnered by beginning with the finished product and determining the process used to manufacture it – cannot be protected as trade secrets."  Hammock by Hammock v. Hoffmann-Laroche, 142 N.J. 356, 384 (N.J. 1995) (quoting Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989)).

To establish the existence of a trade secret under New Jersey law, then, a plaintiff must establish four elements: 1) subject matter (formula, pattern, device or compilation of information); 2) which is used in plaintiff's business; 3) giving an advantage over competitors who do not know or use it; and 4) which is not a matter of general knowledge in the industry.  In the analysis that follows, these are referred to as the four trade secret elements.  A defendant may counter such a showing by demonstrating reverse engineering.

**III.    Protection of confidential information in which there is a legitimate secrecy interest**

New Jersey law recognizes that employers may protect themselves contractually from the

misappropriation of trade secrets and other confidential information.  Ingersoll, 110 N.J. at 635-

36; Whitmyer Bros. Inc. v. Doyle, 58 N.J. 25, 33 (1971).  The enforceability of any post-

employment restrictive covenant depends, however, upon its reasonableness under the

circumstances.  Under New Jersey's Solari/Whitmyer test, such a covenant is reasonable where

it: (1) is reasonably necessary to protect the employer's legitimate interest, (2) causes no undue

hardship on the employee, and (3) does not impair public interest.  Whitmyer Bros., 58 N.J. at

32-33; Solari Indus., Inc. v. Malady, 55 N.J. 571, 576 (1970).

In the Amended Opinion of October 7, 2005, this Court found that, while the

Confidentiality Agreements were overly broad, it would "blue pencil" them and enforce them to

the extent reasonable under the circumstances, deeming protected only that information in which

T&B has a legitimate secrecy interest.  (October 7, 2005 Am. Op. 6-8.)  Examining New Jersey

law, this Court identified the standard by which it would determine whether information was

protectible, and set forth four factors to be considered in the decision to find a contractually

protectible interest in confidential information:

> (1) the degree to which the information is generally known in the industry; (2) the
> level of specificity and specialized nature of the information; (3) the
> employer/employee relationship and circumstances under which the employee
> was exposed to the information; and (4) whether or not the information is
> "current."

(October 7, 2005 Am. Op. 11.)  Among these four factors, the first is essential, since "matters of

general knowledge within the industry may not be classified as trade secrets or confidential

information entitled to protection . . ."  Whitmyer, 58 N.J. at 33-34.  Even when the New Jersey

Supreme Court expanded protection beyond the scope of <u>Whitmyer</u> in <u>Ingersoll-Rand</u>, it

continued to require that information be "not generally known in the industry" to be eligible for

protection:

> We agree with Ingersoll-Rand that the protection afforded by holdover agreements
> such as the one executed by the parties in this lawsuit may under certain
> circumstances exceed the limitation of trade secrets and confidential information.
> We recognize that employers may have legitimate interests in protecting
> information that is not a trade secret or proprietary information, but highly
> specialized, current information not generally known in the industry, created and
> stimulated by the research environment furnished by the employer, to which the
> employee has been 'exposed' and 'enriched' solely due to his employment. We do
> not attempt to define the exact parameters of that protectable interest.

<u>Ingersoll-Rand</u>, 110 N.J. at 638.  Thus, even when extending protection most broadly, the New

Jersey Supreme Court required that information be not generally known in the industry before

finding a protectible interest.

## **DISCUSSION**

**I.**      **Plaintiff's cross-motion to strike**

T&B first asks this Court to strike the motion for partial summary judgment as to the four

original trade secrets because they are not within the scope of this Court's scheduling Order of

August 1, 2006, which stated: "Defendants may file one Rule 56 motion concerning the six trade

secrets and ninety items of confidential information which were the subjects of [two rulings] . . ."

T&B contends, correctly, that the four original trade secrets are not included within the literal

scope of that sentence.  This Court does not find any justification, however, for adopting T&B's

restrictive and literal reading of what was an ordinary scheduling order.

The problem with T&B's position is that it appears to be purely formal, lacking any

underlying rationale.  T&B does not argue that, at this stage of this litigation, this Court intended

9

to bar Defendants from moving for summary judgment as to the other four trade secrets. Nor does T&B even argue that it will suffer prejudice if this Court considers the motion for partial summary judgment as to any of the four trade secrets considered in the Opinion of January 12, 2004. In this context, it seems wasteful and inefficient to refuse consideration of issues that both parties have gone to considerable time, effort, and expense to fully brief, solely because a scheduling order said six trade secrets rather than ten.

Furthermore, there is no merit to T&B's contention that, as to the four trade secrets, Richards' motion is tantamount to an untimely motion for reconsideration of this Court's Opinion of January 12, 2004. Significantly, T&B does not contend that this Court decided particular issues in that Opinion which now bind it as the law of the case. Rather, T&B merely takes the untenable position that, if the Court found that material factual disputes precluded summary judgment in 2004, it must do so again in 2007. T&B provides no law to support its position that a denial of one motion for partial summary judgment precludes making a second after development of the evidentiary record. Nor does the language of FED. R. CIV. P. 56(a), which permits a party to file a summary judgment motion "at any time after the expiration of 20 days from the commencement of the action," support T&B's attempt to prevent Richards from proceeding accordingly.

It is quite possible for factual issues to preclude summary judgment based on one argument, but not on another. In the Opinion of January 12, 2004, the Court denied partial summary judgment as to the rubber formula, for example, because the evidence showed conflicting expert opinions as to the "reverse engineerability" of the formula. (Opinion of January 12, 2004 at 9.) That decision does not preclude a different outcome for the instant

motion, based on the current record and the parties' present arguments.   As to the motion for

partial summary judgment on the four original trade secrets, T&B's cross-motion to strike will be

denied.

      T&B next moves to strike certain testimony from Richards' experts, contending that it is

inadmissible under the Daubert Opinion.   First, T&B argues that Defendants have offered no

evidence that the experts' former employers have permitted them to disclose the information they

have offered.   T&B here alludes to the following language in the Daubert Opinion: "These

witnesses may provide lay testimony regarding their personal observations during their

employment, to the extent they are permitted under the terms of their employment . . ."  (Daubert

Opinion at 35.)   T&B interprets this language as setting a condition for finding such testimony

admissible.   In response, Richards first contends that T&B has misconstrued the Daubert

Opinion, but T&B's interpretation, in fact, conforms to what this Court meant and wrote.

      Richards argues as well that it has presented evidence that satisfies the Daubert Opinion's

requirements for admission of the personal observation testimony; T&B contends that this

evidence is insufficient to provide a basis for admission.   As will be seen in the analysis that

follows, this Court need not decide this evidentiary question to rule on the motion for partial

summary judgment.   The main issue in the motion for partial summary judgment is whether the

information qualifies as a trade secret or as protectible confidential information, and T&B bears

the burden of proof at trial.   To defeat Richards' motion for summary judgment, T&B must

"provide[] sufficient evidence to allow a jury to find in its favor at trial." Gleason, 243 F.3d at

138.  The summary judgment decision turns on T&B's evidence, not Richards'.   As to this expert

testimony, T&B's cross-motion to strike will be denied without prejudice.

Second, T&B moves to strike that expert testimony which is contrary to this Court's Daubert decision that "Covill, Koroluk, and Hervig are barred from giving expert or lay opinions regarding issues of common knowledge in the industry . . ." (Daubert Opinion at 35.)  In response, Richards contends that their experts do not give any opinions regarding issues of common knowledge in the industry.  This is incorrect.  See, e.g., Covill Expert Report ¶ 14 ("Thus, based on my experience, in my opinion the use of flip pins such as those used by Richards is well known and commonly used in the rubber molding industry.")  The Court will strike those portions of the opinion evidence of Covill, Koroluk, and Hervig that are inadmissible under the Daubert Opinion.  As to this evidence, T&B's cross-motion to strike will be granted.

Lastly, T&B asks that the Court exclude those portions of the Luzzi declaration in which he states opinions that certain items at issue are disclosed in certain patents.  The Court need not decide this issue because, as will be seen in the discussion which follows, Luzzi's opinions about patents are not needed to decide the instant motion for summary judgment.

As explained above, T&B's cross-motion to strike will be granted in part and denied in part.

## II.    Defendant's motion to exclude the Walworth 2006 Declaration

Defendants move to exclude the Walworth 2006 Declaration.  This motion does not need detailed treatment, as it is a matter of applying this Court's Daubert Opinion to the declaration in question.  In the Daubert Opinion, this Court set forth in detail the limits on Walworth's testimony.  While this Court found certain subjects of testimony to be inadmissible, it allowed others:

Mr. Walworth's testimony shall be limited to his observations from the parties'

12

> products, manufacturing processes, and documents that were properly admitted
> into evidence; general manufacturing concepts within the rubber molding
> industry; and general concepts regarding the process of reverse engineering
> through examples of his own personal experience, to the extent they are relevant.

(Daubert Opinion at 36.)

The Walworth 2006 Declaration contains a mix of admissible and inadmissible statements, but this Court need not examine it and sift through it in detail in order to decide the motion for partial summary judgment. This Declaration plays a very minor role in the decision that follows. As will be seen in the supporting analysis, the case turns on the evidence of the degree to which the claimed information is generally known in the industry. In the Daubert Opinion, this Court ruled: "Mr. Walworth is barred from giving lay or expert testimony with regard to (a) what is commonly known in the 'rubber molding industry.'" (Daubert Opinion at 36.) Walworth is thus barred from giving testimony on the issue on which the motion for partial summary judgment turns. This Court has considered the Walworth 2006 Declaration only insofar as it states Walworth's direct observations of the parties' products and documents, and these are admissible under the Daubert Opinion. Defendants' motion to exclude the Walworth 2006 Declaration will thus be granted in part and denied in part. Insofar as the Walworth 2006 Declaration contains statements that are inadmissible under the Daubert Opinion, such statements will be excluded.

## III.    Defendants' motion for partial summary judgment

In moving for partial summary judgment, Richards seeks three things: 1) a determination that Defendants independently developed certain alleged trade secrets and items of confidential information; 2) a determination that certain items of information are not protectible either as

13

trade secrets or as confidential information; and 3) a continuance of the November 13, 2006 trial date.

Before discussing particular items of information, T&B discusses general aspects of its case, including the four factors in the standard under which this Court will determine whether T&B has a protectible interest in particular confidential information. (T&B Opp. Br. 31-37.) T&B contends that there is evidence which is relevant generally to the four factors for all its items of confidential information. What it offers, however, is a mix of argument and evidence that supports few general inferences applicable to all the items of confidential information.

As to the first factor in this Court's four-factor standard, the cited portions of the deposition testimony of Jeffrey Bier (Jeffrey Bier Dep. 51:21-52:4, Robertson Cert. Ex. 13) and the deposition testimony of Bruce Bier (Bruce Bier 2002 Dep. 30:25-33:21, Robertson Cert. Ex. 14) do not support general inferences applicable to all the items of confidential information at issue in this motion. The cited portion of the Borgstrom declaration addresses particular patents and is quite item-specific; it does not support general inferences applicable to all the items of confidential information at issue in this motion. (Borgstrom 2006 Decl. ¶¶ 45-76.) The remaining bullet points under the first factor present argument, not evidence. As to the first factor, the degree to which the information is generally known in the industry, T&B has not presented evidence that supports general inferences applicable to all the items of confidential information at issue in this motion.

Neither the second factor, the level of specificity and specialized nature of the information, nor the fourth factor, whether or not the information is current, lend themselves to general statements about all 34 items of information alleged as confidential. As to the third

14

factor, the employer/employee relationship and circumstances under which the employee was exposed to the information, T&B presents evidence on numerous points. Most importantly, T&B points to the undisputed fact that Luzzi had signed a confidentiality agreement. Also, T&B offers the statements of Borgstrom on the general steps taken to maintain the confidentiality of information at Elastimold. (Borgstrom 2006 Dec. ¶ 18.) In brief, Borgstrom states that: 1) physical access to T&B facilities is controlled by locks, fences, security guards, and alarm systems; 2) visitors may not take cameras into facilities without authorization; 3) confidential information is kept in locked cabinets in locked rooms, or controlled-access databases, with access given only to employees with a valid purpose; 4) outside vendors and many employees involved in development must sign confidentiality agreements before they are provided with confidential information; 5) trash handling is secure; and 6) an annual ethics class covers protection of company information. (Id.)

This security evidence has general relevance to the items at issue. As to the items of confidential information, it is relevant to the third factor, the circumstances under which the employee was exposed to the information. As to the trade secrets, it is relevant to the sixth element, the precautions taken to maintain the secrecy of the trade secret. The discussions of particular items below refer to this evidence as "the general security evidence."

In addition, T&B argues that it is entitled to inferences that its information was not generally known based on its position in the marketplace. It is undisputed that, before 1999, Elastimold was the only company that manufactured 600-amp I, Y or H connectors, and that, while other companies manufactured elbow connectors, none manufactured connectors with an oil-resistant jacket. In support of its position, T&B cites Rohm & Haas, but that case does not

stand for the proposition that marketplace position alone shows that the underlying technology

was not generally known.  Rather, in Rohm, the Third Circuit relied on far more extensive

evidence:

> Plaintiff's proof that the Process was its secret consisted of demonstrating by the
> realities of the marketplace that this valuable method of producing latex paint
> vehicles was unknown to its competitors. Apart from defendants, plaintiff was the
> only manufacturer to use the Process and as a result it could offer four superior
> products. Other competitors had tried and failed to put competing products on the
> market.  Defendants' Dr. Meyer, a Ph.D. chemist, had been unable over the course
> of two years to develop competing products without plaintiff's Process.

Rohm & Haas, 689 F.2d at 431.  Thus, in Rohm, the evidence went beyond a showing that the

plaintiff was the only seller of a product in the marketplace; the evidence showed that, as to the

manufacturing process at issue: 1) no competitor used the process; 2) competitors had tried and

failed to put competing products on the market; and 3) the competitors' failure was linked to not

having the particular process.  The evidence that Elastimold was the only manufacturer of I, Y,

and H connectors is far more limited than the evidence presented in Rohm, and does not allow

general inferences that all the technologies connected to the manufacture of those connectors

were not generally known.

In support of its position, T&B also cites Sun Dial, but that case is inapposite.  In Sun

Dial, the Supreme Court of New Jersey relied not on the plaintiff's marketplace position, but on

the undisputed fact that "competitors, though they had tried, were unable to duplicate the

process."  Sun Dial Corp. v. Rideout, 16 N.J. 252, 261 (N.J. 1954).  T&B has offered no

evidence that competitors have tried and failed to duplicate the technologies at issue.

Rather than helping T&B, Rohm and Sun Dial are instructive about what is missing from

Plaintiff's case.  In neither of these cases did the plaintiff succeed on marketplace position alone,

16

but presented other evidence that competitors did not have the technology at issue, including evidence that competitors had tried and failed to produce the product without the secret technology.  This is relevant to both the third and fourth elements of the requirements to establish a trade secret articulated above.  The third element requires a showing of an advantage over competitors who do not know or use the secret, and the fourth element requires a showing that the secret is not a matter of general knowledge in the industry.  Both elements involve evidence that competitors do not possess the technology claimed to be secret.  As will be seen in the discussion that follows, as to nearly every item at issue in the instant motion, T&B has not offered evidence that competitors did not have the technology at issue.  Under these facts, marketplace position alone is insufficient to persuade a reasonable jury that the confidential information was not generally known.

In presenting their positions on this motion, both parties offer large amounts of evidence that is irrelevant to deciding the question before the Court: does the information qualify for protection?  The questions of whether Richards misappropriated information from T&B and used it are not at issue at this time; the many pages devoted to the matters of misappropriation and use are irrelevant.  This Court limits its analysis to whether the claimed information is protectible either as a trade secret or confidential information under New Jersey law.  Walworth's observations on the similarity between the parties' documents and products have no bearing on this question, nor does other evidence pertaining to Richards' use of the information, nor does the evidence about what was or was not in the Closet Documents.

A.      The injection ports

T&B has alleged misappropriation of one trade secret (# 5) and three items of

17

confidential information (# 2, 27, and 37) concerning injection ports.  T&B asserts as a trade secret a proprietary design, "extended flats on the bottom and top of the injection port."  FPO 284.  Confidential information items 2 and 27 refer to the description of trade secret 5.  FPO 288, 302.  Confidential information item 37 claims "quality standards for the appearance and outside characteristics of its 600 amp connectors" (referred to as the "cut-off details.")  FPO 307.  T&B agrees that this quality standard consists of an instruction to cut off the injection port within an eighth of an inch.  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 284.)

As to the port design, Richards argues that: 1) T&B has offered no evidence that it uses this injection port design; 2) Richards does not use this injection port design; 3) Defendants' experts have testified that they have used designs similar to Richard's injection port design in their work outside of Richards; 4) numerous products in the marketplace are sold with injection ports of this design still attached; 5) injection ports with this design are disclosed in T&B's sales materials and in issued patents; and 6) many T&B employees who were not bound by confidentiality agreements had access to the injection port design.  As to the quality standards, Richards argues that the standards for finishing the products (i.e., removing the injection ports) are easily discoverable by inspection of the products as sold in the marketplace.

In response, T&B argues that: 1) Walworth's observations are evidence that T&B uses this design; 2) Walworth's observations are evidence that Richards uses this design; 3) the evidence from Defendants' experts is inadmissible, irrelevant, and otherwise flawed; 4) the injection ports on Richards' marketplace samples from other manufacturers do not have the proprietary design; and 5) the T&B sales materials do not depict the proprietary design.  As to the standards for finishing the products, T&B contends that they are not evident from examination of

18

the products.

As these summaries demonstrate, the parties obscure the fundamental question – is the information protectible as confidential information or as a trade secret? – with considerable irrelevant argument.  T&B has offered much argument to attack Defendants' case but little evidence to prove that its information is protectible.  As the party opposing the motion for partial summary judgment, and as the party bearing the burden of proof at trial, T&B must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248.

T&B offers this evidence to prove that the injection port information is protectible: 1) documents identified by Walworth as Elastimold drawings showing injection ports with flats or octagonal designs bear T&B's proprietary rights statement (Walworth 2006 Dec. ¶ 11(e)); 2) T&B  has continued to use this injection port design in manufacturing (Borgstrom 2006 Dec. ¶ 21); 3) the general security evidence; and 4) evidence that T&B does not publicize its injection port design, and removes the ports before the product is sold.  This evidence is not sufficient to defeat the motion for partial summary judgment on the injection port design.  As to both the claim of a trade secret and the claims of protectible confidential information, evidence to establish essential elements of T&B's case is absent.

As to its claim for misappropriation of trade secret 5, the first problem concerns the first element in the trade secret analysis: identification of the subject matter.  It is undisputed that injection ports are commonly used in the injection molding process.  T&B has not defined in a precise and consistent way exactly what its design secrets are.  The Final Pretrial Order states that the "new injection port utilized extended flats on the bottom and top of the injection port and did

away with the angled and octagonal shape. . ." FPO 284.  In its opposition brief, T&B contends that it claims the design element of the octagonal shape as well as the flats, contradicting the Final Pretrial Order.  (Pl.'s Opp. Br. 63.)  T&B's witness Walworth treats the octagonal shape as a feature of Richards' design that distinguishes it from T&B's.[1]  (Walworth 2006 Dec. ¶ 11.) Having disclaimed the octagonal shape design element in the Final Pretrial Order, this Court will not permit T&B to now reclaim it.

Moreover, even if this Court restricts the subject matter to the injection port design element of flats, T&B's briefing and evidence fail to precisely identify the proprietary subject matter.  T&B admits that Defendants have submitted a photograph (Cantine Ex. 24) of an Elastimold 200 amp deadend receptacle with visible flats.  (Pl.'s Resp. to Defs.' 56.1 Stmt. at 109.)  T&B asserts that the flats on this product are not similar to the flats on the injection ports on its 600-amp products, and states: "The injection ports on 600 amp products are significantly larger in size in terms of height, width and diameter."  (Id. at 110.)

Richards has accused T&B of making some of its items into moving targets, and this is the moving target in action.  T&B claims that the injection port design element of flats is secret but, when Richards produces a photograph of one of its products showing visible flats, T&B contends that its secret flats are different because they are larger.  T&B does not define the larger size, nor explain why a larger size of a design that is publicly available would be a secret, nor explain what advantage the larger size gives T&B over competitors who do not know or use it. With its use of the moving target, T&B urges this Court to conclude that Richards has failed to

---

[1] Walworth states: "I have observed the injection port used by Richards and although it has an octagonal shape, nonetheless" it is similar to Elastimold's design.  (Walworth 2006 Dec. ¶ 11.)

hit the mark. Richards, however, does not bear the burden of hitting the mark. Quite to the contrary, at this stage, T&B bears the burden of defining the mark, and it has not done so. T&B has failed to identify the subject matter with sufficient precision to invoke trade secret protection.

As to the second element in the trade secret analysis, T&B has offered evidence that it uses the flats design. As to the third element, T&B has offered no evidence that its port design "gives [it] an opportunity to obtain an advantage over competitors who do not know or use it." Restatement of Torts § 757 comment b (1939). As to the fourth element, it has not presented evidence that this design is "the secret of a particular employer and not a matter of general knowledge in the industry." Rohm, 689 F.2d at 431. At best, T&B has offered evidence that the injection port design is not disclosed to or accessible to the general public. No reasonable jury could conclude from such evidence that the design is not a matter of general knowledge in the industry, and that it qualifies for trade secret protection.

T&B has thus failed to sufficiently identify the subject matter of trade secret 5, and has failed to offer evidence to establish the third and fourth elements needed to establish the existence of a trade secret. In this situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

As to its claims for misappropriation of confidential information items 2 and 27, T&B does not present sufficient evidence to establish that these items are eligible for protection. This Court's Amended Opinion of October 7, 2005 set forth four factors to be considered in the decision to find a contractually protectible interest in confidential information. (October 7, 2005 Am. Op. 11.) As a threshold matter, however, the confidential information must be identified

21

with sufficient particularity.[2]  Plaintiff's action for protection of confidential information rests on this Court's enforcement of a post-employment restrictive covenant which, under New Jersey's Solari/Whitmyer test, is a matter of its reasonableness under the circumstances.  This Court holds as a matter of law that, when an employer does not identify confidential information with sufficient particularity, it is not reasonable to enforce a post-employment restrictive covenant. As to confidential information items 2 and 27, Defendants are entitled to judgment as a matter of law.

Furthermore, even if Plaintiff's failure to identify the confidential information with particularity did not entitle Defendants to judgment as a matter of law, Plaintiff has failed to carry its summary judgment burden under this Court's four-factor standard for protectible confidential information.  First among these factors is: "the degree to which the information is generally known in the industry."  (Id.)  As discussed with regard to trade secret 5, evidence that the injection port design is not disclosed to or accessible to the general public does not constitute evidence of the degree to which the information is generally known in the industry.  In the absence of any evidence from T&B on this essential factor, this Court cannot conclude that the information is protectible.  T&B argues that this factor is in dispute, but offers only argument attacking Defendants' evidence – not evidence in support of its own position.  Getting rid of Defendants' evidence is not a substitute for proving one's case.  To survive summary judgment, the party with the burden of proof must point to actual evidence that could persuade a jury to find

---

[2] The Court did not include this as one of the factors because definition is an obvious prerequisite to finding information protectible.  Although definition with particularity could be viewed as part of the second factor, the specialized nature of the information, it is more sensibly understood as a prerequisite to consideration for protection.

in its favor.

To be protected under <u>Whitmyer</u> and <u>Ingersoll-Rand</u>, information must be not generally known in the industry.  Proof of this is essential.  In the absence of evidence that the injection port design is not generally known in the industry, T&B cannot prevail, as it bears the burden of proving that the information is protectible under this Court's four-factor test.  Having presented no evidence as to the first factor, it cannot prove that the information is eligible for protection.  This constitutes a complete failure of proof, and there can be no genuine issue as to any material fact.

In addition, T&B does not effectively refute Richards' assertion that many of T&B's employees were exposed to the design of the injection ports, and that many of these workers were not bound by any confidentiality agreement.  T&B argues that the design was disclosed only to those hourly workers who needed to know it, but does not explain why it did not have all such workers sign confidentiality agreements so as to protect the alleged confidential information.  As stated in this Court's October 7, 2005 Amended Opinion, the third factor in the analysis of whether confidential information is protectible is the employer/employee relationship and the circumstances under which the employee was exposed to the information.  (October 7, 2005 Am. Op. 11.)  As discussed, the expectations of the parties with respect to the information is an important aspect of this factor.  (<u>Id.</u> at 13.)  Because T&B does not dispute that not all hourly workers were bound by confidentiality agreements,[3] this Court finds that this supports the

_____

[3] In its moving brief, Richards points to evidence that the injection port design was known by approximately 60 hourly manufacturing workers, and claims that none of those workers had signed a confidentiality agreement.  (Defs.' Br. 55-56.)  In opposition, T&B counters by arguing that the evidence shows that only those workers with a need to know the port design were given that information.  (Pl.'s Opp. Br. 60.)  The evidence shows that Richards'

inference that T&B did not expect the information to be kept confidential, which weighs against a finding that this is protectible information.

The same analysis holds for confidential item 37, the injection port quality standards. T&B has offered no evidence that its finishing standards are not generally known in the industry. Moreover, it would appear that finishing standards should be discoverable by any skilled observer who encounters the finished product in the marketplace. Certainly, T&B has not offered evidence to the contrary,[4] and thus, on this record, this Court does not see how this is protectible information.

Defendants' motion for partial summary judgment as to the injection port information (trade secret 5 and confidential information items 2, 27, and 37) will be granted.

---

assertion is not completely supported, and T&B's assertion is not supported. The evidence T&B points to does not say what T&B claims; neither ¶ 18 of the Bergstrom 2006 declaration nor the cited section of the Higgins 11/21/03 deposition (Robertson Cert. Ex. 12 at 185:8-13) say that only workers with a need to know about injection port design were given that information. More importantly, however, although T&B offers evidence that some hourly workers signed confidentiality agreements (Borgstrom 2006 Dec. ¶ 36), T&B appears to concede that not all hourly workers signed a confidentiality agreement. See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 43 ("*Often*, hourly workers, as well as salaried, signed confidentiality agreements") (emphasis added). The evidence T&B offers in support of its "need to know" argument is not sufficient to raise a material factual question as to whether T&B protected the confidentiality of items 2 and 27 by binding all manufacturing workers who had knowledge of the information with confidentiality agreements. T&B's evidence does not support its assertion that only those workers with a need to know the port design were given that information.

    [4] T&B offers only the Walworth declaration as evidence in support of its assertion that quality standards would not be evident from the appearance of its products. (Pl.'s Opp. Br. 64-65.) In this Court's Daubert Opinion, however, this Court precluded Walworth from offering any testimony beyond, inter alia, his personal observations of the products. (April 3, 2006 Opinion 33-34.) Thus, to the extent that Walworth offered any opinions about what others in the industry might discover, or fail to discover, from inspection of T&B's products, such testimony has been excluded.

B.     Matted Texturing

In its opposition brief, T&B stated that it has withdrawn without prejudice its claims involving matted finish on the outside of inserts, which are trade secret 10 and confidential information item 5.  (Pl.'s Opp. Br. 67.)  Defendants have not consented to this and, as they note, voluntary dismissal without their consent is not available at this juncture under FED. R. CIV. P. 41(a)(1).  Rather, dismissal of these claims is available, pursuant to FED. R. CIV. P. 41(a)(2), only "upon such terms and conditions as the court deems proper."  This Court thus construes T&B's assertion of withdrawal as a motion for voluntary dismissal pursuant to FED. R. CIV. P. 41(a)(2).

Voluntary dismissal under FED. R. CIV. P. 41(a)(2) is a matter entrusted to the discretion of the district court.  Sinclair v. Soniform, Inc., 935 F.2d 599, 603 (3d Cir. 1991).  T&B filed its withdrawal a full five years after this case was initiated.  Because dismissal without prejudice so late in the litigation would subject Defendants to extreme financial prejudice, dismissal will be granted only with prejudice.  See Ferguson v. Eakle, 492 F.2d 26, 29 (3d Cir. 1974) (dismissal with prejudice is proper late in the litigation to protect defendants from financial prejudice).  T&B's claims for misappropriation of trade secret 10 and confidential information item 5 will be dismissed with prejudice.

C.     Flip pins

T&B has alleged misappropriation of one trade secret (# 6) and one item of confidential information (# 1) concerning flip pins.  T&B asserts as a trade secret the manufacturing use of a flip pin to form the hole in an injection port during molding.  FPO 285.  Confidential information item 1 refers to the description of trade secret 6.  FPO 288.

In moving for partial summary judgment, Richards argues: 1) it developed its flip pin on

its own; 2) flip pins are known and used by competitors of T&B in molding; and 3) many T&B employees who were not bound by confidentiality agreements had access to the flip pin use.  In opposition, T&B contends that: 1) Richards' evidence of independent development is problematic; and 2) Richards' evidence that flip pins are generally known in the industry is inadmissible and shows nothing anyway.

T&B offers this evidence: 1) T&B uses the flip pin, which "saves a lot in scrap" and "improves consistency" (Higgins 11/21/2003 Dep. 121:14-25, Robertson Cert. Ex. 12); 2) two drawings labeled as "inject hole pivot ass'y" bear T&B's proprietary rights statement (Richards Dep. Ex. 53-54, Robertson Cert. Ex. 70) 3); the general security evidence; 4) evidence that T&B does not publicize its flip pin design (Borgstrom 2006 Dec. ¶ 80); and 5) molds made by the Blackburn and Joslyn companies, which T&B purchased, did not use flip pins (Borgstrom 6/17/04 Dep. 763:22-764:3, Robertson Cert. Ex. 16; Higgins 11/21/03 Dep. 38:9-16, 43:22-24, Robertson Cert. Ex. 12.)

Although T&B has presented evidence in support of the first three trade secret elements, T&B has failed to present evidence as to the fourth, that the secret is not generally known in the industry.  T&B offers evidence that the molds acquired when T&B purchased Blackburn and Joslyn did not use flip pins, but the fact that two purchased companies did not use flip pins does not constitute evidence that flip pins were not generally known in the industry.  As such, T&B has presented no evidence that this design is "the secret of a particular employer and not a matter of general knowledge in the industry."  Rohm, 689 F.2d at 431.  This constitutes a complete failure of proof of an essential element, and Defendants' motion for partial summary judgment as to trade secret 6 will be granted.

26

As to its claim for misappropriation of confidential information item 1, T&B has presented no evidence on the first factor, the degree to which the information is generally known in the industry. T&B offers only argument attacking Defendants' evidence – not evidence in support of its own position. In the absence of any evidence from T&B on this factor, this Court cannot conclude that the information is protectible. Defendants' motion for partial summary judgment as to confidential information item 1 will be granted.

Furthermore, as with the injection ports, Richards offers evidence that the use of flip pins was disclosed to workers who were not bound by confidentiality agreements, and T&B does not counter with evidence that raises a factual dispute.[5] Again, this Court finds that this supports the inference that T&B did not expect the information to be kept confidential, which weighs against a finding that this is protectible information.

D.    Hollow point drill bits

T&B has alleged misappropriation of one trade secret (# 7) and one item of confidential information (# 4) concerning self-clearing hollow point drill bits. T&B asserts as a trade secret the design of a self-clearing hollow point drill bit. FPO 285-286. Confidential information item 4 refers to the description of trade secret 7. FPO 289.

In moving for partial summary judgment, Richards argues: 1) T&B no longer uses hollow point drill bits in manufacturing; 2) the design of the hollow point drill bit Richards uses differs

---

[5] See Defs.' Br. 74; Pl.'s Opp. Br. 73. T&B again makes its "need to know" argument, but the only evidence Plaintiff offers in support is the statement of a single employee (Barker) that he had never heard of a flip pin. (Pl.'s Opp. Br. 73.) As above, this is not sufficient to raise a material factual question as to whether T&B protected the confidentiality of item 1 by binding all manufacturing workers who had knowledge of the information with confidentiality agreements.

from the design that T&B once used; 3) self-clearing hollow point drill bits are commercially available and are used by competitors of T&B; and 4) many T&B employees who were not bound by confidentiality agreements had access to the hollow point drill bits.  In opposition, T&B contends that: 1) Richards' evidence of independent development is problematic; 2) Richards' evidence that hollow point drill bits are generally known in the industry is inadmissible and disputed by T&B's evidence; and 3) Richards' evidence of commercial availability is irrelevant because it relates to the year 2005, years after 1999, the time period at issue.

T&B points to this evidence: 1) the deposition testimony of Borgstrom and Higgins concerning whether the hollow point is well-known in the industry (Borgstrom 5/2/03 Dep., 267:10-14, 271:10-16, Robertson Cert. Ex. 16; Higgins 5/29/03 Dep., 110:2-111:7, Robertson Cert. Ex. 12;  Higgins 11/21/03 Dep., 114:5-7, Robertson Cert. Ex. 12); 2) a drawing identified by White as a hollow point drill bit bears T&B's proprietary rights statement (White Dep. 22:2-15, Robertson Cert. Ex. 31; Richards Dep. Ex. 47, Robertson Cert. Ex. 47); 3); the general security evidence; 4) evidence that T&B does not publicize its hollow point drill bit design (Borgstrom 2006 Dec. ¶ 80); 5) the Blackburn company, which T&B purchased, did not use hollow point drill bits (Borgstrom 6/17/04 Dep. 767:25-768:6, Robertson Cert. Ex. 16); and 6) T&B continues to use hollow point drill bits in manufacturing (Higgins 11/21/2003 Dep. 179:10-16, Robertson Cert. Ex. 12).

The deposition testimony of Borgstrom and Higgins does not, as T&B contends, create a factual dispute over whether the hollow point drill bit is generally known in the industry.  (Pl.'s Opp. Br. 80.)  The cited testimony from Borgstrom concerns wire brushing and flip pins, not drill bits.  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 405; Borgstrom 5/2/03 Dep., 267:10-14, 271:10-16,

28

Robertson Cert. Ex. 16.)  The cited testimony from Higgins concerns wire brushing and flip pins, not drill bits.  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 405; Higgins 5/29/03 Dep., 110:2-111:7, Robertson Cert. Ex. 12;  Higgins 11/21/03 Dep., 114:5-7, Robertson Cert. Ex. 12.)  T&B has thus offered no evidence relevant to the question of whether hollow point drill bits are generally known in the industry.  The evidence that the Blackburn company did not use hollow point drill bits does not constitute evidence that hollow point drill bits are not generally known in the industry.

As to the advantage over competitors, T&B contends that the hollow point drill bit is a safer and more effective tool for drilling holes than alternative tools available on the market, but it offers in support one of its own interrogatory responses.  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 433; T&B's Supp. Response to Pl.'s First Set of Interrog. No. 6, Robertson Cert. Ex. 44.)  This contention interrogatory response was submitted by T&B attorney Philbrick and does not qualify under Rule 56(e) as a supporting affidavit made on personal knowledge.

T&B's case with regard to the hollow point drill bits suffers from the same defects seen in the discussion above of the flip pins.  T&B has presented no evidence that its hollow point drill bit design meets the trade secret requirement that it gives T&B an opportunity to obtain an advantage over competitors who do not know or use it.  Nor has it presented evidence that this design is "the secret of a particular employer and not a matter of general knowledge in the industry."  Rohm, 689 F.2d at 431.  This constitutes a complete failure of proof of an essential element, and Defendants' motion for partial summary judgment as to trade secret 7 will be granted.

As to its claim for misappropriation of confidential information item 4, T&B has

29

presented no evidence on the first factor, the degree to which the information is generally known in the industry. The cited testimony from Bergstrom and Higgins concerns flip pins, not hollow point drill bits. T&B offers only argument attacking Defendants' evidence – not evidence in support of its own position. In the absence of any evidence from T&B on this factor, this Court cannot conclude that the information is protectible.

Furthermore, as with the injection ports, Richards offers evidence that the use of hollow point drill bits was disclosed to workers who were not bound by confidentiality agreements, and T&B does not counter with evidence that raises a factual dispute.[6] Again, this Court finds that this supports the inference that T&B did not expect the information to be kept confidential, which weighs against a finding that this is protectible information. Defendants' motion for partial summary judgment as to confidential information item 4 will be granted.

E.    Use of the uncured rubber plug technique in manufacturing

T&B has alleged misappropriation of one trade secret (# 8) and one item of confidential information (# 6) concerning use of uncured rubber plugs in manufacturing. T&B asserts as a trade secret the manufacturing "technique of manually inserting uncured rubber plugs into the H and Y jacket along the seam in order to fix voids that occur during overmolding." FPO 286.

_____

[6] See Defs.' Br. 80; Pl.'s Opp. Br. 81. T&B again makes its "need to know" argument, but the evidence Plaintiff offers does not support its position: Borgstrom's 6/17/04 deposition testimony concerns a customer and product sales list, not hollow point drill bits (Robertson Cert. Ex. 16 at 686:12-16); Higgins' 11/21/03 deposition testimony is very general and does not refer specifically to hollow point drill bits (Robertson Cert. Ex. 12 at 20, 21), while his 12/18/03 testimony is purely conclusory and general (Robertson Cert. Ex. 12 at 1008:5-9); and T&B's answers to Plaintiff's interrogatories are inadmissible hearsay (Robertson Cert. Ex. 44). As above, T&B's evidence is not sufficient to raise a material factual question as to whether T&B protected the confidentiality of item 4 by binding all manufacturing workers who had knowledge of the information with confidentiality agreements.

Confidential information item 6 refers to the description of trade secret 8.  FPO 289.  T&B concedes that the general concept of using uncured rubber plugs is not a trade secret.  (Pl.'s Opp. Br. 83.)

In moving for partial summary judgment, Richards argues: 1) it developed its rubber plug technique on its own and prior to Luzzi's employment at Richards; 2) the uncured rubber plug technique is known and used by competitors of T&B in manufacturing; and 3) many T&B employees who were not bound by confidentiality agreements had access to the uncured rubber plug technique.  In opposition, T&B contends that: 1) no other companies manufactured H and Y connectors by any method prior to Richards' employment of Luzzi; 2) Richards' evidence of independent development is problematic; and 3) Richards' evidence that flip pins are generally known in the industry is inadmissible and also is irrelevant.

T&B points to this evidence: 1) the undisputed fact that, prior to Luzzi's departure, T&B was the only manufacturer of Y and H connectors; 2); the general security evidence; 3) evidence that T&B does not publicize its rubber plug technique (Borgstrom 2006 Dec. ¶ 80); 5) the Blackburn company, which T&B purchased, did not use hollow point drill bits (Borgstrom 6/17/04 Dep. 767:25-768:6, Robertson Cert. Ex. 16); and 6) T&B continues to use the rubber plug technique in manufacturing (Borgstrom 5/2/03 Dep. 295:18-21, Robertson Cert. Ex. 16).

T&B here makes its first attempt to argue the significance of marketplace position: "[t]he fact of no competitors, in and of itself, evidences that all secret aspects of the Y and H connector manufacturing process that Luzzi took with him – including the use of uncured rubber plugs as a manufacturing solution – was in fact an Elastimold secret."  (Pl.'s Opp. Br. 87.)  As discussed above, this Court does not accept T&B's argument that marketplace position alone, with regard

31

to 600-amp Y and H connectors, permits the broad inference that everything associated with manufacturing those products was secret.  Thus, in the absence of the kinds of evidence seen in Rohm and Sun Dial, marketplace position by itself does not give rise to the inference that the rubber plug manufacturing technique was not generally known in the industry.  Marketplace position alone is not sufficient to raise a genuine issue of fact as to whether the rubber plug technique was generally known.

T&B's case with regard to the rubber plug technique suffers from the same defects seen in the discussion above of the flip pins.  T&B has presented no evidence that its rubber plug technique meets the trade secret requirement that it gives T&B an opportunity to obtain an advantage over competitors who do not know or use it.  Nor has it presented evidence that this technique is "the secret of a particular employer and not a matter of general knowledge in the industry." Rohm, 689 F.2d at 431.  This constitutes a complete failure of proof of an essential element, and Defendants' motion for partial summary judgment as to trade secret 8 will be granted.

As to confidential information item 6, Plaintiff has failed to carry its summary judgment burden under this Court's four-factor standard for protectible confidential information.  In the absence of evidence that the rubber plug technique is not generally known in the industry, T&B cannot prevail, as it bears the burden of proving that the information is protectible under this Court's four-factor test.  Having presented no evidence as to the first factor, it cannot prove that the information is eligible for protection.  This constitutes a complete failure of proof, and there can be no genuine issue as to any material fact.

Furthermore, as with the injection ports, Richards offers evidence that the use of the

32

rubber plug technique was disclosed to workers who were not bound by confidentiality

agreements; T&B does not dispute that approximately 80 hourly workers knew and used the

technique.  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 455.)  T&B does not counter with evidence that

raises a factual dispute.[7]  Again, this Court finds that this supports the inference that T&B did not

expect the information to be kept confidential, which weighs against a finding that this is

protectible information.  Defendants' motion for partial summary judgment as to confidential

information item 6 will be granted.

 F. <u>Nested insert mold design</u>

  T&B has alleged misappropriation of one trade secret (# 9) and three items of

confidential information (# 8, 13, and 49) concerning a mold design having interchangeable

cavities.  T&B claims that it has designed molds with interchangeable cavities for use with stress

cones, cable adapters, and BSR and elbow molds.  T&B asserts as trade secret 9 a stress cone

mold design utilizing pie-shaped, nested interchangeable cavities.  FPO 287.  Confidential

information item 8 describes a mold design utilizing interchangeable cavities that is used in two

cycles of the cable adapter molding process, the stress cone mold and the cable adapter mold.

FPO 291.  Confidential information item 13 refers to the description of trade secret 9.  FPO 295.

Confidential information item 49 describes a design for BSR and elbow molds utilizing

interchangeable cavities for the test points and name plates.  FPO 311.  T&B states that "the

---

  [7] <u>See</u> Pl.'s Opp. Br. 87.  T&B again makes its "need to know" argument, but points only to its general security evidence, as well as to its evidence that some of its manufacturing employees signed confidentiality agreements.  As above, T&B's evidence is not sufficient to raise a material factual question as to whether T&B protected the confidentiality of item 6 by binding all the workers who knew of the rubber plug technique with confidentiality agreements.

general concept of an interchangeable mold cavity design is not at issue," but, rather, "T&B's specific application of that concept to its stress cone mold, which is an interchangeable, multi-cavity mold with nested pie-shaped inserts . . ."[8]  (Pl.'s Opp. Br. 94.)

Richards begins its argument for partial summary judgment by contending that T&B has not shown ownership of the mold design at issue.  It is uncontested that "[t]he nested mold in question was built by a 'sister' company of Elastimold (before it was purchased by T&B), namely Caco Pacific."  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 487.)  In addition, T&B states that "Elastimold contracted with its sister company, Caco Pacific, for the design and build of the stress cone mold in early 1983."  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 488.)  In its moving brief, Richards argues that T&B has produced no evidence that establishes any relationship between Elastimold and Caco Pacific, nor evidence that T&B has a proprietary interest in molds built by Caco Pacific.

T&B does not address these issues in its opposition brief.  Rather, it is Richards, in its reply brief, that points to Plaintiff's Response to Defendants' Rule 56.1 Statement, where it offers the Borgstrom 2006 Declaration to support the assertions cited above.  (Defs.' Reply Br. 129; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 488.)  In his declaration, Borgstrom, general manager of an Elastimold facility, states: "Elastimold contracted with its sister company, Caco Pacific, for the design and build of the stress cone mold in 1983.  As a result, Elastimold owned both the mold and the design and the tool drawings for the mold."  (Borgstrom 2006 Dec. ¶ 22.)

---

[8] This admission is surprising because of its implications for confidential information item 8.  Since item 8 claims "interchangeable cavity mold construction," and T&B has conceded that the general concept of interchangeable cavity mold construction is not at issue, T&B has effectively conceded that it has no viable claim for item 8.  Here, again, when one tries to define precisely the proprietary information at issue, one finds a moving target.

T&B's position on its ownership of the mold design suffers from serious defects.  First, even if T&B had not effectively conceded that it has no viable claim for item 8, item 8 claims a proprietary cable adapter mold design, but T&B has offered no evidence whatever as to the origin or ownership of a cable adapter mold design; Borgstrom's declaration refers only to the stress cone mold, which T&B itself distinguishes from the cable adapter mold.  FPO 291. Second, and more crucially, since T&B failed to even address the issue of ownership in its opposition brief, it has failed to carry its burden at summary judgment: Richards has pointed to an absence of evidence in support of an essential element of T&B's case (ownership of the proprietary information at issue), and T&B's failure to respond constitutes a complete failure of proof.  Third, even if this Court were willing to consider the Borgstrom 2006 Declaration in the absence of any argument pointing to it in the opposition brief, Borgstrom's statements in ¶ 22 are not admissible evidence, but are legal conclusions without foundation.  See FED. R. EVID. 602. In sum, having admitted that Elastimold did not design the stress cone mold, T&B cannot establish that a trade secret exists in the absence of evidence that it owned the design.  This alone provides sufficient basis to grant Defendants' motion for partial summary judgment as to trade secret 9 and confidential information items 8 and 13, concerning a mold design for stress cones.[9]

T&B points to this evidence: 1) the general security evidence; and 2) evidence that T&B does not publicize its stress cone mold design (Borgstrom 2006 Dec. ¶ 80).  T&B offers the deposition testimony of Borgstrom as evidence for the proposition that the stress cone mold design reduces scrap and increases thermodynamics, but the cited testimony refers to the circular pattern and does not refer to any advantages of the nested, pie-shaped design.  (Borgstrom 5/2/03

---

[9] Item 8 also claims a mold design for cable adapters.

Dep. 310:16-311:2, Robertson Cert. Ex. 16.)

With regard to the nested insert mold design, even setting aside the ownership issue, the evidence to support T&B's case is insufficient. T&B has presented no evidence that its stress cone mold design meets the trade secret requirement that it gives T&B an opportunity to obtain an advantage over competitors who do not know or use it. Nor has it presented evidence that this design is "the secret of a particular employer and not a matter of general knowledge in the industry." Rohm, 689 F.2d at 431. This constitutes a complete failure of proof of an essential element, and Defendants' motion for partial summary judgment as to trade secret 9 will be granted.

As to its claim for misappropriation of confidential information items 8 and 13, T&B has presented no evidence on the first factor, the degree to which the information is generally known in the industry. T&B offers only argument attacking Defendants' evidence – not evidence in support of its own position. In the absence of any evidence from T&B on this factor, this Court cannot conclude that the information is protectible. Defendants' motion for partial summary judgment as to confidential information items 8 and 13 will be granted.

As to confidential item 49, concerning a design for BSR and elbow molds utilizing interchangeable cavities for the test points and name plates, T&B's claim is undercut by its admission, quoted above, that "the general concept of an interchangeable mold cavity design is not at issue." (Pl.'s Opp. Br. 94.) Having argued that it does not claim interchangeable mold cavity design, but, instead, such design with the distinguishing features of nested and pie-shaped cavities, it cannot now claim that interchangeable mold cavity design is confidential and proprietary.

Moreover, T&B has not offered evidence sufficient to make its case.  In T&B's opposition brief, it presents a summary of the evidence relating to item 49 with 12 bullet points. (Pl.'s Opp. Br. 131-133.)  Nine concern stress cones or cable adapters, not BSR or elbow molds. Three are generally about mold design and manufacturing.[10]  None refer specifically to the design of molds for BSRs or elbows.  Since T&B has offered no evidence about its design of BSR or elbow molds, and since it has already disclaimed interchangeable mold cavity design as confidential information,  Defendants' motion for partial summary judgment on item 49 will be granted.

G.      Items of rubber technology

T&B has alleged misappropriation of one trade secret (# 1) and five items of confidential information (# 54, 59, 60, 64, and 72) concerning rubber technology.  T&B asserts as a trade secret a formula for oil-resistant rubber which the Final Pretrial Order does not define.[11]  FPO 281.  Confidential information item 54 alleges that Richards used Elastimold's rubber shrinkage data and implies that the data was used to design molds.  FPO 313.  Confidential information item 59 alleges that Richards used Elastimold's rubber physical characteristics data in the mold design process.  FPO 315-316.  Confidential information item 60 alleges that Luzzi obtained "specific processing properties information" for the formula, as well as the formula itself.  FPO

_____

[10] Even applying the general statements about mold designs and manufacturing to BSR or elbow molds, they at most provide evidence that T&B took measures to secure the information.

[11] The FPO states that Elastimold had created a formula using a 60/40 ratio of EPDM to nitrile, and that the formula included the ingredients ketjen black and Vulcan XC-72, but then says that "Elastimold had to reformulate the compound because DuPont was discontinuing the previously used EPDM."  FPO 281.  A formula which is not in use is not eligible for trade secret protection.  The FPO gives no information about the reformulated formula.

316.  Confidential information item 64 alleges that Richards used Elastimold's compound

shrinkage and preheat data to design tools.  FPO 317.  Confidential information item 72 alleges

that Luzzi copied the oil-resistant rubber formula and that Richards used that formula to develop

its own formula.  FPO 321.

    *1. Trade secret 1 and confidential information item 72: the rubber formula*

   T&B seeks protection for its oil-resistant rubber formula, but has not specifically

identified the formula at issue.  In the section on trade secret 1, the FPO states that Elastimold

reformulated the formula because DuPont was discontinuing the previously used EPDM, but

gives no information about the new formula.  FPO 281.  In the section on item 72, the FPO states

that "Elastimold developed an oil resistant compound that is a blend of EPDM and Nitrile."  FPO

320.  Thus, the only specific element of the formula that appears in the Final Pretrial Order is use

of a blend of EPDM and Nitrile.  T&B's expert Del Vecchio concedes, however, that the practice

of using blends of EPDM and Nitrile is in the public domain.  (Del Vecchio Dep.  91:13-21,

Robertson Cert. Ex. 60.)  Thus, if this Court were to limit T&B to the definition of the rubber

formula contained in the Final Pretrial Order, it would have no case for protection whatever.

   The parties, however, appear to have developed an understanding outside of the Final

Pretrial Order that T&B's formula uses a 60/40 blend of EPDM to Nitrile.  (Pl.'s Resp. to Defs.'

56.1 Stmt. ¶ 552.)  Because the parties have litigated this motion as if the Final Pretrial Order had

been amended to specify use of a 60/40 blend, this Court will decide this motion accordingly.

   Richards contends that use of a 60/40 blend of EPDM and Nitrile cannot be a trade secret

because is a matter of general knowledge within the industry.  T&B bears the burden of proof

that its formula is a trade secret.  Richards, however, does more than point to the absence of

evidence that this is not a matter of general knowledge within the industry; it offers evidence that 60/40 blends of EPDM and Nitrile are well-known in the industry.  Defendants' expert Richard F. Grossman stated that, in 1977, Julian Mitchell published a paper which disclosed rubber formulas with a 60/40 blend of EPDM and Nitrile.  (Grossman Expert Report ¶¶ 32-33.)  Also, Luzzi states that example 4 of U.S. Patent No. 4,849,478 (filed Feb. 16, 1988) discloses a 60/40 blend of EPDM and Nitrile.  (Luzzi Dec. ¶ 106.)

T&B does not respond to these points in its opposition brief.  In its response to Defendants' 56.1 Statement, however, it points to two pieces of evidence.  First, it offers the November 16, 2004 deposition testimony of its expert, R.J. Del Vecchio, which not only does not support T&B's position, but seriously undermines it.  (Robertson Cert. Ex. 60.)  The testimony T&B cites might provide support for the proposition that T&B's formula as a whole is not in the public domain, but Del Vecchio states that "the general practice[] of using blends of nitrile and EPDM . . . fall[s] within the public domain."  (Del Vecchio Dep. 91:13-21, Robertson Cert. Ex. 60.)  Moreover, Del Vecchio proceeds to explain, as to the 60/40 ratio, "[a]ny ratio between these polymers can be said to be in the public domain.  Studies have been published . . . in which the ratio was changed from zero/100 to 10/zero."  (Id. at 94:7-12.)  Thus, T&B's own expert's deposition testimony supports Richards' assertion that the use of a 60/40 blend of EPDM and Nitrile is generally known in the industry.

Second, T&B offers the Del Vecchio 2006 declaration, which offers an opinion about the patent referred to by Luzzi, U.S. Patent No. 4,849,478.  (Del Vecchio 2006 Dec. ¶¶ 16-19.)  Del Vecchio does not dispute that this patent discloses the use of a 60/40 blend of EPDM and Nitrile.  Instead, he contends that the patent does not disclose that such a ratio produces a compound with

"the desirable optimal qualities." (Id. at ¶ 18.)   This is mere obfuscation.[12]  At issue is whether

the use of a 60/40 blend of EPDM and Nitrile is generally known in the industry.  Beyond oil

resistance, the physical properties of the resultant rubber are irrelevant to the issue at hand.

T&B has responded to Richards' argument that the 60/40 blend is generally known in the

industry only by offering evidence that supports Richards' position.[13]  No reasonable jury could

hear T&B's evidence and decide in its favor on trade secret 1.   As to trade secret 1, Defendants'

motion for summary judgment will be granted.

As to the rubber formula, T&B again argues that this Court's denial of the motion for

partial summary judgment in 2004 establishes that factual issues preclude summary judgment.

On the instant motion, however, this Court is examining different trade secret issues than it did in

2004.  Richards has now raised the argument that the formula is well-known, and so the Court

must look to the requirement that a trade secret "be the secret of a particular employer and not a

matter of general knowledge in the industry."  Rohm, 689 F.2d at 431.  Once the moving party

has carried its burden of pointing to the absence of evidence, because T&B bears the burden of

proof as to the elements of a trade secret, the burden shifts to the nonmovant to point to actual

---

[12] Moreover, if the Court credited this assertion, it would be allowing an expert opinion to move the target.  While it is conceivable that the combination of a particular product property and a particular formulation might constitute a trade secret, the only product property stated in the Final Pretrial Order, in association with the claimed formula, is oil resistance.  FPO 281.  T&B may not add in additional, unspecified product properties at this point in the litigation.  As it is, U.S. Patent No. 4,849,478 claims an "oil-resistant rubber composition."  T&B has not even argued, no less shown, that it was not generally known in the industry that a 60/40 blend produced oil-resistant rubber.

[13] T&B also points to this evidence: 1) the general security measures; 2) it does not publicize the rubber formula; and 3) it continues to use the rubber formula.  None of this evidence shows that the rubber formula is not a matter of general knowledge in the industry.

evidence to support its case.  T&B has offered no evidence that its formula for oil-resistant

rubber is not a matter of general knowledge in the industry.  Thus, the factual dispute over the

"reverse engineerability" is now seen to be immaterial in the context of T&B's complete failure

of proof as to an essential element of its case.

T&B asserts as well that the oil-resistant rubber formula is protectible as confidential

information item 72.  Looking to this Court's four-factor analysis, T&B has presented no

evidence on the first factor, the degree to which the information is generally known in the

industry.  As discussed above, T&B offers evidence that supports Richards' assertion that the use

of a 60/40 blend of EPDM and Nitrile is generally known in the industry.  In the absence of any

evidence in support of T&B's position on this factor, and given the evidence showing that the use

of a 60/40 blend of EPDM and Nitrile is generally known in the industry, this Court cannot

conclude that the information is protectible.  Defendants' motion for partial summary judgment

as to confidential information item 72, concerning the formula for oil-resistant rubber, will be

granted.

### 2. *Confidential information item 54: the rubber shrinkage data*

T&B claims that Richards misappropriated T&B's rubber compound shrinkage data.

Richards moves for partial summary judgment, contending that: 1) T&B asserts a 3.65%

shrinkage factor, while Richards' compounds have a shrinkage factor of 1 to 2.5%; 2) there is no

evidence that Richards has used T&B's shrinkage data; and 3) use of a 2% shrinkage factor is

well-known in the industry.  In opposition, T&B points to this evidence: 1) Richards' employee

Lungin's deposition testimony that Luzzi gave him Elastimold information concerning shrinkage

rates (Lungin Dep. 68:1-4, Robertson Cert. Ex. 11); and 2) various evidence that Richards used

shrinkage factors that were the same as T&B shrinkage factors.  For example, as to the second

category, T&B offers evidence that the shrinkage rates noted on Richards document R1493 (2.5

% on length and 2% on diameter) are the same as on Elastimold document R2828.  (Del Vecchio

2006 Dec. ¶¶ 29, 31.)  It is not clear from T&B's briefs and statements whether T&B claims that

the proprietary information is a shrinkage rate of 2%, 2.5%, or 3.65%, but the Court need not

resolve this ambiguity, as T&B has not established that any one of these rates is confidential and

protectible information.

T&B's opposition addresses only the issue of Richards' use of the shrinkage data and is

largely irrelevant to the question presently before the Court, whether item 54 is protectible.  None

of the evidence T&B offers establishes the first factor, the degree to which the information is

generally known in the industry.  Richards offers evidence that a shrinkage factor of 2 - 3% is

well-known in the industry: the supplemental expert report of Richard Grossman states that

shrinkage rates for rubber compounds of varying composition are well known, and that a

shrinkage rate of "2-3% for hydrocarbon rubbers such as EPDM is well known."  (Grossman

Supplemental Expert Report 3).  T&B states that it contests this, but offers no evidence in

opposition.  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 568.)  Whether T&B's position is that its

confidential shrinkage factor is 2% or 3.65%, it has offered no evidence as to the degree to which

that information is generally known in the industry.  In the absence of any evidence from T&B on

this factor, this Court cannot conclude that the information is protectible.  As to confidential

information item 54, Defendants' motion for partial summary judgment will be granted.

> 3.     *Confidential information item 59: the rubber physical characteristics data*

T&B claims that Richards misappropriated and has used "Elastimold's compound data

42

such as specific gravity, pounds per inch and ounces per inch." FPO 315-316. Richards moves

for partial summary judgment, contending that there is no evidence that it misappropriated or

used such data. In a single paragraph of opposition, T&B points to Luzzi's deposition testimony

that, at the time he left Elastimold, he had at home a document disclosing the oil-resistant

formula.[14] (Pl.'s Opp. Br. 106; Luzzi Dep. 147:4-7, Robertson Cert. Ex. 20.) This says nothing

about compound data such as specific gravity or pounds per inch. T&B has pointed to no

evidence in support of its claim that item 59 is protectible confidential information, and

Richards' motion for partial summary judgment will be granted.

> 4.  *Confidential information item 60: specific processing properties information*

T&B claims that Luzzi "obtained specific processing properties information for

Elastimold's oil resistant rubber compound." FPO 316. This fails to even state a valid claim for

relief, since there is not even an allegation of use of the information.

In moving for partial summary judgment, Richards contends that T&B has not supplied

sufficient detail to state a cognizable claim. T&B's two sentences of opposition show only that

Richards is correct, as this Court is unable to recognize the basic elements of a claim for

misappropriation of confidential information. Plaintiff's Response to Defendants' Rule 56.1

Statement treats the subject at greater length, but fails to specifically identify what T&B's

"processing properties" are, or what evidence exists that this is protectible confidential

information. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 582-583.) Richards' motion for partial summary

_____

[14] Nor does any of the deposition testimony cited in Plaintiff's Response to Defendants' Rule 56.1 Statement provide evidence that Luzzi had the Elastimold compound data document R2818, or any other Elastimold compound data document, at his home. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 572; Robertson Cert. Ex. 10 at 147:20-24; 149:12-13; 170:17-19; 196:20-197:4.)

judgment as to confidential information item 60 will be granted.

>    5.    *Confidential information item 64: compound shrinkage and preheat data*

T&B claims that Richards used Elastimold's shrinkage and expansion data from a document titled "Tool Design Shrinkage Rates" to design tools. FPO 317. In moving for partial summary judgment, Richards contends that: 1) there is no evidence that it had access to this document; and 2) there is no evidence that it used the data from this document. In opposition, T&B argues that: 1) Luzzi admitted to having this document when he left Elastimold; and 2) Lungin admitted that Luzzi gave him the shrinkage data.

T&B's arguments are irrelevant to the issue before the Court, which is whether item 64 is protectible as confidential information. T&B has pointed to no evidence that "Tool Design Shrinkage Rates" contains any protectible confidential information. Richards' motion for partial summary judgment as to confidential information item 64 will be granted.

>    H.    Mold vent design

T&B has alleged misappropriation of one trade secret (# 2) and two items of confidential information (# 32 and 74) concerning mold vent design. T&B asserts as a trade secret a mold vent design termed "v-vents." FPO 282. Confidential information item 32 alleges that T&B has a quality standard for the vent grooves that are left in the molded part by the vent design; the vent grooves may not exceed .007" high and .010" wide. FPO 304-305. Confidential information item 74 largely repeats the allegations made in trade secret 2. FPO 322.

T&B begins by noting that this Court's Opinion of January 12, 2004 denied Defendants' motion for partial summary judgment as to trade secret 2, concerning the v-vent design. As this Court explained, it denied summary judgment because the record "at this point, is sufficiently

undeveloped . . ."  (Opinion of January 12, 2004 at 11.)  This clearly envisions revisiting the issues at a later point, when the record has been further developed.  This is that time.

In moving for partial summary judgment, Richards argues: 1) it does not use the v-vent mold design, but instead uses scribe lines; 2) the use of scribe lines is generally known in the industry; 3) T&B's v-vent design is evident from inspection of the product as it appears in the marketplace; and 4) the quality standard is evident from witness lines which appear on the product in the marketplace.

In response, T&B attacks Richards' case but does not make its own.[15]  T&B offers this evidence: 1) the general security evidence; 2) T&B does not publicize its v-vent design (Borgstrom 2006 Dec. ¶ 80); and 3) T&B continues to use the v-vent design in manufacturing (Borgstrom 2006 Dec. ¶ 30.)  As above, T&B has failed to present evidence that its v-vent design is not a matter of general knowledge in the industry.  This constitutes a complete failure of proof as to an essential element of Plaintiff's case as to trade secret 2 and confidential information item 74.  As to as to trade secret 2 and confidential information item 74, Defendants' motion for partial summary judgment will be granted.

In moving for partial summary judgment as to confidential information item 32, Richards argues that the quality standard at issue here is evidenced by witness lines which are visible on

_____

[15] The parties devote many pages to disputing the evidence as to whether Richards uses the v-vent design.  Although that issue is not presently before the Court, it is interesting that T&B concedes that Richards cannot exactly copy its v-vent design because it lacks the machinery to do so (an "Electronic Discharge Machine.")  (Pl.'s Opp. Br. 111; Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 600.)  T&B refers to its exact implementation as the "dead sharp corner" and concedes that Richards' technique, which uses a grinding wheel instead of an Electronic Discharge Machine, "cannot achieve the dead sharp corner."  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 596.)  Thus, even if T&B persuaded this Court that its v-vent design was protectible information, it has conceded that Richards' manufacturing equipment cannot achieve it.

the finished product, and thus easily discoverable.  T&B does not address the quality standard or

confidential information item 32 at all in its opposition brief or in its statements of facts.

Richards asserts that the "standard at issue relates to the witness lines that are visible and

detectable on the finished product."  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 625.)  In response, T&B

points to Walworth's statement in which he refers to "the raised v-vent witness line visible on the

insulation portion of an Elastimold molded product . . ."  (Walworth 2006 Dec. ¶ 16(t).)  The

Walworth statement thus supports Richards' contention that the witness lines are visible on the

finished product.  More importantly, T&B has offered no evidence that this standard is

confidential information.  As to as to confidential information item 32, Defendants' motion for

partial summary judgment will be granted.

      I.     <u>Customer, sales, and production information</u>

T&B has alleged misappropriation of one trade secret (# 3) concerning customer and

sales information, and five items of confidential customer, sales, or production information (# 63,

65, 71, 75, 78).  T&B asserts as trade secret 3 lists of its customers and their history of purchases.

FPO 282-283.  T&B claims as confidential information its monthly mold yield/productivity

reports (item # 63), monthly product sales totals (item # 65), sales totals and customer purchase

history (# 71 and 75), and Hackettstown facility financial reports for October 1998 (#78).  FPO

317, 318, 320, 322-323, 324-325.

    In moving for partial summary judgment as to all of these items, Richards argues that the

information was old and stale, and that it was not used and could not be used to compete with

T&B.  This Court has already ruled that T&B cannot claim that the identity of its customers is a

trade secret.  (Opinion of January 12, 2004 at 11.)  In response, T&B offers only general evidence

and speculation regarding whether the information is protectible.

The Solari/Whitmyer test allows this Court to tailor its analysis to the kind of information at issue, since the decision on enforcement of a restrictive covenant is ultimately based on what is reasonable under the circumstances.  The business information at issue in this group of items differs markedly from the other items, which involve technical design and manufacturing information.  By its nature, this kind of sales and production information is very likely to be not generally known in the industry, to be specific, and to have been communicated in the context of a confidential employer/employee relationship.  As to this kind of information, however, it is essential to establish the fourth factor, that the information "has current value to the employer." (Opinion of January 12, 2004 at 14.)  It is not reasonable to protect sales and financial information that does not have current value to the employer.

As to this group of items, the facts of this case make establishing the fourth factor crucial. It is undisputed that it was Con Ed that approached Richards, as early as 1997, seeking to have Richards produce a competing line of 600-amp products.  FPO 17.  T&B has not alleged that Richards took any of its customers except for Con Ed.  T&B cannot argue that Richards used T&B's financial information to get Con Ed as a customer, since Con Ed sought out Richards. The question, then, is how this information had value such that its misappropriation injured T&B.

T&B offers no evidence that these items of information had value to T&B at the time of their alleged misappropriation.  Instead, T&B offers speculation that the information might have

been valuable, or could have been useful, to Richards, which is irrelevant.[16]  This does not

establish the fourth factor in this Court's protectible confidential information standard.  Because,

as to item numbers 63, 65, 71, 75, and 78, T&B has presented no evidence of the fourth factor,

this Court determines that no reasonable jury could find in favor of Plaintiff, and Defendants'

motion for summary judgment will be granted.

As for the trade secret claim, only the sales information survived this Court's decision of

January 12, 2004.  T&B did not include any opposition to Defendants' motion, perhaps as an

oversight.  T&B has thus presented no evidence that this information "gives him an opportunity

to obtain an advantage over competitors who do not know or use it."  Rohm, 689 F.2d at 431.  As

to trade secret 3, Defendants' motion for summary judgment will be granted.

Moreover, as indicated in the discussion on the confidential information items, the factual

circumstances of this case leave this Court skeptical about the competitive advantage offered by

the sales information.  The Final Pretrial Order contains the allegation that Richards used the

information to undercut Elastimold's pricing.  FPO 283.  T&B has offered no evidence to

support this allegation, and, in view of the fact that T&B concedes that Con Ed approached

---

[16] T&B offers the Borgstrom declaration, which contains only speculation about
Richards' use of the information: "Each of the documents listed immediately above . . . would
give a competitor an advantage in competing with Elastimold."  (Borgstrom 2006 Dec. ¶ 82).
T&B also invites the Court to speculate about Luzzi's intentions, but Luzzi's intentions are not at
issue here, and conjecture about Luzzi is not evidence that the information had current value to
T&B.  See, e.g., Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 662 ("The reasonable inference to be drawn . .
. is that *he intended to use* the report and the report had value to Richards in developing and
selling competing products"), 667 ("The only reasonable inference . . . is that Luzzi *is willing to*
accept obviously confidential information and use it to advance Richards' interests"), 668
("Luzzi took a copy of T&B's mold productivity report . . . It *would provide* any competitor with
valuable benchmark information . . . The report *would be* particularly helpful . . ."), 677 ("T&B's
costs and productivity is highly valuable competitive information that *would allow* a competitor .
. .") (all italics added).

Richards, it cannot maintain that Richards stole Con Ed as a customer by using confidential

information to undercut T&B's prices.  Because Con Ed could have disclosed to Richards what

products T&B had sold to it, and what their price was, this Court doubts that, relative to Con Ed,

the sales information gave Richards a competitive advantage over T&B.

       J.       Design specifications for the high impulse elbow

       T&B has alleged misappropriation of one trade secret (# 4) and two items of confidential

information (# 33 and 73) concerning design of a high impulse elbow.  T&B asserts as trade

secret 4 the design specifications for a high impulse elbow connector.  FPO 283.  As confidential

information item 33, T&B claims the dimensions for inserts for the 650 BLR elbow.  FPO 305.

As confidential information item 73, T&B repeats the allegations made for trade secret 4.  FPO

321-322.

       As with the motion concerning the rubber formula, T&B observes that this Court already

denied Richards' motion for partial summary judgment on trade secret 4, and asks this Court to

therefore strike or deny the instant motion.  In the Opinion of January 12, 2004, this Court denied

partial summary judgment as to the design of the high impulse elbow because the evidence

showed conflicting expert opinions as to the "reverse engineerability" of the design.  (Opinion of

January 12, 2004 at 9-10.)  For the reasons already stated above, this Court rejects this argument.

       In moving for partial summary judgment, Richards argues that: 1) T&B alleges that

Richards copied the high impulse elbow design shown on document R3334, but that document

does not show a design for a high impulse elbow; 2) to the extent that the "design" of the elbow

is understood to mean its dimensions, that information is easily discoverable by a purchaser of

the product in the marketplace, as well as from sales drawings publicly distributed by T&B; and

3) the design of a high impulse elbow was generally known in the industry.

T&B responds by disputing the evidence of Richards' use of the design, which is irrelevant. T&B also offers this evidence: 1) T&B does not publicize its high impulse elbow design (Borgstrom 2006 Dec. ¶ 80); 2) T&B's drawings for the high impulse elbow design bear a confidentiality declaration (Borgstrom 2006 Dec. ¶ 34); 3) T&B continues to use the design in manufacturing (Borgstrom 2006 Dec. ¶ 44); and 4) the general security evidence.

This evidence is insufficient to show that the information qualifies for protection as a trade secret or confidential information. Moreover, Richards has made a persuasive case that this design is not protectible because it is easily discoverable by any purchaser of the product. Richards offers, inter alia, expert opinion that the dimensions of T&B's high impulse elbow can be measured. (Hervig Expert Report ¶ 27.) T&B responds by offering the deposition testimony of Borgstrom, contending that, while approximate dimensions can be measured, exact dimensions cannot. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 696.) The cited testimony does not, however, support this proposition: to the contrary, Borgstrom testifies that the dimensions can be measured.[17] (Borgstrom 10/29/02 Dep. 94:4-20, Robertson Cert. Ex. 16.) Remarkably, in fact,

---

[17] Similarly, T&B later points to the deposition testimony of Kenneth Barker to support the proposition that measurements of an actual product are only approximations. (Pl.'s Opp. Br. 128; Barker 1/8/04 Dep., Robertson Cert. Ex. 19.) There, again, the deposition testimony does not support T&B's position:

Q:     Could you measure the product?
A:     No, because it's gone through distortion and so forth. I mean you could measure it, but it's a very dicey way to start. You need original dimensions and then to calculate all the shrinkage from there.

(Barker 1/8/04 Dep. 263:11-15, Robertson Cert. Ex. 19.) Barker admits that one can measure the product, but describes it as a difficult way to copy a molded rubber part, because one would have to take shrinkage into account. T&B here confuses dimensions before shrinkage with dimensions after shrinkage. The fact that measurement of a product in the marketplace gives you exact dimensions after shrinkage, which are not the same as exact dimensions before shrinkage,

Borgstrom says the following, on the subject of duplicating the part by measuring:

> Q:    How long would it take to do it by trial and error based on your expertise
>       in this area?
> A:    It depends on the person's expertise that's doing it.  If they've done it once
>       already, it's a piece of cake to do it a second time around.

(Id. at 95:12-18.)  Thus, T&B's own witness calls it "a piece of cake" to duplicate the Elastimold

high impulse elbow by measuring it.[18]  T&B has failed to offer any evidence that creates a factual

dispute as to whether the dimensions of T&B's high impulse elbow can be discovered by

measuring the product as it appears in the marketplace.  Rather, T&B has offered evidence that

supports Richards' case.  In addition, T&B does not dispute Richards' assertion that T&B was

not the only manufacturer of high impulse elbows.  (Pl.'s Opp. Br. 124.)

T&B has failed to present evidence that its high impulse elbow design is not a matter of

general knowledge in the industry.  Also, T&B has offered no evidence that its design gives it an

advantage over competitors who do not know or use it.  This constitutes a complete failure of

proof as to essential elements of Plaintiff's case as to trade secret 4.  As to trade secret 4,

Defendants' motion for partial summary judgment will be granted.

As to its claim for misappropriation of confidential information items 33 and 73, T&B

has presented no evidence on the first factor, the degree to which the information is generally

known in the industry.  In the absence of any evidence from T&B on this factor, this Court

cannot conclude that the information is protectible.  Defendants' motion for partial summary

---

does not mean, as T&B argues, that measurement gives only approximations and not exact
dimensions.

[18] It is worth noting that Borgstrom here is discussing the exact issue raised by Barker: the
calculation of pre-shrinkage dimensions from post-shrinkage measurements.  Borgstrom, T&B's
witness, considers such a calculation, if done just once before, to be "a piece of cake."

51

judgment as to confidential information items 33 and 73 will be granted.

The elbow insert dimensions, confidential item 33, deserve special note. T&B has presented strong evidence that Luzzi took a document from T&B, and that Richards copied the dimensions for the elbow insert from that document. T&B refers to this as the "smoking gun" evidence of copying, and that is a fair statement. (Pl.'s Opp. Br. 127.) Yet, as to this item of information, the smoking gun evidence is not enough: making every reasonable inference in T&B's favor, proof of copying is irrelevant to the question of whether this qualifies as protectible information. A crucial element is missing – evidence that raises a factual issue as to whether T&B has a legitimate secrecy interest in the copied information. As explained above, no reasonable jury could hear the evidence T&B has offered and decide that T&B has a legitimate secrecy interest in the dimensions. Gleason, 243 F.3d at 138. Even if T&B originated the dimensions by engineering them, and maintained security measures for this information, Richards has presented evidence that the information is discoverable by competitors simply by measuring the product in the marketplace, and there is no evidence to create a factual dispute over this. The evidence offered does not show a genuine factual issue as to whether T&B has a legitimate secrecy interest in item 33.

K.    The insert end design, and a calculation method

T&B has alleged misappropriation of one item of confidential information (# 58) concerning the design of the end shape of an insert. As confidential information item 58, T&B asserts both a specific design for the shapes of the two ends, which have different radii, as well as "the trigonometry," a method to calculate the lengths of the radii. FPO 315. There are thus two elements here: 1) a calculation method (formula), which gives rise to 2) the shape of the insert

end which, in cross section, has a rounded and tapered shape which looks something like the cross section of a lipstick.  T&B limits its claim to designs which are the product of the calculation method.  (See Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 768.)

In moving for partial summary judgment, Richards argues: 1) T&B has offered no evidence that Richards used the calculation method at issue; and 2) the end shape design is well-known in the industry, as well as evident from inspection of the products.

In response, T&B offers this evidence: 1) T&B does not publicize its insert end shape geometry (Borgstrom 2006 Dec. ¶ 80); and 2) T&B continues to use the design in manufacturing (Borgstrom 2006 Dec. ¶ 44).  As to the geometry of the end shape of the insert, T&B has offered no evidence that this is information that is not generally known in the industry.  In the absence of any evidence from T&B on this factor, this Court cannot conclude that the information is protectible.

Richards also points to evidence that the insert end shape geometry is evident from inspection of the products.  See, e.g., Covill Supplemental Expert Report ¶ 58 ("[Y]ou could cut open a T&B elbow and see the end shape of the insert and observe that it had a larger radius and a small radius area and these radii could be measured and duplicated.")  In response, T&B argues that such measurements are only approximations; as discussed above, T&B's evidence does not support this.  Moreover, T&B offers the deposition testimony of Higgins, which, surprisingly, supports Richards' case.  Higgins admitted that, if one cut a BSR in half length-wise, one would "probably" be able to measure the radius of the insert.  (Higgins 12/10/03 Dep. 830:6-10, Robertson Cert. Ex. 12.)  Higgins also agreed that if one cut an Elastimold BLR laterally, one would be able to determine the geometry for the end shape for the insert on that product.  (Id. at

833:15-18.)  The available evidence thus supports Richards' assertion that the geometry is discoverable by inspection of the product as it appears in the marketplace.

Similarly, as to the calculation method, T&B has failed to offer any evidence that it has a legitimate secrecy interest in the formula.  It has offered no evidence that the formula is not generally known in the industry.  Nor has it offered evidence that a competitor would need the formula to copy the end shape geometry: if the geometry can be determined by cutting open the product, it is unclear why the formula would be needed.  Moreover, T&B does not dispute that other competitors have used an insert end design with a rounded shape.  There is no evidence that having the T&B formula is of any special value.  T&B has offered no evidence from which this Court could conclude that the calculation method is protectible.

As to confidential information item 58, Defendants' motion for partial summary judgment will be granted.

L.    Spade connectors

T&B has alleged misappropriation of one item of confidential information (# 31) concerning the dimensions and tolerances of spade connectors.  FPO 304.  In moving for partial summary judgment, Richards argues: 1) Richards uses spade connectors that were designed by its supplier, Homac; and 2) T&B publishes drawings and catalogues that depict the dimensions of its spade connectors.  T&B does not dispute that certain of the drawings that Richards points to contain dimensions, but maintains that they do not disclose all the relevant dimensions and tolerances for the spade connectors.

In response, T&B offers this evidence: 1) T&B does not publicize its spade connectors (Borgstrom 2006 Dec. ¶ 80); 2) the general security evidence; and 3) T&B continues to use its

spade connector drawings (Borgstrom 2006 Dec. ¶ 42). As discussed above, this does not constitute evidence of the degree to which the information is generally known in the industry.

T&B concedes that "the dimensions of a spade connector can be measured from the spade connector itself . . ." (Pl.'s Opp. Br. 139.) T&B argues again that such measurements are only approximations, which this Court has rejected. T&B offers no evidence for its assertion that measurements would only be approximate.

As to its claim for misappropriation of confidential information item 31, T&B has presented no evidence on the first factor, the degree to which the information is generally known in the industry. In the absence of any evidence from T&B on this factor, this Court cannot conclude that the information is protectible. As to confidential information item 31, Defendants' motion for partial summary judgment will be granted.

M.     Runner shut-off devices

Richards has moved for partial summary judgment as to confidential information item 10, concerning the use of runner shut-off devices in the rubber molding process. FPO 293. In its opposition brief, T&B gives no response to Richards' motion. In Plaintiff's Response to Defendant's Rule 56.1 Statement, T&B stated that it withdraws without prejudice its claim involving the use of runner shut-off devices. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 794.) As with the claims concerning matted finish discussed above, this Court concludes that dismissal without prejudice so late in the litigation would subject Defendants to extreme financial prejudice; dismissal will be granted only with prejudice. T&B's claim for misappropriation of confidential information item 10 will be dismissed with prejudice.

55

N.      Non-specific claims

Richards presents a final category of claims which, it alleges, lacked specifics in the Final Pretrial Order.  Richards contends that the Court warned T&B that it must include detail in the Final Pretrial Order, and that T&B did not comply.  Richards asks that these claims be "excluded."  Insofar as this Court construes this to be a motion to dismiss certain claims as a sanction for non-compliance with this Court's directives, it has been submitted without briefing on the legal and factual basis for such a request.  Richards has not persuaded this Court that such sanctions are justified.  Rather, this Court will address these claims within the framework of the motion for partial summary judgment.

Richards includes seven items of confidential information in this category: temperatures (item 30), injection system (item 70), and design criteria (items 80, 81, 82, 84, and 85).  Richards contends that it is entitled to partial summary judgment because T&B has failed to specifically identify the information at issue.  As discussed above, specific identification may be considered as a prerequisite for protection, or as connected to the second factor of this Court's standard for determining whether T&B has a protectible interest in information, the level of specificity and specialized nature of the information.  The bottom line is that information that has not been specifically identified will not be protected.

1.      Item 30: temperatures

As to confidential information item 30, temperatures, T&B has not specifically identified the temperatures it claims as confidential information.  The Final Pretrial Order asserts that molds for injection molding rubber parts contain components which run at seven different temperatures, and that these temperatures are detailed in Elastimold's standard operating procedures.  FPO 303.

56

T&B has not specified what these temperatures are, no less what does what at what temperature. T&B offers the Walworth 2006 declaration, in which no greater specificity appears. Rather, Walworth states: "I have observed the use of specific temperatures by Elastimold and have observed the use of similar specific temperatures by Richards." (Walworth 2006 Dec. ¶ 23.) Walworth does not identify what temperatures are used for what purpose. It would be difficult to get more vague than this. Nor does T&B offer evidence relating to the first factor, the degree to which the information is generally known in the industry. No reasonable jury could hear this evidence and conclude that T&B has a protectible interest in confidential item 30.

In disputing Richards' assertion of independent development of the temperatures, however, T&B does point to evidence that states specific temperatures. T&B points to Luzzi deposition exhibit 21, which does offer twenty-three pages listing what appear to be different specific temperatures. (Robertson Cert. Ex. 56.) Yet, because T&B has not specified what temperatures and methods are associated with item 30, the Court has no basis to find that the documents in exhibit 21 are even relevant; furthermore, there is no foundation for considering this document.

In Plaintiff's Response to Defendants' Rule 56.1 Statement, T&B states that every temperature in every Elastimold standard operating procedure is at issue. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 824.) For the sake of argument, even if the Court accepted this broad definition as setting the limits of item 30, T&B has still presented no evidence that any of its temperatures is proprietary information, not generally known in the industry.

T&B has offered no evidence from which a jury could find that the information claimed in item 30 has been specifically identified and not generally known in the industry. As to item 30,

Defendants' motion for partial summary judgment will be granted.

2.      Item 70: the injection system

Richards contends that T&B has failed to identify the specific pieces of confidential information that have been misappropriated.  While this Court finds that Richards is entitled to judgment on item 70 as a matter of law, it does so on a number of grounds.

As stated in the Final Pretrial Order, item 70 contains a number of component claims. First, the Final Pretrial Order states that Richards purchased equipment made by a company long out of business (Lewis)[19] that is the same as equipment that T&B has.  FPO 319-320.  T&B agrees that Lewis is one of the most popular manufacturers of injection presses, and that at least two of T&B's competitors used the same type of Lewis presses as T&B to make electrical connectors. (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶¶ 840, 841.)  While this Court believes that T&B could find no set of facts under which the recent purchase of decades-old, commonly-used equipment from third parties who were its lawful owners would constitute misappropriation of confidential information, it is sufficient for the present motion to find that T&B has offered no evidence in support.

Next, the Final Pretrial Order states that Richards has made certain modifications to these presses.  FPO 320.  These modifications are not alleged to comprise T&B's confidential information.  This fails to state a claim, as, without more, T&B has no cause of action for Richards' modifications of its own equipment.  This Court declines to amend the Final Pretrial Order at this late date so that T&B has a cause of action.

Lastly, the Final Pretrial Order states that "Richards has created technical drawings of proprietary nozzles Elastimold has designed for Lewis presses."  FPO 320.  T&B has offered no

_____

[19] The FPO states that Lewis has been "out of business for decades."  FPO 319.

evidence in support of this claim.  This Court observes that the Walworth 2006 declaration – the only evidence offered by T&B to support its case on item 70 – addresses the Lewis presses but says nothing about proprietary nozzles.  (Walworth 2006 Dec. ¶ 24(a).)

For the foregoing reasons, as to item 70, Defendants' motion for partial summary judgment will be granted.

### 3.    Items 80, 81, 82, 84, and 85: design drawings

These items all concern specific part drawings that, T&B claims, Richards copied.  T&B first addresses items 81 (drawing of the H and Y connector jacket – document R3341), 82 (drawing of the H bus bar – documents R3342 and R3343), and 85 (drawing of the voltage detector cap – documents R3327 and R3349).  (Pl.'s Opp. Br. 147.)  In support, T&B offers Lungin's deposition testimony, but not only do the cited sections relate to documents other than the ones at issue, but the testimony goes to use, not to whether the information is protectible.  (Lungin Dep. 64:11-21, 66:16-22, 113:18-115:8, 124:1-12, 125:17-25, Robertson Cert. Ex. 11.)  Similarly, the Malave testimony that T&B points to is not relevant evidence.  (Malave Dep. 57:21-59:15, Robertson Cert. Ex. 17.)  As to items 81, 82, and 85, T&B has offered no evidence that the items are protectible confidential information.

Next, T&B addresses item 80 (drawing of the BSR jacket – document R1590).  FPO 326.  Again, T&B points to evidence concerning other documents, not the document at issue, and presents no evidence that the information is protectible.

Last, T&B addresses item 84 (drawings of the cable adapter – documents R3008-R3009 as

numbered in T&B Dep. Ex. 8[20]).  FPO 328-329; Pl.'s Opp. Br. 150; Robertson Cert. Ex. 59.  The
only evidence that T&B offers is the testimony of Luzzi, who identified the handwriting on
document R3008 as his own.  (Luzzi Dep. 191:1-14, Robertson Cert. Ex. 10.)  This is not
evidence that item 84 meets this Court's standard for protectible confidential information.

At the end of the section of its brief relating to these design drawings, T&B adds the one-
sentence statement that paragraph 24 of the Walworth 2006 declaration provides evidence
substantiating these claims.  (Pl.'s Opp. Br. 150.)  Walworth's statements, however, are directed
at the issue of design similarity, which is irrelevant to the question presently before this Court.
Furthermore, as discussed above, Walworth cannot provide testimony as to what was generally
known in the industry, and so his declaration cannot provide evidence as to the first factor of this
Court's protectible confidential information analysis.

T&B has offered no evidence in support of its claims as to the specific drawings in items
80, 81, 82, 84, and 85.  As to these items, Defendants' motion for partial summary judgment will
be granted.

O.    Discussion

Because this Court has determined that no items of information at issue are protectible as
trade secrets or confidential information, the issue of whether Defendants independently
developed the items is moot and need not be reached.

T&B has failed to establish that any of the items of information at issue in this motion is
protectible as a trade secret or as confidential information in which T&B has a legitimate secrecy

---

[20] T&B's opposition brief erroneously points to R3008 in exhibit 1 of the Robertson
certification, rather than in exhibit 59.

interest.  The weakness of T&B's position may be understood better by looking at a crucial

chapter in the history of this litigation: the origin of T&B's list of confidential information.  The

list was developed by Walworth, formerly offered as an expert, who appears to have looked at the

record, as it was at one time and, based on the incomplete information available to him, listed

similarities he found between information that Richards appeared to possess and information

T&B appeared to possess.  Walworth candidly admits that he did not consult with T&B to find out

whether T&B itself considered the items on his list to be confidential.  (Walworth Dep. 280:15-

18, Cantine Dec. Ex. 2.)  The result is a list of items that has been generated based on an

outsider's ideas of similarity, rather than on an insider's understanding of what is valuable and

secret.  It is no surprise that, with this foundation, T&B has produced a case with scant support for

the necessary inferences that the information is valuable and secret.

## CONCLUSION

For the reasons stated above, Plaintiff's cross-motion to strike and Defendants' motion to exclude are both **GRANTED IN PART** and **DENIED IN PART**.  As to Defendants' motion for partial summary judgment, Defendants have shown, pursuant to FED. R. CIV. P. 56c),  "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Defendants have pointed to the absence of evidence establishing that these items of information are protectible as trade secrets or as confidential information in which T&B has a legitimate secrecy interest, and T&B has failed to offer actual evidence that raises material factual disputes.  Defendants' motion for partial summary judgment is **GRANTED** in its entirety.


        ___s/ Stanley R. Chesler_____
        STANLEY R. CHESLER, U.S.D.J.

Dated: April 26, 2007