**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                              :
THOMAS & BETTS CORPORATION,                   :
                                              :
                    Plaintiff,                :        Civil Action No. 01-4677 (SRC)
                                              :
           v.                                 :        **OPINION**
                                              :
RICHARDS MANUFACTURING                        :
COMPANY, et al.,                              :
                                              :
                    Defendants.               :
_____:

**CHESLER, U.S.D.J.**

      This matter comes before the Court on four motions: 1) Plaintiff Thomas & Betts

Corporation's ("T&B") motion for reconsideration of this Court's April 3, 2006 <u>Daubert</u> Order

limiting the testimony of Van T. Walworth and this Court's April 26, 2007 Order granting partial

summary judgment [docket item #364]; 2) T&B's motion to strike evidence proffered by Lloyd

Covill, Walter Koroluk, and Harold Hervig [docket item #335]; 3) Defendants Richards

Manufacturing Company, Bleema Manufacturing Company, and Glenn Luzzi's (collectively,

"Richards") motion to exclude the 2006 and 2007 Declarations of Van T. Walworth [docket item

#348]; and 4) Richards' motion for partial summary judgment pursuant to Federal Rule of Civil

Procedure 56 [docket item #321].  This Court has considered the submissions by the parties in

connection with the motion and, pursuant to Federal Rule of Civil Procedure 78, adjudicates the

motion based on the papers submitted.  For the reasons stated below, T&B's motion for

reconsideration will be **DENIED**, T&B's motion to strike will be **GRANTED IN PART** and

**DENIED IN PART**, Richards' motion to exclude evidence will be **GRANTED IN PART** and

**DENIED IN PART**, and Richards' motion for partial summary judgment will be **GRANTED**.


## BACKGROUND

This case arises from a dispute concerning allegations of misappropriation of trade secrets

and confidential information relating to the design and manufacture of certain high-voltage

electrical connectors.  The background is discussed in greater detail in this Court's previous

Opinions.  A brief overview is given in the Court's April 26, 2007 Opinion [docket item #306]

and is repeated here:

> Briefly, the following are undisputed facts.  This case involves four broad categories of high-voltage electrical connector products: I-joints, Y-joints, H-joints, and elbows.  The joints connect sets of cables, while an elbow terminates a single cable at a switch or transformer.  (Final Pretrial Order ("FPO") 14, 16.)  The joints are connected to cables in combination with sleeves. (FPO 13.)  The sleeve consists of three main parts: an insert, an insulating layer, and an outer jacket.  (FPO 52.)  T&B refers to a sleeve as a "BSR."  (Pl.'s Resp. to Defs.' 56.1 Stmt. ¶ 62.)  T&B refers to an elbow as a "BLR."  (Walworth 2006 Decl. ¶ 11(f).)

> Glenn Luzzi ("Luzzi") was employed by Elastimold, a division of Thomas & Betts Corporation, for approximately 20 years.  (FPO 14.)  For several years, Luzzi had design responsibility for the 600-amp connector line.  Id.  During the last six years of employment with Elastimold, Luzzi served as Director of Engineering.  Id.

> In 1978, Luzzi had signed the "Non-Competition, Invention, and Secrecy Agreement."  (FPO 15.)  T&B released Luzzi from only the non-compete restriction of this Agreement. (FPO 18.)  In 1996, Luzzi signed the "Employment Proprietary Information and Invention Agreement."  (Def.'s Reply to T&B's

Stmt. Addl. Facts ¶ 29.)  Luzzi left Elastimold at the end of the
second week of January of 1999 and went to work for Defendant
Richards Manufacturing Company the following Monday.  Id.

Before 1999, Richards had never used injection molding to
manufacture a product.  Id.  Prior to Luzzi's employment change,
Elastimold was the only company that manufactured the I, Y or H
components at issue.  (Def.'s Reply to T&B's Stmt. Addl. Facts ¶
24.)  Other companies manufactured elbow connectors, but none
manufactured connectors with an oil-resistant jacket.  Id.  Prior to
1999, Richards had manufactured a high-voltage molded connector
for Consolidated Edison ("Con Ed"), but not using an injection
molding process.  (FPO 18.)

Con Ed is the largest purchaser of the products in question.
(Def.'s Reply to T&B's Stmt. Addl. Facts ¶ 25.)  Before 1999, Con
Ed had approached Richards to discuss Richards' becoming a
second source for the products at issue.  Id. at ¶ 35.  Richards states
that it began selling sleeves to Con Ed in 2000.  (Defs.' 56.1 Stmt.
¶ 211.)

It is undisputed that Luzzi had at his home approximately
six hundred pages of Elastimold documents pertaining to the
design and manufacture of Elastimold products; T&B calls these
the "Closet Documents."  The parties dispute the source of these
documents, with T&B contending that Luzzi took them from
Elastimold during employment, and Richards contending that it
provided many of these documents to Luzzi after he became
employed with them.

(Apr. 26, 2007 Op. 2-3.)

The entire procedural history of this litigation need not be reviewed here, but the decision

on the instant motion relies considerably on three previous Opinions.  On October 7, 2005, this

Court denied Richards' previous motion for partial summary judgment.  This Court examined the

Confidentiality Agreements at issue and held that, while they were overly broad, the Court would

"blue pencil" them and "deem protected only that information in which T&B has a legitimate

secrecy interest."  (Oct. 7, 2005 Op. 8.)  The Court then set forth a four-factor standard that it

would use to determine whether T&B had a legitimate secrecy interest in the named items of information.  (<u>Id.</u> at 9-14.)  The Court then denied the motion without prejudice and directed the parties, if the motion was renewed, to marshal the evidence and apply this four-factor standard.  (<u>Id.</u> at 14.)

On April 4, 2006, after five days of hearings, the Court issued its Opinion on a group of motions relating to evidentiary issues (the "<u>Daubert</u> Opinion").  In that Opinion, the Court ruled on the admissibility of particular testimony from proposed experts Walworth, Covill, Koroluk, Hervik, and Grossman.

Then, on April 26, 2007, the Court issued its Opinion on a motion for partial summary judgment filed by Richards in accordance with the guidelines set by the October 7, 2005 Opinion.  In that Opinion, the Court also addressed T&B's cross-motion to strike certain parts of the motion, contending that they were outside the scope of this Court's authorizing Order of August 1, 2006, as well as certain pieces of evidence, contending they were inadmissible under the <u>Daubert</u> Opinion.  Richards' motion to exclude most of the 2006 Walworth Declaration, contending it was inadmissible under the <u>Daubert</u> Opinion, was also addressed.  This Court granted Richards' motion for partial summary judgment in its entirety, dismissing all of T&B's trade secret claims and a number of confidential information claims as unsupported by the evidence.  (Apr. 26, 2007 Op. 17-62.)  T&B's cross-motion to strike was granted only as to "those portions of the opinion evidence of Covill, Koroluk, and Hervig that are inadmissible under the <u>Daubert</u> Opinion[.]" (<u>Id.</u> at 12.)  Richards' motion to exclude the 2006 Walworth Declaration was also granted in part and denied in part, with the Court excluding all statements within the Declaration that ran afoul of the <u>Daubert</u> Opinion.  (<u>Id.</u> at 13.)  Further, this Court

4

again explained the four-part test in light of T&B's evidence (id. at 14-17), emphasized that "[t]he summary judgment decision turns on T&B's evidence, not Richards'" (id. at 11, 19), and explained that identifying the confidential information with sufficient particularity is a "threshold matter" (id. at 21-22).

The instant partial motion for summary judgment filed by Richards addresses the remaining items that T&B claims to be confidential information.

## DISCUSSION

### I.    T&B'S MOTION FOR RECONSIDERATION

T&B seeks reconsideration of this Court's April 3, 2006 Daubert Order limiting the testimony of Van T. Walworth and this Court's April 26, 2007 Order granting partial summary judgment [docket item #364].  T&B states that there has been an intervening change in law due to the Third Circuit's recent opinion in Pineda v. Ford Motor Co., 520 F.3d 237 (2008).  T&B argues that "Pineda has undermined this Court's Daubert ruling, which should no longer be considered the law of the case[,]" positing that the facts of Pineda are sufficiently similar to the facts of this case regarding qualification of an expert and the proof needed to show an expert is reliable.  (T&B Br. in Supp. of Mot. for Reconsideration 2-5.)

A motion for reconsideration is intended "to correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir.1985)).  Alteration or amendment of a judgment is proper where "the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the

controlling law; (2) the availability of new evidence that was not available when the court

[decided] the motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent

manifest injustice." Id. The motion should set forth "the matter or controlling decisions which

the party believes the Judge or Magistrate Judge has overlooked[.]" L. Civ. R. 7.1(i). Although

motions for reconsideration must normally be made within ten days after entry of the order or

judgment on the initial motion, case law in this District makes an exception where a party asserts

that there has been an intervening change in the law. Elec. Mobility Corp. v. Bourns

Sensors/Controls, Inc., 87 F.Supp.2d 394, 401 (D.N.J. 2000).

Pineda was a products liability action stemming from injuries sustained by an automobile

technician when he was repairing a Ford Explorer's liftgate and the liftgate glass exploded.

Pineda, 520 F.3d at 240-41. In that case, the Third Circuit addressed whether a proffered witness

was qualified to testify, overturning the underlying District Court's determination that the

witness was unqualified. Id. at 240. The Court addressed the individual topics on which the

expert was proffered to testify, explaining:

> First, Clauser [(the expert)] testified that a specific, step-by-step procedure was
> required in order to reduce the likelihood that the rear liftgate glass would fail
> when replacing the liftgate brackets and hinges on a 2002 Ford Explorer. More
> specifically, he opined that such a procedure should have been embodied in an
> instruction in the 2002 Explorer's service manual but was not. Clauser testified
> during the Daubert hearing that, while he was not proposing what the instruction's
> precise language should be, he was asserting that a proper instruction was a
> solution to an engineering problem under the safeguarding hierarchy. To meet
> Rule 702's liberal qualification requirement, Clauser did not need to be
> substantively qualified in the design of automobile rear liftgates or the drafting of
> service manual instructions. Clauser's expertise in the stresses and other forces
> that might cause a material such as glass to fail was more than sufficient to satisfy
> Rule 702's substantive qualification requirement.
>
> . . .

6

> Additionally, Clauser was proffered to establish that the 2002 service manual should have contained an explicit warning that following the necessary step-by-step instruction was a safety issue.  Again, as an engineer, Clauser did not purport to opine on how the warning should be worded or how it should appear in order to effectively convey its message to an automobile technician.  He only testified that neglecting to follow the steps of an instruction when replacing the 2002 Explorer's liftgate brackets and hinges might result in failure of the liftgate glass, and that a warning was necessary to alert a technician to the potential problem.  Clauser was substantively qualified to testify on this point because a proper warning is also a solution to an engineering problem.

Pineda, 520 F.3d at 245.  The Court clarified that the expert need only be qualified, but need not be the "best qualified[.]"  Id.  It then found, using the standard set in Daubert, that the expert's testimony was sufficiently reliable.  Id. at 247-49.  In coming to these conclusions, the Third Circuit applied the standard espoused in Daubert and its progeny to the specific facts of Pineda.  See id. at 243-49.  In accordance with Daubert, Pineda involved a detailed fact-based inquiry, demonstrating that the admissibility of expert testimony is a factual determination based on specific criteria of the opinion being offered.  Despite T&B's assertions to the contrary, therefore, Pineda does not represent an intervening change in the controlling law.

In its April 3, 2006 Daubert Opinion, this Court followed the standards set forth in Daubert v. Merrell Dow Pharm., Inc, 509 U.S. 579 (1993), and subsequent cases.  As such, in analyzing the facts of this case under first prong of the Federal Rule of Evidence 702 standard, whether the witness possesses the requisite "knowledge, skill, experience, training or education" with regard to the subject matter of the testimony for which he or she is offered, the Court recognized that

> [t]he Third Circuit has interpreted the "qualification" requirement liberally and has held that "a broad range of knowledge, skills, and training qualify an expert as such." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994). While liberal in qualifying experts, the Third Circuit has "also set a floor with respect to

an expert witness's qualifications." [Elcock v. Kmart Corp., 233 F.3d 734, 742
(3d Cir. 2000).]

(Apr. 4, 2006 Op. 17.)  The Court then engaged in a detailed analysis of the issues upon which

T&B offered Walworth's testimony pursuant to the standards set forth in Federal Rule of

Evidence 702 and explained in Daubert and its progeny.  (See Apr. 3, 2006 Op. 26-33.)  The

Court found both Walworth's experience and his methodology insufficient and determined that

Walworth was not qualified to testify as an expert.  (Id.)

The Court's Rule 702 analysis in its April 4, 2006 Opinion was entirely in accord with the

Third Circuit's analysis in Pineda.  T&B therefore fails to demonstrate the existence of any

"intervening change in the controlling law[.]"  See Max's Seafood Café, 176 F.3d at 677.  As

T&B does not assert any other grounds for reconsideration, alteration, or amendment of the

Court's April 3, 2006 Order and subsequent Orders that relied on its conclusions, reconsideration

is inappropriate, and T&B's motion is denied.


II.    **T&B'S MOTION TO STRIKE EVIDENCE PROFFERED BY LLOYD COVILL, WALTER
       KOROLUK AND HAROLD HERVIG**

T&B moves to bar the evidence proffered by Richards' witnesses Lloyd Covill ("Covill"),

Walter Koroluk ("Koroluk"), and Harold Hervig ("Hervig") on the basis that their testimony is

barred by this Court's April 3, 2006 Daubert Order.  Richards asserts that the testimony is

admissible.  After reviewing both parties' submissions, this Court finds that, although the

evidence in question contains a mixture of admissible and inadmissible statements, Richards has

presented sufficient evidence to satisfy the Daubert Opinion's requirements for admission of

personal observation testimony.

8

In its <u>Daubert</u> Opinion, this Court found that Covill, Koroluk, and Hervig were "barred from giving expert or lay opinions regarding issues of common knowledge in the industry, security matters and whether or not Elastimold treated the information at issue appropriately, and issues of reverse engineering." (Apr. 3, 2006 Op. 22-23.) However, testimony regarding prior personal experience was allowed with a condition precedent: "[t]hese witnesses may provide lay testimony regarding their personal experiences during their employment, to the extent they are permitted under the terms of their employment, and generalized testimony, not opinion, regarding molding processes and operations based upon their personal experience and observations from the properly admitted evidence in this case." (<u>Id.</u> at 23.)

Based on these determinations, in opposing Richards' earlier motion for partial summary judgment, T&B filed a cross-motion to strike testimony from Covill, Koroluk, and Hervig as inadmissible under the <u>Daubert</u> Opinion. This Court denied that cross-motion to strike without prejudice, explaining that "this Court need not decide this evidentiary question to rule on the motion for partial summary judgment" due to T&B's failure to provide sufficient evidence to meet its burden of proof on that motion. (Apr. 26, 2007 Op. at 11.) However, the Court granted T&B's motion as to the three witnesses' testimony where the testimony expressed "expert or lay opinions regarding issues of common knowledge in the industry . . . " as violative of the <u>Daubert</u> Opinion. (<u>Id.</u> at 12 (quoting Apr. 3, 2006 Op. at 35).)

In opposing the motion at hand, Richards supplied this Court with sworn affidavits by its three experts explaining that they are not barred from testifying about the prior personal experiences from prior employment that are at issue. (Decl. of Jason Sobel, Esq. In Supp. of Defs.' Opp'n to T&B's Mot. to Strike Evidence, Nov. 19, 2007 ("Sobel Decl."), Exs. 1, 2, & 3.)

T&B asserts that these affidavits are an insufficient showing to meet the Court's requirement that the witnesses only testify "to the extent they are permitted under the terms of their employment." The Court disagrees with T&B's interpretation of the Court's earlier opinions and finds that Richards has made a sufficient showing through the sworn affidavits of Covill, Koroluk, and Hervig that their testimony as to prior work experience is permissible under the terms of present and prior employment agreements.

However, as per the Daubert Opinion, testimony of Covill, Koroluk, and Hervig that consists of "expert or lay opinions regarding issues of common knowledge in the industry, security matters and whether or not Elastimold treated the information at issue appropriately, and issues of reverse engineering" remains barred.  (See Apr. 3, 2006 Op. 22-23.)  As such, the Court has considered the evidence proffered by Covill, Koroluk, and Hervig only insofar as it is "lay testimony regarding their personal experiences during their employment . . . and generalized testimony, not opinion, regarding molding processes and operations based upon their personal experience and observations from the properly admitted evidence in this case" (id. at 23), and that evidence is admissible under the Daubert Opinion.  Insofar as the evidence provided by Covill, Koroluk, and Hervig contains statements that are inadmissible under the Daubert Opinion, those statements will be excluded.  T&B's motion to strike the evidence proffered by Richards' witnesses Covill, Koroluk, and Hervig will thus be granted in part and denied in part.

## III.   RICHARDS' MOTION TO EXCLUDE THE DECLARATIONS OF VAN T. WALWORTH

Richards moves to exclude the Walworth 2007 Declaration and renews its motion to strike the Walworth 2006 Declaration.  In opposition, T&B argues that "[t]he Court previously

acknowledged that the declaration of [Walworth] submitted in 2006 fits squarely within the Court's <u>Daubert</u> Opinion; the 2007 Declaration, hewn from the same materials should be considered with equal measure." This argument misrepresents the Court's prior decision. The Court did not "acknowledge[] that the declaration of [Walworth] submitted in 2006 fits squarely within the Court's <u>Daubert</u> Opinion"; the Court expressly stated that "[t]he Walworth 2006 Declaration contains a mix of admissible and inadmissible statements," and found large portions of that Declaration inadmissible. (Apr. 26, 2007 Op. 13.)

This motion does not require detailed discussion, as the Court thoroughly addressed the permissible bounds of Walworth's testimony in its April 3, 2006 and April 26, 2007 Opinions. For clarification, in its April 3, 2006 <u>Daubert</u> Opinion, this Court placed the following limitations on testimony by Walworth:

1. Mr. Walworth is barred from giving lay or expert testimony with regard to (a) what is commonly known in the "rubber molding industry," (b) what is generally done in the "rubber molding" industry with respect to maintaining secrecy in manufacturing operations, and whether Elastimold's efforts were consistent with such practices; (c) whether or not Richards reverse engineered Elastimold's products and what it would take, or how long it would take, to reverse engineer and develop a manufacturing process for the products at issue; (d) the transferability of processes regarding injection molding plastics to manufacturing the products at issue; and (e) whether or not information that Mr. Luzzi allegedly took with him to Richards is protectible trade secret information; and

2. Mr. Walworth's testimony shall be limited to his observations from the parties' products, manufacturing processes, and documents that were properly admitted into evidence; general manufacturing concepts within the rubber molding industry; and general concepts regarding the process of reverse engineering through examples of his own personal experience, to the extent they are relevant.

(Apr. 3, 2006 Op. 36.)

As with the 2006 Declaration, the Walworth 2007 Declaration also contains a combination of admissible and inadmissible information based on the above standard.  Despite this, the Court need not examine the 2007 Declaration in detail, since it plays a very minor role in the decision that follows.  The analysis that follows will demonstrate that this case turns primarily on the sufficiency of particularity with which T&B describes each item of confidential information, whether the alleged confidential information is generally known, and whether the claimed item is sufficiently specialized as to warrant protection.  Walworth is barred from testifying regarding "what is commonly known in the 'rubber molding industry'" (id. at 36), and the testimony that Walworth is permitted to give lends little assistance in determining whether the description of the  information is sufficiently particular or specialized.  As such, this Court reaffirms its determination regarding the Walworth 2006 Declaration and applies that holding to the Walworth 2007 Declaration.  Specifically, "[t]his Court has considered the Walworth 2006 [and 2007] Declaration[s] only insofar as [they] state[] Walworth's direct observations of the parties' products and documents, and these are admissible under the Daubert Opinion. . . . Insofar as the Walworth 2006 [and 2007] Declaration[s] contain[] statements that are inadmissible under the Daubert Opinion, such statements will be excluded."  (Apr. 26, 2007 Op. 13.)  Richards' motion to exclude the 2006 and 2007 Walworth Declarations is therefore granted in part and denied in part.

## IV.   RICHARDS' MOTION FOR PARTIAL SUMMARY JUDGMENT

In moving for partial summary judgment, Richards seeks a determination that the items of confidential information that were not dismissed by this Court's April 26, 2007 Order are not

legally protectible, dismissal of Counts I, II, IV, V, and VI of T&B's Counterclaims, and an order for Final Judgment against T&B and in favor of Richards.

## A.    Legal Standard

### 1.    Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991)).  "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at

325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).

### 2. Protection of Confidential Information in which There is a Legitimate Secrecy Interest

As stated in its April 26, 2007 Opinion, the law of the case regarding confidential

information is as follows:

> New Jersey law recognizes that employers may protect themselves contractually from the misappropriation of trade secrets and other confidential information.  Ingersoll, 110 N.J. at 635-36; Whitmyer Bros. Inc. v. Doyle, 58 N.J. 25, 33 (1971).  The enforceability of any post-employment restrictive covenant depends, however, upon its reasonableness under the circumstances.  Under New Jersey's Solari/Whitmyer test, such a covenant is reasonable where it: (1) is reasonably necessary to protect the employer's legitimate interest, (2) causes no undue hardship on the employee, and (3) does not impair public interest. Whitmyer Bros., 58 N.J. at 32-33; Solari Indus., Inc. v. Malady, 55 N.J. 571, 576 (1970).

> In the Amended Opinion of October 7, 2005, this Court found that, while the Confidentiality Agreements were overly broad, it would "blue pencil" them and enforce them to the extent reasonable under the circumstances, deeming protected only that information in which T&B has a legitimate secrecy interest.  ([Oct. 7, 2005 Op.] 6-8.)  Examining New Jersey law, this Court identified the standard by which it would determine whether information was protectible and set forth four factors to be considered in the decision to find a contractually protectible interest in confidential information:

>> (1) the degree to which the information is generally known in the industry; (2) the level of specificity and specialized nature of the information; (3) the employer/employee relationship and circumstances under which the employee was exposed to the information; and (4) whether or not the information is "current."

([Oct. 7, 2005 Op.] 11.)  Among these four factors, the first is essential, since "matters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection . . ."  Whitmyer, 58 N.J. at 33-34.  Even when the New Jersey Supreme Court expanded protection beyond the scope of Whitmyer in Ingersoll-Rand, it continued to require that information be "not generally known in the industry" to be eligible for protection:

> We agree with <u>Ingersoll-Rand</u> that the protection
> afforded by holdover agreements such as the one
> executed by the parties in this lawsuit may under
> certain circumstances exceed the limitation of trade
> secrets and confidential information. We recognize
> that employers may have legitimate interests in
> protecting information that is not a trade secret or
> proprietary information, but highly specialized,
> current information not generally known in the
> industry, created and stimulated by the research
> environment furnished by the employer, to which
> the employee has been 'exposed' and 'enriched'
> solely due to his employment. We do not attempt to
> define the exact parameters of that protectible
> interest.

> <u>Ingersoll-Rand</u>, 110 N.J. at 638.  Thus, even when extending
> protection most broadly, the New Jersey Supreme Court required
> that information be not generally known in the industry before
> finding a protectible interest.

(Apr. 26, 2007 Op. 8-9.)

**B.       Specific Discussion of the Law of this Case**

Prior to discussing the core of Richards' motion,  whether the items of confidential

information are legitimately protectible, this Court will briefly highlight certain general

principles applicable to the summary judgment standard and the four-part test discussed above

that affected its reasoning.

Of utmost importance, T&B holds the burden of proof regarding this motion for partial

summary judgment.  This has been repeatedly stated by the Court.  For example, in its April 26,

2007 Opinion, the Court wrote that "T&B must present actual evidence that creates a genuine

issue as to a material fact for trial."  (<u>See, e.g.</u>, Apr. 26, 2007 Op. 19, 4, 11.)  Further, the Court

clarified what this standard requires, stating that "[g]etting rid of Defendant's evidence is not a

16

substitute for proving one's case.  To survive summary judgment, the party with the burden of proof must point to actual evidence that could persuade a jury to find in its favor."  (Id. at 22-23.)

Furthermore, this Court previously held that "when an employer does not identify confidential information with sufficient particularity, it is not reasonable to enforce a post-employment restrictive covenant."  (Apr. 26, 2007 Op. 21-22.)  This is obviously a concommittal of the fact that a former employee cannot be expected to respect the confidentiality of information if he or she has never been effectively told what is regarded as confidential.  This problem is compounded in this case by the fact that, even in the Final Pretrial Order, T&B still failed to sufficiently identify many of its claims for misappropriated information.  As the Court noted in its April 2007 Opinion, T&B has used a moving target in pursuing many of its claims in this case.  Where T&B fails to sufficiently identify the alleged confidential information, it not only makes it impossible for a former employee to conform his conduct, it also makes it impossible for a court to adequately evaluate whether the information is truly protected.  Moreover, the problem is not solved by T&B using its submissions in a summary judgment motion to remedy defects that it has had repeated opportunities to cure.  Thus, where the Final Pretrial Order, on its face, fails to adequately specify the parameters of T&B's claim, it is totally appropriate to dismiss the claim on that ground alone, without considering T&B's belated efforts to identify the claim.

Specifically relating to the threshold inquiry of the four-part test, whether an item is generally known, T&B must present actual evidence that demonstrates that the item is not generally known.  (See Oct. 7, 2005 Op. 11-12.)  In discussing a number of different items, Richards offers the testimony of three witnesses, Covill, Koroluk, and Hervig, stating that they

used the items being claimed confidential by T&B in prior employment within the industry. Evidence that another company used a particular item that is now being claimed confidential by T&B is insufficient to demonstrate that the item under review is generally known. However, T&B holds the burden of proof, so T&B must present this Court with evidence that refutes Richards' evidence, and it must also produce its own affirmative evidence that the information is not generally known, although the undisputedly small size of the industry in question adds weight to the evidence offered by Covill, Koroluk, and Hervig. (See Dec. 13, 2005 Daubert Hr'g Tr. 48:8-11 (stating that four companies, including Richards and Elastimold, make up the "primary underground electrical connectors manufacturers today"; this is not disputed by T&B in its opposition brief or in the Final Pretrial Order).) Generally speaking, the evidence offered by Richards as to its witnesses' prior experiences highlights T&B's failure to meet its evidentiary burden.

Finally, before addressing individual claims, it must be noted that every claim in T&B's brief fails to satisfy T&B's burden of demonstrating that reasonable efforts were made to keep the items at issue confidential. That issue will therefore not be discussed in detail. Nevertheless, this Court will deal with the remaining components of the legal standard on an item-by-item basis, addressing each item by the number it was assigned in the Final Pretrial Order.

**C.   Item-by-Item Analysis of T&B's Claimed Confidential Information**

**(1) Narrow Point Runner (Item #3)**

In the Final Pretrial Order, T&B identifies confidential information item #3 as follows:

3. **Narrow Point in the Runner Just Outside the Injection Port.** Elastimold developed a tome called the "Standard Technical Practices – Rubber Mold Design" in order to create continuity of design between molds as new molds were built. A

18

portion of Elastimold's Standard Technical Practices – Rubber Mold Design were obtained from Richards along with 600 other pages of Elastimold documents during discovery in this case.

Elastimold's Standard Technical Practices – Rubber Mold Design calls for a narrow point in the runner just outside the injection port and sets forth specific parameters to determine the size and location of the narrow point.

Richards has implemented a narrow point in the runner just outside the injection port in its BSR and BLR insulation molds in accordance with Elastimold's Standard Technical Practices – Rubber Mold Design tome. It is impossible to determine from a visual examination of a finished part that the mold and runner system was designed to have a narrow point in the runner just outside the injection point.

(Final Pretrial Order 288-89.)

First, on the issue of sufficient particularity, T&B says in its opposition brief that "relative dimensions" are identified in its interrogatory answer, which cited as an example R3402 (discussing trouble-shooting to prevent deep sprues and stating methods for preventing them without giving specific numbers and measurements) and R2916 (discussing specifications for gate design, again without giving specific measurements, for example, "[t]he break (pinch) point of the gate shall occur three to four times the pinch point diameter of the gate away from the molded part."). (T&B Br. 27.) Additionally, the Elastimold's Standard Technical Practices was authenticated as being a T&B document by Alan Borgstrom. (Borgstrom Decl. at 16.) The term "narrow point runner" is not used in R2916, although the need for a narrow runner may be stated in R3402 ("The second, much more attractive [means for preventing deep sprues], is to reduce the sizes of gates to a point where even though deep sprues will be present their size will be acceptable. This is usually possible to do with injection presses and processes. In general the depth of the deep sprue will not exceed 70-80% of the gate diameter"). The latter explanation

does not explain how to create something.  Because identification of an item with sufficient particularity is a threshold issue for enforcement of a post-employment restrictive covenant (see Apr. 26, 2007 Op. 22), summary judgment is granted on item #3.

Furthermore, the explanations above fail to show that item #3 is specialized information. T&B offers nothing to show that their "tome" gave Richards enough information to copy its product design.  T&B fails to indicate that this information is anything other than the type of information that an employee working in a field would gain as general experience and knowledge over the years.  Whitmyer, 58 N.J. at 33.  As such, T&B also fails to meet the second part of the four-part test.

**(2) Elastimold's In-House Designed and Built Demolding Device (Item #7)**

In the Final Pretrial Order, T&B identifies confidential information item #7 as follows:

7.  **Elastimold's In-House Designed and Built Demolding Device.**  When overmolding (molding the insulation portion of the product), Elastimold designed removable cavity sections, known as "end cups," that fit over the ends of the I, Y, H or U bus bar to form the insulation end of the product.  As the insulation is injected, the area surrounding the bus bar is filled, including the end cups.  After molding, the end cups together with the product are removed as a single unit from the mold.  The operator must remove the end cups from the product, but because of the filling and curing of the insulation rubber, the end cups are too tight to remove by hand.  Many years ago, Elastimold designed and built a pnuematic demolding device, called the "puller" or "demolding fixture."  The operator would place the newly overmolded part into the puller and attach the part to the device at the end cups.  The operator would turn on the device, which would pull the end cups off one side of the part, then the other.

Because no other company made I, Y, H or U connectors, Elastimold's puller was unique to Elastimold.  The puller was slow and took room at the molding station. Due to the time parts sat in the puller, preheat ovens were required to reheat the end cups before they could be used in the next heat.

When Richards developed its manufacturing process, it also built molds with removable cavity sections known as "end cups," that fit over the ends of the I,Y, H

or U bus bar to form the insulation end of the product.  Likewise Richards built a pneumatic demolding device, just like Elastimold's, which the operator uses to remove the end cups on the newly overmolded part.  Richards' puller works just like Elastimold's even with the same, slow sequencing of pulling the end cups off one side of the part first, and then the other.

After Luzzi resigned and as part of Elastimold's continuous effort to improve its manufacturing process, Elastimold developed a new and more efficient method for removing the end cups.  Nonetheless, Richards exact duplication of the prior method and prior tooling utilized by Elastimold until after Luzzi departed is stark evidence of Luzzi and Richards wholesale misappropriation of Elastimold confidential and proprietary information.

(Final Pretrial Order 289-91.)

Regarding the requirement that T&B identify the alleged confidential information with sufficient particularity, the details of T&B's claim are not articulated.  In its brief, T&B relies on Walworth's 2007 Declaration to support the statement that "Richards['] demolding device is a knock-off copy of the one-of-a-kind demolding device that Elastimold designed for its own use." (T&B Br. 31.)  This statement is the only thing T&B offers towards the particularity of the description given for item #7.  However, the statement made by Walworth is "I have observed that the Richards demolding device and the T&B demolding device are similar[.]" (Walworth 2007 Decl.¶ 18.)  Walworth's conclusion is within what this Court allowed in its <u>Daubert</u> Opinion and within the parameters allowed in the similar motion decided today, but T&B's use of Walworth's conclusion is not in accord with his statement.  (<u>See</u> Apr. 3, 2006 Op. 33.) Further, Richards raises a number of facts that are undisputed by T&B regarding Luzzi not possessing drawings of T&B's demolding device, T&B's witness Higgins' statement that the documents cited by T&B would not allow someone to design item #7 (Higgins Tr. 218:9-13 in Decl. of Charles E. Cantine, Esq. in Supp. of the Defs.' Supp. Renewed Mot. for Partial Summ.

J. [hereinafter Cantine Decl.], Ex. 48.), and other factors (see Richards Br. 26, Richards Reply Br. 31).

Moving on to the four-part test articulated by this Court in its earlier opinions, T&B fails to offer sufficient evidence to satisfy any of the four parts.

On the issue of whether item #7 is generally known, T&B argues that it was the only manufacturer of I, Y, & H connectors, so no one else would need a demolding device like theirs (T&B Stat. of Add'l Facts 24-27), Richards' witness Koroluk was unable to show any industry literature showing something similar to T&B's demolding device (T&B Stat. of Add'l Facts 154-55), and T&B did not make public its use of the demolding device (Borgstrom 2007 Decl. ¶5). (T&B Br. 31-32). T&B then asks the Court to make an inference that item #7 is not generally known based on that information. However, Richards offers the statements of various witnesses that they used similar devices while employed in the industry or similar industries. Richards' witness Covill stated that he used a "puller" similar to Richards' while at Chardon in the late 1980s and 1990s for various similar purposes. (Covill Supp. Expert Report 5 in Cantine Decl., Ex. 61.) Richards' witness Koroluk stated that he "used similar mechanical devices, actuated by air or hydraulics, to extract the cores from molded parts while employed by Burndy, Kearney and General Electric" and has designed similar devices for use in other industries. (Koroluk Supp. Expert Report 10-11 in Cantine Decl., Ex. 62.) Richards' witness Hervig stated that "3M used pulling devices to remove finished splices from their cores for the larger 5400 series splices, including the 5450 series." (Hervig Supp. Expert Report 3 in Cantine Decl., Ex. 63.) Based on the information offered by T&B and the witness testimony put forth by Richards, T&B fails to show this Court affirmative proof that item #7 is not generally known. This is particularly so in

view of the fact that the only evidence supporting the alleged copying is Walworth's statement that Richards' device is "similar" to T&B's, but Richards' witnesses state that they have seen "similar" devices used elsewhere within the industry.

As to the rest of the four-part test, T&B falls short in meeting the second prong, the level of specificity and the specialized nature of the information, as it only states that "there is substantial evidence that this item is an in-house designed machine unique to T&B." Nothing else is offered. (T&B Br. 32.) As discussed above, T&B has failed to offer anything more than general information regarding the nature of the employer/employee relationship & level of employee exposure to the information, so it will not be discussed here. Finally, the fourth prong is whether the information is current; however, the Final Pretrial Order itself states that T&B no longer uses the device at issue. (Final Pretrial Order 290-91.)

In sum, T&B fails to describe the item in question with sufficient particularity, and it also fails to meet a single prong of the four-part test. Summary judgment on item #7 is therefore granted.

**(3)  Telescoping Hanger Bolts for Cable Adapter Molds (Item #9)**

In the Final Pretrial Order, T&B identifies confidential information item #7 as follows:

**9.  Telescoping Hanger Bolts for Cable Adapter Molds:** The tooling that makes up an individual cavity for either the stress cone or the cable adapter molds consists of an outer shell that forms the outside diameter features of the stress cone/cable adapter. The cores are suspended from the top mold plate in a vertical orientation. In order to facilitate removal of the cable adapter cores, Elastimold has machined wrench slots into the top of the cores so that they can be removed while the mold is hot. However, in order to remove the core, the mold must open wide enough (commonly referred to as daylight) so that the operator can reach in and remove/replace individual cores.

A mold designer has several means available to create the required daylight.

23

> A conventional technique is to mount the bottom platten on a shuttle, so that it can slide out. Luzzi stole from Elastimold tool specifications for telescoping hanger bolts. Richards' tooling documents evidence use of telescoping hanger bolts to create the required daylight. Moreover, there is no way to determine from a visual examination of a final product that the mold it came from utilized telescoping hanger bolts.

(Final Pretrial Order 292.)

First, this Court will address the threshold requirement that the employer identify confidential information with sufficient particularity. In its brief, T&B states that it is "not the mere use of a telescoping hanger bolt at issue in this item; it is the use of such a bolt with Elastimold's stress cone and cable adapter molds as a technique for creating the necessary daylight to quickly remove cores while hot which is at issue." (T&B Br. 33.) Richards contends that this is a "moving target"; however, that does not appear to be the case, as T&B's reading of item #9 can be inferred from the Final Pretrial Order. Nonetheless, how item #9 is used is unclear, and no support is given in T&B's brief for how the bolts are used and what was "stole[n]" by Luzzi. (See T&B Br. 33). T&B's description therefore lacks sufficient particularity.

As to the first prong of the four-part test, whether this item is generally known, T&B does not refute that telescoping hanger bolts are commercially available. (T&B's Resp. to Defs.' Stat. of Material Facts at 282.) Further, Richards' witnesses testified that other companies used telescoping hanger bolts. (Covill Supp. Expert Report 6 in Cantine Decl., Ex. 61 (stating he used telescoping hanger bolts in the automotive molding industry in the 1970s and in the high voltage rubber molding industry at Chardon in the 1980s and 1990s); Koroluk Supp. Expert Report 13 in Cantine Decl., Ex. 62 (he used a telescoping hanger bolt in connection with a washing machine

24

door he designed, and Havelna's 1992 report, the source of items R3412 and R3414 which are referred to by T&B, states that telescoping hanger bolts are used as a matter of common practice on vertical molds).)  However, T&B refutes the substance of Richards' witnesses' statements by saying they are not testifying about "telescoping hanger bolts" but are testifying about "hanger bolts" and that Blackburn did not use item #9.  (T&B Br. 34; T&B Resp. to Richards Stat. of Facts ¶¶ 290-296.)  T&B also states that "Richards did not know how to use the item in connection with the products at issue until Luzzi instructed it to do so" but fails to support that statement with any reference to the record.  (T&B Br. 34.)  At this stage in the proceedings, T&B meets part one of the four-part test.

All that is offered by T&B regarding the second prong of the test, the level of specificity and specialized nature of the information, is T&B's statement that the item itself is not at issue; what is at issue is its use as a means to create daylight.  However, nothing is cited for this proposition.  T&B also provides nothing more than the terms of the Final Pretrial Order for support.  (T&B Br. 34.)

Finally, as to the fourth prong, whether the information is current, T&B offers a declaration that it presently uses this information.  (Borgstrom 2007 Decl. ¶6.)  T&B also states that it has spent "millions of dollars" to perfect its manufacturing process, a statement that is not specific to item #9.  Furthermore, in support of the latter statement, T&B cites the Borgstrom 2007 Declaration at ¶6 and the Stevens Feb. 4, 2004 Deposition at 121:13-122:3 (Robertson Cert., Ex. 40), but those documents offer no support.

In sum, T&B fails to offer anything beyond general statements in support of parts two and four of the four-part test, which is contrary to this Court's April 26, 2007 Opinion's statement

25

that "[n]either the second factor, the level of specificity and specialized nature of the information, nor the fourth factor, whether or not the information is current, lend themselves to general statements about all . . . items of information alleged as confidential." (Apr. 26, 2007 Op. at 14.) Furthermore, as demonstrated above, T&B fails to describe item #9 with sufficient particularity. Summary judgment is therefore granted on item #9.

**(4)  Use of Jack Screws (Item #11)**

In the Final Pretrial Order, T&B identifies confidential information item #11 as follows**:**

> **11.  Jack Screws On Interchangeable Cavitites Of Cable Adapter Molds In Order To Remove Cavities During Exchange**: When building a mold that utilizes interchangeable cavities, the mold designer can choose from a variety of mechanisms that will allow cavities to be held in place while operating, but permit the cavities to also be removable. The Elastimold tool specifications that Luzzi stole call for the use of jack screws to "jack" cavities out of their pockets. Richards has employed jack screws to "jack" a cavity out of a pocket. There is no way to determine from a visual examination of a final product cable adapter to determine that the mold it came from utilized jack screws.

(Final Pretrial Order 293-94.)

In its description of item #11 within its brief, T&B states that a jack screw is "a threaded hole in a cavity and/or piece of tooling that is used to what we call jack out that particular piece of tooling or mechanically lift." (T&B Br. 35-36 (quoting Higgins 12/2/03 Dep., 307:11-22 in Robertson Cert., Ex. 12).) T&B witness Higgins testified that the term "jack screws" "can count as both [the threaded hole and the screw that goes into the threaded hole] depending on the context." (Higgins 12/2/03 Dep., 307:11-22 in 2007 Robertson Cert., Ex. 12.) Higgins then testified that he understood the term "jack screw" to mean "the threaded hole as opposed to what goes in the threaded hole." (Higgins 12/2/03 Dep., 308:8-13 in Robertson Cert., Ex. 12.) Richards asserts that item #11 is a "moving target," because T&B is now referring to the hole as

opposed to the screw.  This disagreement is not clarified by the terms of the description in the

Final Pretrial Order.  T&B also offers no information short of somewhat refuting Richards'

allegation that jack screws mean the holes, despite the Final Pretrial Order not making this clear.

The failure to clarify what exactly is protected, the screw, the hole, or both, demonstrates that

T&B has failed to "identify confidential information with sufficient particularity" (Apr. 26, 2007

Op. 22 ), as was required by this Court's April 2007 Opinion.

Furthermore, T&B offers no evidence as to item #11 being not generally known; it only

refutes Richards' statements in part by saying that Richards' witnesses' testimony is

inadmissible, because the witnesses are testifying without permission from their former

employers, an issue resolved to the contrary in this Opinion's treatment of T&B's motion to

exclude that testimony.  (T&B Br. 36-37.)  Richards' witness Covill stated that he "used jack

screws on 15 kv, 25 kv and 35 kv load break elbow molds since the mid 1980s" and generally at

Chardon.  (Covill Supp. Expert Report 7 in Cantine Decl., Ex. 61.)  Richards' witness Koroluk

stated that he "used jack screws to remove the cavities of a Dead End Mold to convert from 15 to

25 [kv] parts for General Electric in the 1980s" (Koroluk Supp. Expert Report 15 in Cantine

Decl., Ex. 62), and Hervig testified that 3M used this type of device "on many molds with

cavities" in the "late 1970s or early 1980s" (Hervig Supp. Expert Report 4 in Cantine Decl., Ex.

63).  As to the other parts of the four-part test, T&B offers nothing but the most general

statements.

Summary judgment is granted on item #11 due to T&B's failure to identify the item with

sufficient particularity and its failure to meet any part of the four-part test.

**(5)  Use of Tapered Cores (Item #12)**

In the Final Pretrial Order, T&B identifies confidential information item #12 as follows:

12. **Tapered Cores For Cable Adapter Molds**: While the top of Elastimold's cable adapter cores have flats for wrench slots, the bottom of the cores have a taper that allows the core to seat into the bottom plate and facilitate venting through the v-vents and a tear ring.  Richards' cores for the cable adapter also employ the same tapered cores.  Over the years, Elastimold has attempted to improve venting at the bottom of the cable adapter core.  Originally, Elastimold employed a textured surface near the tapered end of the core.  This was not good enough, so Elastimold attempted to improve the venting by putting four[] holes into the core located just above the taper and filed the holes with a screen that would permit air to escape but not rubber.  This was not good enough, so Elastimold applied its v-vent technology to the cable adapter cores by grinding "v" shaped grooves lengthwise along the core.  This proved to be a more effective vent.

Richards never experimented with any venting mechanisms.  Richards' drawings for the cable adapter cores call for the grinding of v shaped vents lengthwise along the core at the tapered end, just like Elastimold.  While there are "witness lines" on final products produced by Elastimold utilizing the "vents" on the core, the dimensions and shapes cannot be determined by an examination of the final products or any "witness lines" that appear thereon.

(Final Pretrial Order 294.)

T&B fails to describe item #12 with sufficient particularity.  It asserts that item #12 was "the subject of deposition testimony[,]" citing Higgins' December 2, 2003 deposition at 317:15-322:25 (Robertson Cert. Ex. 12), but Higgins' testimony does not detail the specifics of what item #12 is and does not elaborate on "v-vents" as described in the Final Pretrial Order.  Further, the Final Pretrial Order is the document that must assert with particularity what is alleged confidential, and it does not specify if the vent or the v-shaped grooves are what is confidential.  Answers to interrogatories also only reveal that T&B is claiming as confidential "[u]se of Elastimold tapered cores for cable adapter molds"; this does not explain what "v-vents" means.  (T&B's Third Supp. Resp. to Richards' Interrog. No. 10 at ¶11.)  Furthermore, although not

28

raised by Richards in its brief, the description of item #12 is remarkably similar in substance to the description of confidential information item #74 (see Final Pretrial Order 322), on which this Court granted Summary Judgment in its April 2007 Opinion.  (See April 26, 2007 Op. 44-45.) The description of item #12 is insufficiently particular to demonstrate how it differs from what T&B unsuccessfully claimed to be confidential information in item #74.

As to the four-part test, T&B does not offer affirmative evidence showing that item #12 is not generally known.  First, T&B's citations do not clearly support its statements.  An example of the latter is that, although used as the sole support for the assertion that "Richards had to be taught the technique manifested in Ex. 43[,]" the cited support, paragraphs 231-47 of T&B's Statement and paragraphs 5, 117, and 118 of Borgstrom's 2007 Declaration, do not support that assertion.  (T&B Stat. of Add'l Facts in Supp. of Its Opp'n ¶¶108, 231-47; T&B Br. 39.) Furthermore, T&B later alleges that Barker had to teach item #12 to Richards, but the only possible citation given that could support that statement is T&B's Statement of Additional Facts in Support of Its Opposition at paragraph 108, which does not refer to the use of tapered cores or to cable adapter molds.  (T&B Stat. of Add'l Facts ¶108.)  The Court also notes that the citations given in support of paragraph 108 do not support all of the assertions made within that paragraph. (Id.)  Second, no new information is given by T&B as to whether item #12 is generally known; T&B only refutes what Richards asserts.  (T&B Br. 39.)  Richards offers statements by Hervig that he used tapered cores at 3M (Hervig Supp. Expert Report 4 in Cantine Decl., Ex. 63); Koroluk that he used similar designs of tapered cores at Burndy, General Electric, and Kearney (Koroluk Supp. Expert Report 15 in Cantine Decl., Ex. 62); and Covill that he used tapered cores at Chardon and while molding automobile parts in the 1960s (Covill Supp. Expert Report 7 in

Cantine Decl., Ex. 61).  None of this testimony is refuted in substance.  Finally, T&B relies on

Walworth's description of whether tapered cores are in the public realm and how that relates to

what Elastimold's product – this is beyond the allowable scope of Walworth's testimony, as it

shows analysis, not mere observation from personal experience.  (T&B Br. 39.)

  T&B also fails to offer evidence as to the other prongs of the four-part test.  T&B offers

nothing as to the level of specificity and specialized nature of the information claimed

confidential other than statements that #12 had to be taught to Richards (which, as stated above,

is not supported by the underlying citation given by T&B) and "the mere fact that different

degrees of taper must work does not mean that the concept embodied in T&B Ex. 43 is not

protectible."  (T&B Br. 40.)  The only evidence offered as to whether item #12 is current is

T&B's statement that the item "is still in use at Elastimold, and it is part of a process that

Elastimold has invested millions of dollars to perfect."  This is more general than is required by

the four-part test.

  The failure to clarify what exactly is protected, the v-vents or the entire tapered core,

demonstrates that T&B has failed to "identify confidential information with sufficient

particularity[,]" as was required by this Court's April 2007 Opinion (Apr. 26, 2007 Op. 22.) and

also fails to show that item #12 and item #74 do not refer to the same thing.  T&B also fails to

offer sufficient evidence as to any portion of the four-part test.  Summary judgment is granted as

to item #12.

**(6)  Use of BSR Molds to Mold Dead End Caps (Item #14)**

  In the Final Pretrial Order, T&B identifies confidential information item #14 as follows:

  14.  **BSR Molds to Mold Dead End Caps.**  Ordinarily, mold designers avoid family

molds (making more than one product in a single mold). While some costs may be saved by having a single mold, if the mold is damaged or needs service, the manufacturer cannot mold sibling products. Also, a family mold could potentially create a capacity bottleneck. If demand for one member of the product family is great, then the mold cannot be used to make other products. Nevertheless, Elastimold went against the conventional practice and built tooling to mold dead end caps in some of their BSR molds. Specifically, Elastimold built a separate Dead End Cap insert mold. But with respect to the Dead End Cap jacket, Elastimold used the BSR jacket mold to mold the dead end and cap jacket. Elastimold inserts tooling into the BSR jacket mold designed to block out the cable entrance end of the BSR jacket. Likewise, Elastimold used the BSR insulation mold to overmold the Dead End Cap. Elastimold inserts tooling into the BSR insulation mold designed to block out the cable entrance end of the BSR. It is impossible to determine from an examination of a final product, that Elastimold uses two of its BSR molds to make its Dead End Caps.

A mold designer does not choose between separate molds for like parts, or create family mold tooling, without detailed knowledge about the quantity of parts needed to be made, and specifics as to the material, shrinkage and flow characteristics between the two parts. Luzzi had taken from Elastimold detailed information about the quantity of parts Elastimold produced, specifics of the materials used, shrinkage information as well as a host of other manufacturing documents such as standard operating procedures. Richards did not make an informed decision as to whether to create family molds. Rather, it used all the information that Luzzi had gathered from Elastimold in order to create a knock-off manufacturing line, including copying Elastimold's practice of using its BSR molds to mold Dead End Caps.

(Final Pretrial Order 295-96.)

T&B's description in the Final Pretrial Order of how it uses BSR molds to mold dead end caps does not describe item #14 with sufficient particularity. T&B states that specifics are given in depositions, but those specifics were not articulated in the Final Pretrial Order nor are they explained in T&B's brief. Furthermore, the citation in T&B's brief to Higgins' deposition does not clearly refer to a discussion of item #14; item #14 was discussed at Higgins' December 2, 2003 Deposition (pages 351:9-355:16), but that discussion sheds little light on what exactly is being claimed confidential. (See T&B Br. 41.) T&B's only other statements in its brief

31

regarding the particularity of its claims refute Richards' claims but do not offer an independent

explanation.  (T&B Br. 41-42.)  Furthermore, T&B states that the use of the BSR mold to make

Dead End Caps is at issue, not the use of family molds.  Richards asserts that the issue is the use

of family molds, and T&B's use for Dead End Caps is not specialized.  (T&B Br. 42; Richards

Reply Br. 47-48.)  This disagreement is not clarified by the record.

T&B also fails to demonstrate that item #14 is not generally known.  In arguing this issue,

T&B relies on Walworth's testimony that "the way Elastimold was doing [making dead end

caps] was very unusual."  (T&B Br. 42.)  This is beyond Walworth's "direct observations of the

parties' products and documents," which was the limit that this Court placed on his testimony in

its April 26, 2007 Opinion and reaffirmed in this Opinion.  (Apr. 26, 2007 Op. 13.)  However,

T&B also relies on admissible Walworth testimony from his 2007 Declaration where he lists

observations and states that after reviewing competitors' documents, he did not see the use of

BSR molds reconfigured as dead end cap molds.  (Walworth 2007 Decl. ¶ 34(f), (g).)  Despite

this, T&B fails to refute Richards' witnesses' statements that companies they worked for used

this type of mold process.  (See Covill Supp. Expert Report 8 in Cantine Decl., Ex. 61 (stating

that he designed similar molds at Chardon); Koroluk Supp. Expert Report 16-17 in Cantine

Decl., Ex. 62 (stating that he used this method at Burndy, General Electric, and Kearney); Hervig

Supp. Expert Report 4 in Cantine Decl., Ex. 63 (stating that "3M had a prototype dead end in

about 1972 to 1974, but it was never marketed").)

Insufficient evidence is then offered as to the other three prongs of the four-part test.

T&B does not describe the item with sufficient particularity, and it fails to satisfy the

generally known part, or any other part, of the four-part test.  Summary judgment is therefore

granted as to item #14.

**(7)  Use of Split Core Halves for Dead End Caps (Item #15)**

T&B's identification of confidential information item #15 in the Final Pretrial Order is as

follows:

> 15. **Split Core Halves For Dead End Caps.**  In order to block out the cable end of the BSR to mold the Dead End Cap, a variety of tool designing techniques were available to Elastimold.  Elastimold chose to design split core halves that would be bolted into the portion of the cavity which would not be used to mold the Dead End Cap.  The cores were split in the sense that half of the core bolted into the cavity on the bottom plate and the other half of the core bolted separately into the top plate. In addition, Elastimold designed the split core halves to be shaped like dumbbells or "dog bones" as they are referred to by the machine operators.  The shape cut down on the amount of surface-to-surface contact between the core and the cavity and made the split core halves easier to handle.

> It is impossible to determine from an examination of an end product the method or characteristics of the tooling used by Elastimold to alter the BSR cavity in order to manufacture the Dead End Cap.  Yet, Richards' tooling employs split core halves shaped like dumbbells, just like Elastimold's.

(Final Pretrial Order at 296.)

The issue of whether item #15 is identified with sufficient particularity is unclear from

the Final Pretrial Order and is insufficiently briefed.  In its brief, T&B fails to make any specific

argument explaining how it identified item #15 with sufficient particularity; all that is stated is

reference to its arguments on the four-part test and that "the evidence establishes that the

particular design described by T&B is not generally known."  (T&B Br. 44.)  However, all

parties agree that "[t]he split core halves are the plugs that are used to block off the cable

entrance end of the BSR mold."  (T&B's Resp. to Richards' Stat. of Uncontested Facts ¶403.)  If

more specific description exists within the record, it is not pointed out to the Court and was not

discovered in the Court's search of the record for relevant materials.

Moving on to the first prong of the four-part test, whether item #15 is generally known, T&B states that the documents that Richards' witness Koroluk refers to in his testimony do not mention "using BSR molds to mold dead end caps." (T&B Stat. of Add'l Facts ¶ 292.) T&B also states that two companies "do not use split core halves in BSR molds to mold Dead End Caps," Richards' drawings are marked confidential, and T&B kept its method of using BSR molds to mold dead end caps confidential. (T&B Br. 44.) However, in its response to Richards' Statement of Undisputed Facts, T&B goes into detail as to why Richards' proofs are insufficient by stating that Richards' witnesses were unable to show that other companies used BSR molds to mold dead end caps. (T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 411.) Absent a clear explanation of what T&B is seeking to protect as item #15, whether that item is generally known is unclear.

Moreover, regarding the second prong of the four-part test, the level of specificity and specialized nature of the information, T&B asserts that "the item is well-described in the Pretrial Order and related deposition testimony and T&B's evidence that the item is not generally known is undisputed." (T&B Br. 44.) However, this does not appear to be the case. As T&B has failed to explain how the use of split end core halves in molding dead end caps differs from the techniques used in the general use of split end cores for molding other components, it is unclear exactly what T&B is seeking to protect. Item #15 also does not clarify whether, if the use of split end core halves is different, that use is unique or if it is merely an extension of a generally known technique. T&B therefore fails to meet the second part of the four-part test. T&B also fails to meet its burden on the third and fourth prongs of the four-part test due to insufficient evidence and argument.

In sum, T&B fails to specifically explain what it is seeking to classify as confidential information, and that failure of particularity makes whether #15 is generally known impossible to discern. This failure, which is exacerbated by a failure to offer evidence to satisfy the rest of the four-part test, most notably the failure to demonstrate that the information in question is specialized, warrants the granting of summary judgment on item #15.

**(8)  Use of Anti-Rotation Technique for Cores (Item #16)**

T&B's identification of confidential information item #16 in the Final Pretrial Order is as follows:

> 16. **Anti-Rotation Technique For Cores.** The ore is the part of the mold which forms the hollow center of the rubber molded product. In this particular application, it is critical that the cores do not rotate while rubber is being injected into the molds. There are a number of techniques available to the mold designer to prevent cores from rotating. In certain instances, Elastimold employs a two-bolt anti-rotation technique into the end of the core. In other context[s], Elastimold employs a "keyway" system, to prevent a core from rotating.
>
> It is impossible to determine from an examination of a final product, whether Elastimold employs an anti-rotation device in its molds and if so, how. Yet, Richards' molds employ the identical anti-rotation techniques as Elastimold.

(Final Pretrial Order 296-297.)

T&B fails to describe item #16 with sufficient particularity. Item #16 appears to refer to two different techniques: the "a two-bolt anti-rotation technique" and "a 'keyway' system[.]" (Final Pretrial Order 296; T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 424.) Neither of these techniques are described in the Final Pretrial Order, nor does T&B specify if it considers one or both to be confidential information. Furthermore, T&B does not offer a specific description of the techniques in the Final Pretrial Order, its brief, or its response to Richards' Statement of Uncontested Facts. (T&B Br. 46; T&B Resp. to Richards' Stat. of Uncontested

35

Facts ¶¶ 430-37.)

     T&B also fails to offer evidence that demonstrates that item #16 is not generally known. T&B does not refute Richards' witnesses' testimony that the two techniques described in item #16 are known in the industry.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 431-33; 435-42.)  Instead, T&B repeats that it must be more than coincidence that Richards used the same technique as T&B.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 431-33; 435-42.)

     T&B does not explain the level of specificity and specialized nature of item #16.  T&B states that Luzzi and Richards needed to be taught the technique described in item #16 by Barker, so the technique is sufficiently specialized.  However, Barker stated that "using two or three screws is not important[,]" and although he could not remember, he "might have" shared Elastimold's two-bolt mounting system for BSRs while consulting for Richards.  (Barker Apr. 6, 2004 Dep. 57:7-17 in Cantine Decl., Ex. 53.)  The testimony that T&B relies on is, therefore, not even clear that Barker taught the technique to Richards or that the information was specialized. Furthermore, T&B fails to show how the information in question would not be the type that people experienced in the industry would have knowledge of due to their general experience.

     As to current value, T&B only states that the item is still in used by T&B, and T&B "invested millions of dollars to perfect its process for manufacturing the products at issue" in this case.  (T&B Br. 48.)  As stated earlier, these statements are not sufficiently specific to meet the standard articulated by this Court.

     In sum, T&B fails to state with particularity what it is seeking to classify as confidential information, fails to offer information that the item is not generally known, and fails to offer

evidence in support of the other portions of the four-part test.  Summary judgment is therefore

granted on item #16.

### (9) Use of Injection Pre-Pack Screw Delay Techniques (Item #17)

In the Final Pretrial Order, T&B identifies confidential information item #17 as follows:

17.  **Injection Pre-Pack Screw Delay Techniques**.  A typical molding cycle involves loading the barrel by either a ram or screw feed.  Injecting the rubber from the barrel through the runner system, filling the mold cavities.  Once filled, the rubber cures in the mold cavities.  Once cured, the operator opens the mold, removes the parts, and prepares the mold for the next cycle.

In most molding operations, the barrel immediately refills following injection.  At Elastimold, the presses are set so that the barrel refill is delayed until the end of the molding cycle.  For instance, the cure time for the Y splice insulation mold is 18 minutes.  The time needed to refill the barrel is approximately five minutes.  The screw that refills the barrel is set to begin refilling 12 minutes into the 18 minute cure time, so that the barrel is refilled at the end of the curing cycle.

Elastimold employs this technique for its insulation molds because immediately refilling the barrel creates down pressure that transfers through the nozzle to the runner system and into the cavities resulting in an overpressurized curing environment.  This causes product "overpressurized" environment irregularities.  As a result, Elastimold has learned to delay the repack of the barrel until the cavity has sufficiently cured up such that the added pressure caused by a repack fo the screw barrel will not adversely affect the product.

Richards also delays the repack on their insulation molds.  Richards has absolutely no prior experience in injection rubber molding.  According to Richards' manufacturing engineer, Wally Jauch, Richards delays the repack of their screw feed in order to insure that the compound is as hot as possible in the barrel before injection.  In fact, it is the pressure that bears on the molding process and the quality of products molded – not the heat as Richards believes.  Its uninformed assertion, however, clearly reveals that it has not independently developed this "delayed" process, but has instead, simply copied it from Elastimold information that Luzzi provided.

(Final Pretrial Order 297-98.)

First, T&B meets the standard of identifying item #17 with sufficient particularity.

37

Moving on to the four-part test, T&B fails to demonstrate that item #17 is not generally known.  T&B fails to refute the substantive contentions of Richards' witnesses.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶459-61.)  Further, T&B admits that "[t]he ability to delay refilling in the barrel of a press is a built-in feature of the press itself."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 457.)  T&B also admits that "[t]he built-in feature has been on the Lewis presses (the types of press used by both T&B and Richards) since the 1960s, and is described in the manual that comes with the press itself."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 458.)  However, T&B fails to explain how these admissions do not demonstrate that the process in item #17 is generally known; within its brief, it ignores these admissions.  Instead, T&B states that Luzzi "had to steal [Standard Operating Procedures ("SOPs")] reflecting the technique[,]" Richards' witnesses agree that SOPs are confidential, Richards did not know of the technique, and the literature reviewed by Richards' witnesses that was published prior to the alleged misrepresentation did not reflect item #17.  (T&B Br. 49-50.)  However, the citations given by T&B in its brief relate to Richards' witnesses agreeing that the SOPs in general and manufacturing processes as related to elements of flip pins are confidential; Richards' witnesses' statements were not specific to item #17.  (Covill Dep. 27:3-5 in Robertson Cert., Ex. 35; Koroluk Dep. 44:11-18, 79:3-6, 97:24-98:2 in Robertson Cert., Ex. 36; Hervig Dep. 44:12-45:7 in Robertson Cert., Ex. 37.)  The other citations relate to Luzzi improperly having SOPs, but T&B fails to connect the alleged improper possession of SOPs by Luzzi with a demonstration that the information in item #17 was not generally known.

Regarding the specialized nature of the information it seeks to protect, as stated above, T&B admits that the ability to delay refilling of the barrel is a built-in feature of the press and is

38

described in the press's manual.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 457-58.)

T&B also admits that "[t]he screw delay time is not set to fill the barrel precisely at the end of the

cure time[] . . . but "is determined by trial and error, based on the parts, presses and materials

being used."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 466-67.)  Because these

statements were admitted by T&B without qualifying statements or any explanation, T&B has

failed to demonstrate that the information it seeks to protect is specialized.  Due to the delay

feature being part of commercially-available presses and the screw delay time not being the result

of scientific process, T&B also fails to show that item #17 is not the type of information that

would generally be possessed by a person skilled in the field.

Finally, T&B only makes general statements in support of whether item #17 is current.

(T&B Br. 51.)  That alone is insufficient.

In sum, T&B fails to offer sufficient evidence to satisfy the four-part test.  Namely,

T&B's failure to explain how something that is a feature of a commercially-made machine is

confidential is the cause of its failure to satisfy the first and second parts, and its general

statements about whether the information in item #17 is current are insufficient to satisfy the

fourth part.  Summary judgment is granted on item #17.

**(10) Use of Specific Drop Configurations with Y-H Molds (Item #18) &  Specific Drop
Designs for H and Y Molds (Item #29)**

Although addressed in the Final Pretrial Order as two items, the discussion in T&B's

opposition brief is of one element that is #18 and/or #29.  (T&B Br. 52.)  Furthermore, T&B only

addresses whether #18, sprue drop design, is identified with sufficient particularity; no argument

is made relating to item #29, further leading to the conclusion that T&B is only asserting a single

39

item here, not two.  The two items are identified in the Final Pretrial Order as follows:

      18.  **Sprue Drop Configurations For Y-H Molds.**  The sprue, also known as the runner, is the channel through which the compound travels from barrel to cavity.  The mold designer will shape or configure the sprue in a variety of ways depending on the quantity of compound to be injected, the shape of the product to be made, gate considerations for proper filling of the cavity, and material characteristics (some compounds flow around corners while other compounds do (sic)).  The shape, size and layout of the sprue is not knowable from an examination of a final molded product molded (sic).

      Richards sprue drop configurations for their Y and H molds are identical to Elastimold's.  The configurations were part of the materials that Luzzi took before leaving Elastimold and joining Richards.

(Final Pretrial Order 298.)

      29.  **Specific Drop Designs For H And Y Molds.**  A sprue drop refers to the portion of the runner that drops vertically through a mold plate from a runner that runs horizontally along a parting line.  Elastimold's Standard Technical Practices sets out certain design criteria for sprue drops such as:

      All sprues to the gate shall hang a minimum inclined angle taper of five degrees.

      All feeding away from the gate to the molding shall have a minimum included angle of ten degrees.

      The smallest diameter of the feed sprue bore (adjacent to the gate) shall be five to ten times the diameter of the pinch point of the gate.

      Elastimold's Standard Technical Practices was recovered from Luzzi along with 600 pages of Elastimold documents during discovery in this case.  Richards' sprue drops conform to the criteria set forth in Elastimold's Standard Technical Practices.

(Final Pretrial Order 303.)

      T&B fails to demonstrate that item #17 is not generally known.  T&B does not refute

Richards' witnesses' testimony "that competitors of T&B use sprue drops 'similar' to those used

by T&B"; T&B only states that the Richards' witnesses' testimony is barred under the Court's

Daubert ruling.  (T&B Br. 52.)  In its response to Richards' Statement of Uncontested Facts, T&B states that it is not protecting generic information and that its description in #18 is specific. Apart from these responses, general unsupported statements saying that Richards' contentions are incorrect, and one assertion of an alternative way to design the items in question, Richards' witnesses' testimony regarding the items claimed confidential in #18 and #29 appears unrefuted. (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 485-92.)  As support for #18 and #29 not being generally known, T&B only offers the statements that "Luzzi stole R2916[,]" "none of the patents or other materials identified by Defendants' 'experts' in an attempt to locate public references to this item reflect T&B's design[,]" and "Richards itself believes that its drawings depicting this item are 'proprietary and confidential.'" (T&B Br. 52.)  None of these statements refute Richards' witnesses' statements that they used the equivalent of #18 and #29 in prior employment, nor do the statements offer specific information as to the two items not being generally known.

T&B does not show that the information it is seeking to protect in items #18 and #29 is specialized.  T&B refers to R2916 as containing specific references to the components of item #18.  (T&B Br. 52; R.2916 in Cantine Decl., Ex. 6.)  R2916 is a page entitled "Standard Technical Practices, Rubber Mold Design, Section IV."  On that page, under "Gate Design, Peroxide Systems" the document states that "[t]he gate shall be designed so that the gate sprue will break away at a point away from the molded part."  (R2916.)  Percentages, degrees, and other explanations are given as to where things should be positioned, but no specific measurements are given.  (R2916.)  In its brief, T&B states that R2916 "contains specific reference to the dimensions of this part."  (T&B Br. 52.)  No explanation of how the descriptions

41

in R2916 relate to the H&Y mold design is given; all that is shown is a citation to T&B witness Walworth that the "dimensions are consistent with those which appear on the Richards' part drawing for this part." (T&B Br. 52 (citing Walworth 2007 Dec. ¶50f, g).) Further, Higgins, the manufacturing engineer supervisor at Elastimold (Higgins Oct. 24, 2004 Dep. 6:1-6 in Robertson Cert. Ex. 12), testified that he would be unable "to design a sprue drop configuration similar to what Elastimold uses in its Y and H molds based solely on R 2916." (Higgins Dec. 3, 2003 Dep. 463:8 to 465:13 in Robertson Cert., Ex. 12.) This is not refuted by T&B; instead, T&B reasons that Luzzi would be able to design the sprue drop configuration based on the document combined with his other knowledge, but no details of how this is possible or what other knowledge T&B refers to are given. (T&B Br. 52 (citing Higgins Dec. 3, 2003 Dep. 65:22-466:10 in Robertson Cert., Ex. 12).) T&B also does not differentiate between proprietary information and the general knowledge that would be possessed by someone with experience in an industry, the latter of which is not protectible.

As shown above, T&B fails to meet its burden of showing that these items are not generally known, as it fails to refute testimony that other companies used the same technology. Further, T&B fails to offer evidence that the information in items #18 and #29 is specialized and gives scant treatment to the issue in its brief. The rest of the four-part test is barely argued, and T&B fails to offer any specific proof as to any of the latter two prongs. These failures warrant summary judgment on items #18 and #29.

**(11) <u>Peripheral Sprue Bushing</u> (Items #20, #28, #41, and #69)**

Although T&B described items #20, #28, #41, and #61 as separate items of confidential information in the Final Pretrial Order, it argues the four collectively in one statement in

opposition to this motion for partial summary judgment.  The four items are identified in the

Final Pretrial Order as follows:

20. **Elastimold's Peripheral Sprue Bushing.**  The peripheral sprue bushing is a piece of tooling which sits between the bottom of the nozzle and the top of the upper platen. Most commercially available configurations consist of a circular locating ring and a separate sprue drop that fit together and into which the nozzle seats. Elastimold has designed its own peripheral sprue bushing which combines the features of the locating ring and sprue drop into a single unit of tooling. Elastimold's peripheral sprue bushing has several unique profile and design characteristics.

Richards copied the profile and design characteristics of Elastimold's peripheral sprue bushing.  Elastimold's Standard Technique Practices calls for peripheral sprue bushings to be held down by "5-16/18 flathead screws."  No amount of physical examination of final products will reveal such details about the tooling and the type and size of such a peripheral sprue bushing or the minute details as to the size and shape of the screws used to hold the bushing in place.

(Final Pretrial Order 299.)

28. **Specific Peripheral Sprue Bushings Dimensions**.  As discussed in item 20 above, Richards copied Elastimold's peripheral sprue bushing.  Richards copied specific dimensions of the peripheral sprue bushing.  For instance, the interior diameter of Elastimold peripheral sprue bushing found on document marked EST 864 compares with the peripheral sprue bushing on Richards drawing marked R769 as follows:

|  | **Elastimold (EST 846)** | **Richards (R769)** |
|---|---|---|
| A diameter | 1.000 +/- .0005 | 1.005 + .005 - .0000 |
| C diameter | 1.812" | 13/16 * |
| Diameter | 1.998 + .000-.0001 | 1.998 - 1.999 |
| Internal bevel | 15° | 15° |

*13/16 equals 1.812

It is impossible to determine the dimensions of a peripheral sprue bushing from an (sic) physical examination of the final product manufactured nor is any information in the public domain that would provide such dimensions.

43

(Pretrial Order 302.)

    41. **Mounting Screw System On Peripheral Sprue Bushings**.  Elastimold incorporates the facts set forth in Topics 20 and 28.

(Pretrial Order 309.)

    69. **Sprue Bushing Design on BLR Insulation Mold Including Bottom of Bushing At Top of Trunk Runner**.  As indicated in topics 20, 28, and 41, Richards copied all design criteria with respect to Elastimold's peripheral screw bushing.  One unique feature of Elastimold's peripheral screw bushing is that the bottom of the bushing stops at the top of the trunk runner.  This requirement is set forth in Elastimold's Standard Technical Practices, which Luzzi took prior to leaving Elastimold.  A copy was recovered from among the 600 pages of documents Luzzi still had in his possession at the time of discovery in this matter.  Discovery has also established that Richards' peripheral sprue bushings copy Elastimold's design criteria.

(Final Pretrial Order 319.)

    In its brief, T&B addresses these four items in a general discussion of sprue bushing with no reference to the individual descriptions in the Final Pretrial Order.  The Court will therefore follow in suit and treat these four items as one, specifically, the peripheral sprue bushing that "combines the features of the locating ring and sprue drop into a single unit of tooling."  (Final Pretrial Order 299.)

    The core of the dispute over this item is whether T&B's single-unit peripheral sprue bushing differs from other peripheral sprue bushings used within the industry.  It is undisputed that other companies used peripheral sprue bushings and that they were designed by Lewis, the press manufacturer, in the 1960s.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 538, 548-49.)  The questions are therefore whether T&B's peripheral sprue bushing is a specialized version of a generally used item that differs from the industry standard and whether the item is

proprietary T&B information.

Although T&B holds the burden of proof in demonstrating that its peripheral sprue bushing is confidential information, its brief and supporting documents do not clearly explain this issue for the Court.  Despite this, a reading of the Final Pretrial Order demonstrates that T&B identifies what it is seeking to protect with sufficient particularity, namely the single-unit peripheral sprue bushing.  As to whether the items in question are generally known, T&B offers little information to demonstrate that the items are not generally known (T&B Br. 56), but Richards' witness testimony only speaks to the use of peripheral sprue bushings in general; no detail is given as to whether the peripheral sprue bushings discussed by Richards' experts were of the single-unit form that T&B is describing in relation to these items (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 548-549).  Richards' failure to offer anything in response to T&B's meager offer of proof as to this prong leaves a question of fact regarding whether these items are generally known.

T&B, however, fails to demonstrate that its peripheral sprue bushing is specialized.  It cites similarities between its items and drawings in Richards' possession (T&B Br. 56; Walworth 2007 Decl. ¶58; but see Walworth 2007 Decl. ¶58 m, n (citing differences)), but it never explains whether its peripheral sprue bushing is a logical solution to problems that would result from a person experienced in the industry using a Lewis Press or if it is the result of specialized development.  Further, T&B admits that Lewis designed the peripheral sprue bushing that T&B is claiming to be confidential ("Lewis developed a peripheral seal at the request of Elastimold then provided the drawing to Elastimold.").  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 539.)  T&B does not offer any information that the Court can find, and certainly highlights

45

nothing in its brief, that explains whether the seal Lewis produced for Elastimold was sold to other parties after the alterations were made.  (See Borgstrom June 17, 2004 Dep. 615-17 (only stating his belief that the information was proprietary; despite T&B's claim, he does not state conclusively that "Elastimold designed its own unique peripheral sprue bushing" (T&B Br. 55)).)

T&B does not offer specific information as to the other two parts of the four-part test, and therefore fails to meet its burden of proof regarding those prongs.  Due to T&B's failure to demonstrate that its version of a peripheral sprue bushing is specialized information along with its failures of proof on the third and fourth parts of the four-part test, summary judgment is granted on items 20, 28, 41, and 69.

**(12) <u>Use of Core Heaters</u> (Item #21)**

Item #21 is identified in the Final Pretrial Order as follows:

21.  **Core Heaters With Suspended Core Lifters**.  Molds are heated to specific temperatures so that the injected rubber will cure.  Cores typically have a significant amount of surface area contact with the injected rubber compound, but are not commonly heated by a separate mechanism.  Elastimold drills a hole down the center of its cores and inserts a core heater in order to expedite the curing process.

It is impossible to determine from a physical examination of a final product whether Elastimold has heated its cores and if so, how.  Richards has employed the exact same technique of core heaters in combination with suspended core lifters.

(Final Pretrial Order 300.)

T&B identifies item #21 with sufficient particularity, but it fails to offer sufficient information to satisfy the four-part test.  Regarding whether item #21 is generally known, T&B offers testimony as to other companies not using core heaters and information about core heaters with suspended core lifters not being available in literature, but it does not refute or qualify Richards' witnesses' testimony that they used core heaters in their prior employment for different

companies.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 586-87.)  It therefore fails to meet its burden on this portion of the test.

T&B also fails to demonstrate that its use of an internal core heater is specialized knowledge, as it offers no insight as to what is unique about T&B's use of core heaters in connection with suspended core lifters.  Although a description of T&B's core heaters is given in T&B's Response to Richards' Statement of Uncontested Facts, no explanation is given as to what elements of the core heaters used by Elastimold are confidential, particularly in light of core heaters being commercially available.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 579, 581.)  T&B has indicated a general technique but has not shown why its particular use is specialized.  In short, its assertion that cores are not "commonly" heated in the manner Elastimold heats them is not sufficient to demonstrate that Elastimold uses a specialized technique.

As described above, T&B fails to offer affirmative evidence to counter Richards' evidence that item #21 is generally known and fails to demonstrate that its use described in this item is specialized.  Summary judgment is therefore granted on item #21.

**(13) Use of Knock Out System (Item #22)**

Item #22 is identified in the Final Pretrial Order as follows:

22.  **Knock Out System For Suspended Cores.**  Mold designers have a choice whether to suspend cores between mold plates when the mold is open or have them hinge in and out or be entirely separate.  If the mold designer decides to suspend the cores, there are a variety of methods by which he or she can achieve the desired result.  Elastimold has chosen to suspend the cores on its BSR and Elbow molds. Elastimold uses a knockout system that constitutes a separate frame.  The cores are attached to and suspend from the frame.  The frames move independently from the mold plate.

47

> Richards has employed the same knockout system with respect to its BSR and Elbow molds.  It is not possible from a visual examination of a final product to determine whether a mold designer has employed suspended cores or the means by which the cores are suspended.

(Final Pretrial Order 300.)

T&B identifies item #22 with sufficient particularity, but it fails to satisfy the four-part test.

First, regarding whether the item is generally known, Richards' witnesses Covill and Koroluk testified that they used knock out systems similar to Elastimold's while at other companies.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶ 617-21.)  T&B does not refute this, although it offers evidence of other companies not using systems similar to Elastimold's and of the information about item #22 not being available in other patents or literature.  An offer of other evidence that does not address the testimony of Richards' witnesses is insufficient to meet T&B's burden of demonstrating that item #22 is not generally known.

As to the second element, the level of specificity and the specialized nature of the information, T&B only states that "T&B's knockout system is specific, as evidenced by the fact that it was drawn by Barker for Richards and duplicated by Richards." (T&B Br. 62.)  This statement is entirely insufficient as an explanation to the second part of the test – evidence that Barker drew a copy of the system does not *de facto* prove that the system is of a high level of specificity and specialized.  T&B makes no attempt to explain how item #22 is specialized knowledge; namely, T&B does not show the Court how item #22 is anything other than a rational choice between a number of possibilities of which a person with experience in the field would be aware.  T&B's failure to refute Covill and Koroluk's testimony regarding the item being

generally known adds greater question to whether item #22 is unique information or merely a logical option for suspending cores.

The final two parts of the test are also unmet, as T&B only makes general statements that are not specific to item #22.  (T&B Br. 62.)  In sum, T&B fails to meet any part of the four-part test.  Summary judgment is granted on item #22.

**(14)** **Use of Pre-Heat Ovens For Rubber Components (Item #25)**

Item #25 is identified in the Final Pretrial Order as follows:

> 25.  **Pre-Heat Ovens For Rubber Components Prior to Insulation Molding.** Elastimold uses ovens to preheat rubber parts such as inserts and jackets prior to insulation molding.  Preheating rubber parts is not necessarily a standard practice given in molding rubber parts.  In fact, Richards' purported expert, Walter Hervig, testified that 3M chose not to use preheat ovens because of the adverse effects it had on their rubber parts.
>
> One cannot determine from an examination of the final product whether the manufacturer used preheat ovens in the manufacturing process.  Richards not only copied Elastimold's use of ovens to preheat rubber parts, but also implemented Elastimold's temperatures for the preheat ovens as set forth in the standard operating procedures, which Luzzi stole while at Elastimold just before his resignation and which were among 600 pages of Elastimold documents that he still had at the time of discovery in this matter.

(Final Pretrial Order 301.)

The Court will first address Richards' allegation that T&B's description of item #25 is a "moving target."  (Richards Reply Br. 77.)  In the Third Supplemental Response to Richards' Interrogatory Number 10, T&B identified item #25 as "[u]se of specific Elastimold application of pre-heat ovens for rubber components prior to insulation molding."  (Third Supp. Resp. to Pl.'s Interrog. Number 10 at ¶ 25 in Cantine Decl., Ex. 4.)   T&B then adds an additional element to the item in the Final Pretrial Order by asserting that Richards "implemented Elastimold's

temperatures for the preheat ovens as set forth in the standard operating procedures." (Final Pretrial Order 301.) In its brief in opposition to this motion for partial summary judgment, T&B shifts its focus to concentrate entirely on temperatures, relying heavily on two documents, one filed in 2006 and one filed with that brief. (T&B Br. 63-64; R2315 in Robertson Cert., Ex. 85; R2946 in Robertson Cert. Ex. 1.) T&B offers nothing explaining the context of the documents. (T&B Br. 63-64.) Richards' allegation as to item #25 being a "moving target" is therefore correct. T&B began its focus on the use of the ovens generally with no emphasis on temperature, but has subsequently shifted its argument to focus solely on temperature. Summary judgment is therefore warranted on item #25 for this reason alone.

T&B, however, also fails to meet any of the elements of the four-part test. As it is a threshold inquiry, the Court will first address T&B's failure to meet its burden of showing that item #25 is not generally known. T&B does not refute Richards' witnesses' testimony that they used the concept embodied in item #25 in prior employment within the industry. Specifically, Richards offers testimony that its witness Covill "used pre-heat ovens to pre-heat rubber components prior to overmolding at Cooper, Chardon and Hubble Power for all their load break elbows, bushing inserts, junctions and 600 AMP tees." (T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 664.) Richards also offers testimony of its witness Koroluk that he "used pre-heat ovens to pre-heat rubber components while at Burndy, Kearney and General Electric." (T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 665.) T&B does not refute these statements; it only offers other evidence that shows where item #25 was not available and where it was not used. (T&B Br. 64.) As stated earlier, this type of a showing is insufficient from the holder of the burden of proof.

50

T&B also fails to show that the item #25 is specialized.  The general concept of preheating is known within the industry.  T&B concedes that pre-heat ovens are commercially available, but contends that "the use of the ovens in the fashion used by T&B, including T&B's operating procedures for use of the ovens, is [not] equally available." (T&B Br. 63.)  T&B also makes numerous statements and shows documentation of certain temperatures that it uses.  However, what T&B does not show is that its temperatures are unique and anything beyond what a person skilled from years of experience in the industry would use if that person chose to use a commercially available pre-heat oven.  T&B therefore fails to satisfy the second part of the four-part test.

Based on the above, summary judgment is granted on item #25.

**(15) Use of Pre-Heat Ovens For Mold Components (Item #26)**

Item #26 is identified in the Final Pretrial Order as follows**:**

26.  **Pre-Heat Oven For Pre-Heating Interchangeable Mold Components.**  In addition to using ovens to preheat rubber parts, Elastimold also uses ovens to preheat interchangeable mold components such as the cups on the I, Y, and H connectors.  Thomas & Betts' standard operating procedures call out which components and at what temperatures they are to be preheated.  Luzzi stole those standard operating procedures and put them into operation at Richards, including the instructions concerning preheating interchangeable mold components.

(Final Pretrial Order 302.)

Whether information is generally known is a threshold component of the four-part test.  Here, T&B fails to demonstrate that the use of #26 was not generally known.  Specifically, Richards offers testimony that its witness Covill "used pre-heat ovens at Chardon and Hubble to preheat mold components in connection with load break elbows, junctions, bushing inserts and the 600 AMP tee."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶ 691.)  Richards also

offers testimony of its witness Koroluk that he "used pre-heat ovens to pre-heat molds while at

Burndy, Kearney and General Electric." (T&B Resps. to Richards' Stat. of Uncontested Facts ¶

692.) T&B does not refute any of these statements; it only offers other evidence that states

where item #26 was not available and where it was not used. (T&B Br. 64.) This is insufficient

evidence on T&B's part to satisfy its burden of proof regarding whether item #26 is generally

known. Summary judgment is therefore granted on item #26.

(16) **Use of Pre-Heat Temperatures Above The Boiling Point of Water (Item #35)**

Item #35 is identified in the Final Pretrial Order as follows:

> 35. **Pre-Heat Temperatures Above The Boiling Point Of Water For Rubber Inserts.** Elastimold preheats its rubber inserts before overmolding. Specific details of this practice are set out in Elastimold's standard operating procedures. Preheating for a shorter cure cycle. Elastimold preheats its rubber inserts above the boiling point of water, which is extremely hot and could potentially damage the rubber insert. Elastimold has found that preheating rubber inserts above the boiling point of water eliminates moisture on the surface of the insert and enhances the bonding between the insert and the insulation rubber.
>
> A manufacturer's ability to preheat rubber parts is dependent in part on the rubber compounds used. For instance, Richard's expert, Harold Hervig, testified that 3M chose not to preheat rubber inserts because the rubber became too soft and did not hold its shape properly during overmolding. Like Elastimold, Richards preheats rubber parts above the boiling temperature of water. As set forth Topic 72, Luzzi and Richards also misappropriated Elastimold's rubber compound formulation – a formulation that would and does accommodate the higher preheat temperatures that Elastimold used and that Richards similarly used after Luzzi provided Richards with a copy of Elastimold's rubber formulation. A physical examination of a final product that was manufactured using such temperatures would not reveal the use of such temperatures.

(Final Pretrial Order 305-06.)

Numerous problems exist with T&B's identification and evidence presented regarding

item #35.

First, T&B concedes that "this item relates to items 25 and 26[,]" on which summary judgment is granted earlier in this Opinion.  On a similar note, this Court dismissed item #30 in its April 26, 2007 Opinion, which claimed that temperatures used in eight molds were confidential information, but failed to identify the temperatures claimed confidential.  (Apr. 26, 2007 Op. 56-58; Final Pretrial Order 303-04.)  According to T&B, item #30 included "temperatures for '*the barrel, the screw, the preheat oven, the top plate, the float plate, the bottom plate, and the cores*.'" (T&B Br. 70 n.8 (citing as an example T&B Dep. Ex. 21 in Robertson Cert., Ex. 56).)  Temperatures for "the preheat oven" in item #30 appear to overlap with the information claimed confidential in item #35.  Further, item #35 appears to directly overlap with item #25, as they both discuss the temperatures at which T&B sets its preheat ovens.  The Court has therefore already granted summary judgement on item #35.

T&B also states in the Final Pretrial Order that 3M unsuccessfully tried to preheat rubber inserts.  (Final Pretrial Order 305-06.)  This demonstrates that preheating rubber inserts is a concept within the industry that is or would be used as long as the rubber compounds used can withstand the heat.  (See id.)  As such, T&B is claiming that its rubber compound formula is confidential information, because the compound formula and heating temperatures are inextricably tied.  (See id. ("A manufacturer's ability to preheat rubber parts is dependent in part on the rubber compounds used.").)  This Court has already granted summary judgment on T&B's trade secret and confidential information claims relating to its rubber compound formula.  (Apr. 26, 2007 Op. at 37-44 (granting summary judgment on trade secret item #1 and confidential information items #54, #59, #60, #64, and #72, all of which concern rubber technology, with trade secret item #1 and confidential information item #72 specifically addressing Elastimold's

53

rubber formula).)  This issue has therefore already been rejected by the Court as not being confidential information.

Further, addressing the four-part test, T&B fails to demonstrate that the information in item #35 is not generally known.  Richards offers testimony of its witness Covill that he used preheat oven temperatures for rubber inserts that were above the boiling point of water while working at Chardon, Cooper, and Hubbell.  (Covill Supp. Expert Report 12-14 in Cantine Decl., Ex. 61.)  In reference to molding high voltage rubber parts, Covill added that "[a]nyone who has done this type of molding would have a very good knowledge of where to start with set points and refine them from there."  (Covill Supp. Expert Report 13 in Cantine Decl., Ex. 61.)  Richards also offers the testimony of its witness Koroluk who explained that "[w]hen preheating previously molded parts it is good practice to get the temperature of the premolded parts to the same temperature as the mold in order to keep the cure time of the product being molded as short as possible and to aid the cross linking process of the two compounds."  (Koroluk Supp. Expert Report 36 in Cantine Decl., Ex. 62.)  He further explained that he used this method at "Burndy, Kearney and General Electric."  (Koroluk Supp. Expert Report 36 in Cantine Decl., Ex. 62.)  T&B does not refute any of this testimony, stating that it is inadmissible under this Court's April 2007 Daubert ruling.  (T&B Br. 70.)  T&B only states that item #35 is not generally known because "Luzzi had to steal the SOPs to obtain the temperatures[,]" Defendants' expert failed to identify literature or patents that conclusively show that #35 was generally known, and "Defendants' experts admitted that SOPs are the confidential information of Elastimold."  (T&B Br. 70.)  This threshold element of the four-part test is therefore unmet by T&B.

Any of the above cited failures of proof and repetitions independently warrant summary

judgment on item #35; as such, summary judgment is granted on item #35.

**(17) <u>Use of Vertical Injection Process</u> (Item #36)**

Item #36 is identified in the Final Pretrial Order as follows:

36. **Vertical Injection Process With Ram Feed For Conductive Molds And Screw Feed For Insulation Molds.** The vertical injection process is one in which the compound is injected into the mold from the top down and the mold itself is clamped shut from the top down. Elastimold engineers call this a "vertical clamp vertical inject." The barrel sits on top of the press and contains the shot of rubber that will fill the cavities and runner system.

There are essentially two mechanisms for filling the barrel. The older and slower mechanism is known as a ram feed in which compound is fed through the top of the barrel. The ram chops off chunks of rubber and packs them down into the bottom of the barrel, gradually filling the barrel from bottom to top. A screw feed fills the barrel from the bottom thorugh the turning of a screw shaped feeder that cuts and tears the rubber as the rubber is pushed into the barrel.

Elastimold has learned over the decades of manufacturing 600 Amp connectors that ram feeds process conductive and oil resistant compounds better than screw feeds. Accordingly, Elastimold uses ram feeds to mold jackets and inserts when possible and screw feed outfitted presses when molding insulation compounds. Like Elastimold, Richards molds conductive parts using a ram feed and overmolds parts using a screw feed as called for in the Elastimold standard operating procedures, which Luzzi stole and used at Richards.

(Final Pretrial Order 306-07.)

In their briefs, T&B and Richards argue past each other regarding item #36. In short, T&B discusses a process and Richards discusses the press. This does not assist the Court in making its determination. However, T&B explains that "[t]here are essentially two mechanisms for filling the barrel[.]" T&B admits that "[t]he use of vertical injection presses in the manufacture of rubber molded products is in the public domain." (T&B Resp. to Richards' Stat. of Uncontested Facts ¶789.) T&B also admits that other companies within the industry used

vertical injection presses, albeit with different parameters.  (Id. at ¶781.)  However, when read together, these statements demonstrate that the use of vertical injection presses is known in the industry and there are only two ways to fill the barrel.  Furthermore, T&B states that item #36 is the product of experience, specifically that it was "learned over the decades of manufacturing." Given that there are only two ways to use a known device, T&B fails to demonstrate that its use is unique or specialized.  Therefore, no showing is made that an expert in the field would not know how to use item #36 in a manner similar to Elastimold's use based on his experience, just as Elastimold developed item #36 based on its experience.  As such, T&B fails to meet the second part of the four-part test by not demonstrating to the Court that item #36 is proprietary information.  In sum, T&B's evidence and argument regarding item #36 are insufficient to overcome the standard for summary judgment.  Summary judgment is therefore granted on item #36.

**(18) <u>Designing a Web of Rubber Requiring Removal</u> (Item #38)**

Item #38 is identified in the Final Pretrial Order as follows:

38.  **Designing A Web Of Rubber Between The Core And The Flip-Pin In Jackets Requiring Post-Molding Removal.**  When Elastimold developed its use of flip pins to form the hole in injection ports, the tool designers specifically designed the flip pin so that the space between the flip pin and the core would form a rubber web at the bottom of the injection port.  This rubber web was designed so that the operator could easily drill out the web using Elastimold's hollow point drill bits. Depending upon the tool that the operator was to use, the tool designer may have chosen to design a thinner web of rubber left between the flip pin and the core. However, hollow point drill bits do not cut a thin web of rubber as effectively as one with slightly more thickness.  Richards has copied Elastimold's technique of designing a web of rubber between the core and flip pin with sufficient thickness to enhance the use of the hollow point drill bit.  An examination of a final product would not reveal either the dimension of the web, its design, thickness, or the method or tool used to eliminate and clean out the injection port after overmolding had been completed.

(Final Pretrial Order 307-08.)

Item #38 is not identified with sufficient particularity. T&B acknowledges that, in the Final Pretrial Order, it does not identify any specifics about the "rubber web" that it deems confidential information, namely the "dimension of the web, its design, thickness, or the method or tool used to eliminate and clean out the injection port after overmolding had been completed." (T&B Br. 75; Final Pretrial Order 308; T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶806-15.) T&B merely states that "this is not a patent infringement case, where such details might be required." (T&B Br. 75.) Despite T&B's contention, that is not the standard in this case. As this Court articulated in April 2007, "[w]hen an employer does not identify confidential information with sufficient particularity, it is not reasonable to enforce a post-employment restrictive covenant." (Apr. 26, 2007 Op. 22.) From the description given by T&B, it is impossible to determine exactly what T&B seeks to protect; "sufficient thickness" appears key, but no hint of description is given as to what that phrase signifies. Furthermore, it is not even clear what constitutes the "web" referred to by T&B.

Furthermore, item #38 is a moving target. In its opposition brief and its responses to Richards' Statement of Uncontested Facts, T&B focuses on tool design and asserts that the rubber web itself is not confidential. "[T]he tool design which leaves a particular semi-finished product (a portion of which becomes scrap)" is what is alleged confidential, with T&B asserting that the rubber web design it uses "facilitates cleaner, better removal with a hollow point drill." (T&B Br. 75; T&B Resp. to Richards' Stat. of Uncontested Facts ¶801, 803.) In contrast, the Final Pretrial Order and the Third Supplemental Response to Richards' Interrogatories focus on

the web itself.  (Final Pretrial Order 307-08; Third Supp. Resp. to Richards' Interrogs. ¶38 in

Cantine Decl., Ex. 4 ("38.  Use of specific Elastimold practice to design a web between core and

flip-pin in jackets requiring post-molding removal").)

 Additionally, although T&B holds the burden of proof, it has failed to offer affirmative

evidence that counters Richards' witnesses' statements that they used the equivalent of item #38

during employment with other companies.  T&B therefore fails to demonstrate that item #38 is

not generally known.  Richards' witness Covill testified that he used "webs of varying thickness

in the manufacture of underground electrical products at Chardon."  (T&B Resp. to Richards'

Stat. of Uncontested Facts ¶816; Covill Supp. Expert Report 3 in Cantine Decl., Ex. 61.)

Richards' witness Koroluk testified that, at Kearney and General Electric, pivoting pins were

specifically designed "to form a thicker web for facilitating post molding removal."  (Koroluk

Supp. Expert Report 39 in Cantine Decl., Ex. 62; T&B Resp. to Richards' Stat. of Uncontested

Facts ¶817.)  Richards also asserts that "3M used webs of varying thickness[,]" relying on its

expert Hervig's supplemental report.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶818.)

T&B does not counter any of these assertions, only offering other information, some of which

infers a possibility of the information not being generally known: "a) Luzzi stole an SOP which

refers to the manner of removing the web . . . ; b) Defendants' experts[] have opined that SOPs

are the confidential information of Elastimold; c) mold drawings of former industry participants,

including Blackburn and Joslyn, do not reflect a mold design that leaves a thick web or rubber at

the end of the flip pin; and d) Richards['] own documents that disclose its flip pin tool design . . .

assert that the information is the confidential property of Richards."  (T&B Br. 76.)  Inference is

insufficient where the party asserting that inference holds the burden of proof.

Item #38 is a moving target, is not described with sufficient particularity, and is not shown to be generally unknown; therefore, summary judgment is granted on this item.

(19) **<u>Lewis Press Information</u> (Item #40)**

Item #40 is identified in the Final Pretrial Order as follows:

> 40.  **Lewis Press Information Summary Including Press Size, Shot Size, Mold Stack Height Data, Auxiliary Heater System Information, And Hydraulic Assist Information.** Luzzi compiled before leaving Elastimold detailed information as to Elastimold's Lewis presses, including a summary of the press sizes, shot sizes, mold stack height data, auxiliary heater system information and hydraulic assist information.  This summary cross referenced what parts were made on specific presses as well as the cavitation information (how many cavities.  From this information, Luzzi was able to determine Elastimold's manufacturing capacity, efficiency and cost information.
>
> Luzzi used this information to determine what presses Richards needed to buy, how many molds Richards needed to build, what capacity Richards needed to meet and at what cost.

(Final Pretrial Order 308-09.)

Although T&B describes item #40 with sufficient particularity, as it is clear that the item refers to a three page document entitled "Press Fact – Information Sheet" that is marked R2865-67, T&B fails to meet the requirements of the four-part test.

First, T&B fails to demonstrate that item #40 is not generally known.  Richards offers the testimony of three witnesses who analyze item #40 and describe it as standard information.  Richards' witness Covill testified that R2865-67 contains "mostly standard information that would be supplied by a press manufacturer or be a function of the press itself.  [R2865-67] would appear to have been compiled as a quick reference by T&B.  I do not see anything here that would be of any value to Richards.  Richards uses only 400 ton Lewis presses, and only has eight of them.  Other than shot size, the information referenced in [R2865-67] would all be the same

59

for each press." (Covill Supp. Expert Report 16 in Cantine Decl., Ex. 61.) Richards' witness Koroluk testified that R2865-67 do not contain "any reference that is specific to Lewis presses" and classifies the documents as "standard press information, which is available from the press manufacturer." (Koroluk Supp. Expert Report 40 in Cantine Decl., Ex. 62.) Koroluk also stated that "Lewis presses are not named in these documents" although other companies' presses are. (Koroluk Supp. Expert Report 40-41 in Cantine Decl., Ex. 62.) Koroluk further explained that "all presses are manufactured with set specifications; press size, shot size, mold stack height data, and (sic) are all controlling factors when determining what size mold will fit and run in a Lewis or any other rubber molding machine." (Koroluk Supp. Expert Report 41 in Cantine Decl., Ex. 62.) Richards' witness Hervig stated that the information in item #40 "should be readily available from the manufacturer or anybody selling a Lewis press secondhand." (Hervig Supp. Expert Report 9 in Cantine Decl., Ex. 63.) T&B does not specifically respond to these allegations.

Second, T&B fails to demonstrate that the information is specific and specialized. Item #40 does not identify which presses are Lewis Presses and which are built by other manufacturers. ((R2865-67 in Cantine Decl., Ex. 16.) T&B's expert Higgins testified that he was unable to identify which presses listed in item #40 were Lewis presses. (Higgins Dec. 10, 2003 Dep. 693:10-12 in Cantine Decl., Ex. 48.) T&B asserts that Luzzi knew which of the listed presses were Lewis Presses, because he could have cross-referenced item #40 with other documents that T&B alleges that Luzzi stole, specifically "pages R2868-R2875 (Hackettstown Loading Document) and pages R2887-R2890 (Work Center Report)." (T&B Br. 78; T&B Resp. to Richards' Stat. of Uncontested Facts ¶852.) No evidence is given that Luzzi actually cross

60

referenced these documents.  T&B admits that #40 alone would not give Luzzi sufficient information; it argues that the combination of items #36, 43, and 68, all of which have been determined not to be confidential by this Court, along with Polaroid photographs gave Luzzi the information needed to copy Elastimold's presses.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶852.)  These general suppositions of combining information are insufficient to show that this item is specialized.

Regarding the fourth part of the test, whether the information is current, T&B admits that some of the presses listed in R2865-67 are no longer at Elastimold's Hackettstown facility. (T&B Resp. to Richards' Stat. of Uncontested Facts ¶855.)

Finally, T&B's reasoning regarding this item is particularly circular: it asserts that, despite what Richards' experts testified, the information in item #40 was valuable because it was stolen by Richards.  If it was not valuable, it would not have been stolen.  (T&B Br. 79.) Although this reasoning is weak, summary judgment is granted due to T&B's failure to demonstrate the threshold issue that item #40 was not generally known in the industry and its failure to meet the other portions of the four-part test.

**(20) Cal-Rod Heaters In BSR Cores (Item #42)**

Item #42 is described in the Final Pretrial Order as follows:

42.  **Cal-Rod Heaters In BSR Cores.**  A mold designer has many options available to him or her with respect to the thermodynamics of the mold.  Elastimold has a practice of drilling holes down the center of its cores and placing Cal-Rod heaters in the center of the core.  In addition, Elastimold purchases and uses two thousand watt Cal-Rod heaters but runs them at only half voltage.  This is highly specific and highly peculiar practice of Elastimold.

In Luzzi's April 5, 1999 phone call log, Luzzi has a note that provides: "Ken [Barker] core heaters, 2000 watts x 1/2 voltage."  Richard[s] uses Cal-Rod heaters

to heat the BSR cores.  It is not known whether Richards runs the Cal-Rod heaters
at half voltage.

(Final Pretrial Order 309.)

T&B claims that its use of 2000 watt Cal-Rod heaters at half-voltage in the center of its
BSR cores is confidential information.  (Final Pretrial Order 309; T&B Resp. to Richards' Stat.
of Uncontested Facts ¶871.)  As the focus is on the type of heater used, T&B's description of the
wattage and the voltage is sufficiently particular.

T&B also demonstrates, and Richards fails to cast doubt, that T&B's use of 2000 watt
Cal-Rods at half voltage is not generally known.  This is due to Richards' witnesses' testimony
as to item #42 being insufficiently specific to call into question T&B's assertions.  (See Covill
Supp. Expert Report 16 in Cantine Decl., Ex. 61 (discussing the use of Cal-Rod heaters being
generally known but failing to address whether T&B's wattage and voltage combination is
generally known); Koroluk Supp. Expert Report 42 in Cantine Decl., Ex. 62 (similarly non-
specific); Hervig Supp. Expert Report 10 in Cantine Decl., Ex. 63 (similarly non-specific).)

However, T&B fails to show that Richards is using the technology it claims as
confidential.  It is undisputed that "Cal-Rod heaters are commercially available items that T&B
purchases."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶873.)  T&B then claims as
protectible its use of those heaters at half-voltage in the center of its BSR cores.  (T&B Resp. to
Richards' Stat. of Uncontested Facts ¶871.)  However, T&B also admits that "[i]t is not known
whether Richards runs the Cal-Rod heaters at half voltage." (Final Pretrial Order 309.)  T&B's
only evidence is that Richards uses Cal-Rod heaters; T&B offers evidence of what Richards was
told by others, specifically Barker, but has no evidence of what Richards actually does.  (T&B

62

Resp. to Richards' Stat. of Uncontested Facts ¶873.)  T&B asks this Court to accept an inference

that Richards operates its heaters at half-voltage based on Richards' failure to deny that it does

so.  (T&B Br. 80.)  T&B has the burden of proof, and an inference falls far short of meeting that

burden.

      Since T&B fails to counter Luzzi's testimony and supporting documents that he and

others independently developed Richards core heaters (Luzzi Decl. ¶91) and is wholly unable to

show that Richards uses core heaters in the manner claimed confidential by T&B, summary

judgment is granted on item #42.

**(21) <u>Press Loading Summary</u> (Item #43)**

      Item #43 is described in the Final Pretrial Order as follows:

> 43.  **Press Loading Summary Detailing Cavity Count By Part Number.**
> Elastimold generates an internal report called "Hackett[st]own Press Loading" that
> provides detailed information and cross references drawing numbers, part numbers,
> part names, tool drawings, mold cavity counts and the presses on which those molds
> can be used.  This document, in connection with the Elastimold press information
> summary provided Richard[s] and Luzzi with a complete reference table to all parts,
> molds and presses.  In addition, the Hackettown Press Loading summary provided
> Luzzi with the drawing numbers for each 600 Amp part.  These numbers are needed
> in order to access the Elastimold standard operating procedures which are also
> maintained by drawing number.  Luzzi took a copy of Elastimold's press loading
> summary prior to joining Richards.

(Final Pretrial Order 309-10.)

      Item #43 is identified with sufficient particularity.  However, analysis of the item requires

the consideration of information beyond that in item #43.  Specifically, in the Final Pretrial

Order, T&B asserts that item #43, when used with item #40 (Lewis Press Information), gives a

reader "a complete reference table to all parts, molds and presses" used by Elastimold and gives

the reader "drawing numbers for each 600 Amp part[,]" which allows access to the Elastimold

SOPs.  (Final Pretrial Order 309-10.)  In other references, the existence of two Polaroid photographs of two of Elastimold's Lewis presses are also referred to as allowing the reader to identify Elastimold's parts, molds and presses.  (Borgstrom 2007 Decl. ¶31.)  All must be considered in addressing this item.

In his 2007 Declaration, T&B witness Alan Borgstrom states that this information would allow him to "compare Elastimold's productivity and costs against the competitor's and determine where Elastimold was better, worse or even with the competitor.  I would then know where to focus improvement efforts."  (Borgstrom 2007 Decl. ¶31.)  Borgstrom states that the combination of documents reveal "(1) T&B/Elastimold's primary alternate work center for the BSR insulation; (2) that the mold has 4 cavities; (3) T&B/Elastimold's primary alternate work center for the Y &, H, and I splice insulations; (4) that the Y splice mold has 2 cavities; (5) that the I splice mold has 4 cavities; (6) that the H splice mold has 1 cavity)" (Borgstrom 2007 Decl. ¶32); and that "Press #445 is a primary alternate work center for the cable adaptor and for the BLR, and the cavitation on that mold is 2."  (Borgstrom 2007 Decl. ¶33.)  None of this was asserted in the Final Pretrial Order or in T&B's Third Supplemental Response to Richards' Interrogatories.

Additionally, Richards' witnesses testified that the information in #43 would not be useful to Richards.  Covill stated that item #43 "would be of no help to Richards[,]" and stated that, due to Richards' small size and its use of "only one type and size of press (i.e. 400-ton Lewis presses)[,]" Richards had no need for a chart like item #43.  (Covill Supp. Expert Report 16-17 in Cantine Decl., Ex. 61.)  Richards' witness Hervig states that he "see[s] no reason [item #43] would be helpful to Richards to start up a competitive line."  (Hervig Supp. Expert Report

10 in Cantine Decl., Ex. 63.)

T&B also does not claim that this item, in and of itself, is confidential information; it claims that, when this item is used in conjunction with item #40 and two photographs, confidential information is revealed.  This Court determined above that item #40 is not confidential information.

Further, as in item #40, T&B fails to show whether Richards used the data it says Luzzi extrapolated from items #40 and #43.  In its Response to Richards' Statement of Uncontested Facts, T&B wrote, "[a]lthough T&B has no direct evidence that Richards or Luzzi used the information in the report, an inference should be drawn in T&B's favor from the fact that R2868 features 400-ton Lewis presses for most of the items at issue, and from the fact that Luzzi searched out and purchased 400-ton Lewis presses upon leaving Elastimold."  T&B then cites page five of T&B Deposition Exhibit 27 in its opposition brief, which the brief says "reflects Elastimold cavitation information" as "evidence that Luzzi himself transmitted the information reflected on [item #43] to Wirtz Manufacturing Co., a vendor . . . [,]" but no evidentiary explanation is given explaining what T&B Deposition Exhibit 27 is or who authored it.  (T&B Br. 83; T&B Dep. Ex. 27 in Robertson Cert., Ex. 54.)  Finally, in its April 2007 Opinion, this Court recognized that 400-ton Lewis presses are "commonly-used equipment[.]" (Apr. 26, 2007 Op. 58.)

T&B's failure to demonstrate that the allegedly confidential information was misappropriated requires summary judgment on this issue.

**(22) Compression Chamber Groove On Cable Adapter Core (Item #44)**

In the Final Pretrial Order, item #44 is described as follows:

44.  **Compression Chamber Groove On Nose Of Cores For Cable Adapters As A Tear Ring And Vent.**  At the bottom of Elastimold's core for the cable adapter mold, Elastimold machines a compression chamber groove to facilitate venting and part removal.  Richards copied this practice, which is not knowable from a physical examination of a final product manufactured using this compression groove.

(Final Pretrial Order 310.)

T&B fails to demonstrate that item #44 is not generally known.  Richards' witness Covill stated that he used "this type of design since the 1960s in the molding for automotive products" and since the 1980s "in about all the products in the high voltage product line . . . at Cooper, Chardon and Hubble."  (Covill Supp. Expert Report 17 in Cantine Decl., Ex. 61.)  Richards' witness Koroluk described T&B Exhibit 43 and concluded that it "depicts a mandrel design for the registration area similar to the designs [he] used when molding Load Break Bushings and Multitaps for Burndy, Kearney and General Electric[.]"  (Koroluk Supp. Expert Report 43 in Cantine Decl., Ex. 62.)  Richards' witness Hervig wrote that he used compression chamber grooves, which are also known as tear rings, at 3M during the 1970s and that Acushnet used them to mold 3M mining splice covers.  (Hervig Supp. Expert Report 10 in Cantine Decl., Ex. 63.)  T&B does not dispute any of this testimony; it only argues that the testimony is barred by the Court's Daubert Opinion.  (T&B Br. 85.)

In short, T&B fails to satisfy its burden of proof in showing that the item at issue is not generally known, as it failed to refute any of Richards' witnesses' testimony or offer affirmative evidence that demonstrates that item #44 is not generally known.  Since an item not being generally known is a threshold requirement, summary judgment is granted as to item #44.

**(23) Balanced Cavity Layout (Item #45)**

In the Final Pretrial Order, item #45 is described as follows:

45. **Balanced Cavity Layouts For Stress Cone Mold And Cable Adapter Molds.**
The balanced cavity layout means that the distance and volume of each sprue from
runner to cavity is identical so that all cavities fill up at the same rate. A mold
designer can achieve cavity balance through a variety of designs or mechanisms.
Richards had never performed any injection rubber molding prior to Luzzi's arrival.
Richards was so lacking in experience in injection rubber molding that Richard's tool
designer, Vitaly Lungin, drew a series of molds where the cable adaptor and stress
cones with runners systems that were dramatically unbalanced. Mr. Lungin and the
rest of his colleagues at Richards did not know the first thing about designing a
runner system for an injection mold. Ultimately, Richards designed and built runner
systems that matched the Elastimold runner systems.

(Final Pretrial Order 310.)

T&B fails to demonstrate that item #45 is not generally known. Richards' witness Covill

testified that he "used balanced runner systems on all high voltage product molds at Chardon and

Hubble since [the] 1980s." (Covill Supp. Expert Report 17 in Cantine Decl., Ex. 61.) Richards'

witness Koroluk listed molds that he designed for Burndy that used the balanced runners that are

claimed confidential by T&B. (Koroluk Supp. Expert Report 43-44 in Cantine Decl., Ex. 62.)

Richards' witness Hervig wrote that he believed 3M used a balanced layout on its multicavity

5411 splice end seal molds. (Hervig Supp. Expert Report 10 in Cantine Decl., Ex. 63.) T&B

objects to Richards' assertion that details of item #45 are generally available in literature

(Borgstrom 2007 Decl. ¶¶162-165) and cites differences between Blackburn's use of balanced

cavity layouts and its own (T&B Stat. of Add'l Facts ¶¶803-804). However, T&B does not

challenge Richards' witnesses' statements or offer any other affirmative evidence apart from

stating that "Richards had to have Barker teach it about the item" (T&B Br. 87), an assertion that

is not supported by the underlying citation where Barker answers in the affirmative that he

explained the v-vents to Luzzi but then states that "Luzzi was already aware of these V-vents,

67

because he had seen them in the lab, and he could do this engineering anyway." (Barker Jan. 8, 2004 Dep. 186:3-188:2 in Robertson Cert., Ex. 19.)

T&B also fails to demonstrate that item #45 is sufficiently specialized as to satisfy the second part of the four-part test. T&B gives no indication that there is any uniqueness to a balanced cavity layout for stress cone molds and cable adapter molds and acknowledges that the general concept of a balanced cavity layout is in the public domain. (T&B Resp. to Richards' Stat. of Uncontested Facts ¶960.) Given that a balanced cavity layout in general is a known concept, T&B fails to explain how Richards' use of such a layout was not the result of experience-based knowledge accumulated during years of working in the field. T&B therefore fails to meet the second part of the four-part test. T&B's proofs as to the other prongs of the four-part test are equally insufficient.

Summary judgment is therefore granted on item #45 due to T&B's failure satisfy any portion of the four-part test.

**(24) <u>Use of Full Round Runners</u> (Items #50 & #51)**[1]

In the Final Pretrial Order, items #50 and #51 are described as follows:

50. **1/2" Round Runners In The BSR Mold.** When designing a mold, there are a variety of runner shapes that a mold designer can choose from. The leading treatise on the subject of molding technology[] provides: "Different runner cross sections offer relative advantages and disadvantages." Sommerz, <u>Elastimold Elastimor Molding Technology, a comprehensive and unified approach to materials, methods and mold design for elastimors,</u> Elastech, 2003. The mold designer must consider a variety of factors such as part size, machining capability, rayometer data, the compound characteristics as well as screw removal and cavity pressure when choosing a runner shape. As a result, there is no obvious choice in selecting a runner shape or size.

---

[1] These two items were consolidated in the Final Pretrial Order. (Final Pretrial Order 312.)

As set forth in Elastimold's Standard Technical Practices – Rubber Mold Design, Elastimold uses full round runners that are one-half inch in diameter in its BSR molds. Richards employs full round runners that are one-half inch in diameter in its BSR molds. Luzzi stole Elastimold's Standard Technical Practices – Rubber Mold Design and incorporated its requirements into Richards' manufacturing line, including the use of 1/2 full round runners.

51. **Full Round Runners.** Elastimold incorporates the facts set forth in Topic 50 as though set forth herein.

(Final Pretrial Order 312.)

T&B fails to identify items #50 and #51 with sufficient particularity. In its interrogatory responses, T&B cites to T&B Exhibit 44 in support of item #50 and R2915 in support of item #51. (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶¶50-51 in Cantine Decl., Ex. 4.) No other supporting documents are cited. T&B concedes that T&B Exhibit 44 is not a T&B document, but argues that Barker created the document for Richards and that it reflects Elastimold's tooling and processes for making items #50 and #51. (T&B Br. 89.) Barker admits authoring T&B Exhibit 44 for Richards. (Barker Jan. 8, 2004 Dep. 162:10- 20 in Robertson Cert., Ex. 19.)

Upon examination, neither item #50 nor item #51 show measurements for "1/2" round runners" or full runners. (T&B Ex. 44 in Robertson Cert., Ex. 2; R2915 in Robertson Cert., Ex. 1.) Further, according to Barker, T&B Ex. 44 does not depict 1/2 inch round runners. (Barker Jan. 8, 2004 Dep. 281:23-282:9 in Cantine Decl., Ex. 53.) Barker's statement is echoed by Richards' witness Koroluk. (Koroluk Supp. Expert Report 46-47 in Cantine Decl., Ex. 62.) Although it was raised in Richards' initial brief, in T&B's brief in opposition to the motion at hand, T&B does not contest Barker's statement that 1/2" round runners are not depicted. (T&B Br. 89-91; Richards Br. 184.) However, T&B contends that T&B Ex. 44 depicts 1/2 inch round

runners in its response to Richards' Statement of Uncontested Facts by highlighting the

testimony of Higgins that states that page 7 of T&B Ex. 44 shows "a runner half runner diameter

half inch runner diameter in the mold plate and in the upper drawing of the 100 ton Lewis re-

bushing."  (Higgins Dec. 10, 2003 Dep. 763:10-12 in Robertson Cert., Ex. 12; T&B Resp. to

Richards' Stat. of Uncontested Facts ¶ 1031.)  R2915, which is Section IV of the Elastimold

Standard Technical Practices: Rubber Mold Design, states, under the heading "Runner Section

Areas" that "[a]ll runners shall be full round."  (R2915, in Robertson Cert., Ex. 1.)  Despite this,

no details are given: no written description is provided of the dimensions or other physical

characteristics of #50 or #51 or how T&B uses the items.  Additionally, T&B admits that it does

not cite to any documents in Luzzi's possession that depict T&B's use of item #50 or #51.

(Third Supp. Resp. to Richards' Interrog. No. 10 at ¶1033, 1030 in Cantine Decl., Ex. 4.)  The

information provided regarding items #50 and #51 therefore falls significantly short of describing

the items with sufficient particularity.

  T&B further fails to show that items #50 and #51 are not generally known.  Richards'

witness Covill stated that he used 1/2 inch round runners at "Chardon and Hubble in the 1980s

thru 2000s."  (Covill Supp. Expert Report 19 in Cantine Decl., Ex. 61.)  He added that "all our

runners at Chardon were full round except for our test point cap, which was trapezoidal[,]" and

he personally used full round runners since the 1980s.  (Covill Supp. Expert Report 19 in Cantine

Decl., Ex. 61.)  Richards' witness Koroluk testified that, as he recalls, "all of the 15 and 25 KV

elbow jacket and insulation molds [he] designed and used at Burndy, Kearney and General

Electric had 1/2" full round runners."  (Koroluk Supp. Expert Report 47 in Cantine Decl., Ex.

62.)  Koroluk also added that he "used full round runners in all of the HiVoltage molded rubber

parts [he] designed for Burndy, Kearney, and General Electric." (Koroluk Supp. Expert Report

47 in Cantine Decl., Ex. 62.) Richards' witness Hervig testified that 3M used full round runners.

(Hervig Supp. Expert Report 11 in Cantine Decl., Ex. 63.) T&B does not refute any of this

testimony (T&B Br. 90; Third Supp. Resp. to Richards' Interrog. No. 10 at ¶¶1034-41), so it fails

to meet its evidentiary burden of showing that items #50 and #51 are not generally known.

Because T&B fails to meet its burden of proof regarding the threshold requirement of

describing items #50 and #51 with sufficient particularity, summary judgment is granted as to

these two items. This determination is bolstered by T&B's additional failure to demonstrate that

the two items are not generally known.

### (25) Use of Runners On A Separate Runner Float Plate (Item #52)

Item #52 is described in the Final Pretrial Order as follows:

> 52. **Runners On A Separate Runner Float Plate.** Over the decades of
> manufacturing a wide variety of rubber products, Elastimold developed the practice
> of employing an additional plate in its molds that sits between the upper platent and
> the top mold plate. Elastimold calls it a "runner float plate." Such a plate is not
> required nor is its use obvious from the standpoint of an examination [of] the final
> products that have been molded using such a mechanism. Use of such a plate cannot
> be observed from the product.
>
> Like Elastimold, Richards employs a separate runner float plate as called for
> in Elastimold's Standard Technical Practices, as well as its standard operating
> procedures, which Luzzi stole prior to leaving Elastimold.

(Final Pretrial Order 312-13.)

Item #52 is not identified with sufficient particularity. In its interrogatory answers, T&B

refers to R2862 and T&B Ex. 44 as supporting its contention that item #52, which is identified as

"[u]se of specific Elastimold runners on separate runner float plate[,]" is confidential

information. (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶¶50-51 in Cantine Decl., Ex.

4.)  In the Final Pretrial Order, T&B does not offer measurements or other explicit descriptions

of the item.  (Final Pretrial Order 312-13.)  Furthermore, as stated above, T&B Ex. 44 is not a

T&B document but was authored by Barker.  Now, in its brief, T&B again relies on R2862 and

T&B Ex. 44 and adds R2038-R2044 and R2330.  (T&B Br. 92.)  However, it offers no

explanation of the newly referenced documents beyond Walworth's Declaration, in which he

concludes that "Richards' use of runners on a separate runner float plate is similar to

Elastimold's use of runners on a separate runner float plate."  (T&B Br. 92; Walworth 2007 Decl.

¶134.)  In his deposition, which is cited by T&B, Borgstrom testified that T&B Ex. 44 depicted

item #52, but he did not explain any specific details within the Exhibit regarding item #52.

(Borgstrom June 16, 2004 Dep. 428:4-429:6 in Robertson Cert. Ex. 16.)  Furthermore, Richards'

witness Koroluk stated that "there is no reference to runners on a Separate Runner Float Plate in

Document R2862."  (Koroluk Supp. Expert Report 48 in Cantine Decl., Ex. 62.)  Additionally, in

its Response to Richards' Statement of Uncontested Facts, T&B cites additional documents that

it claims give a particular description of item #52.  The documents relied upon are T&B Ex. 44

and a series of Richards documents.  (T&B Resp. to Richards' Stat. of Uncontested Facts

¶¶1056-59 .)  In response to the allegation by Richards that T&B cannot cite to a document in

Luzzi's possession that "disclosed or depicted T&B's use of a runner in a separate runner float

plate[,]" T&B states that Luzzi took T&B's SOPs and cites portions of Bleema Manufacturing

Corporation's Employee Manual that discuss paid leave and other employment information.

(T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶1059; R2767, R2769, R2771, R2781 in

Robertson Cert., Ex. 24.)  It is possible that T&B intended to cite T&B Ex. 56 which contains

documents with identical Richards Bates stamp numbers and is not identified as anything beyond

72

T&B Ex. 21, but those documents do not appear to refer to item #52.  (T&B Ex. 21 in Robertson

Cert. Ex. 56.)  Since T&B holds the burden of proof, this demonstration was insufficient to

describe item #52 with the requisite level of particularity.

      T&B also fails to show that item #52 is not generally known.  Richards' witness Covill

testified that he used a similar system at Chardon.  (Covill Supp. Expert Report 19 in Cantine

Decl., Ex. 61.)  Richards' witness Koroluk stated that "runner plate" is the proper terminology

for item #52 and he "used runner plates in molds to produce all types of multi-cavity molds in

addition to Load Break Bushings, Multitaps and Stress Cones for Burndy, Kearney and General

Electric."  (Koroluk Supp. Expert Report 49 in Cantine Decl., Ex. 62.)  T&B's only refutation of

this testimony is its statement that Richards "apparently did not know the technique prior to

learning it from Elastimold through Barker in T&B Exhibit 44 demonstrates that that item was

not 'generally known.'"  (T&B Br. 92-93.)  T&B also disputes whether an admission by

Walworth cited by Richards that the use of float plates was in the public domain relates

sufficiently to item #52.  However, whether that item relates sufficiently or is just a general

statement is irrelevant due to T&B's failure to refute Richards' witnesses' more specific

testimony described above.  Furthermore, in its Responses to Richards' Statement of

Uncontested Facts, T&B asserts that Richards' witnesses testified to using "the general concept

of a runner float plate[,]" while T&B uses a specific iteration of that item.  (T&B Resp. to

Richards' Stat. of Uncontested Facts ¶¶1060-61 .)  This argument falls short, because, as stated

above, T&B does not identify item #52 with sufficient particularity, so its claim that Richards'

witnesses' testimony is too general fails due to a lack of concrete, detailed information with

which to compare the testimony.

Because T&B does not demonstrate what about item #52 it is claiming to be confidential nor does it offer any evidence of its own construction and use of item #52, it fails to satisfy its burden of proof in identifying the item with sufficient particularity, and summary judgment is granted as to that item.  T&B also fails to demonstrate that item #52 is generally known, further warranting summary judgment.

**(26) <u>Cross Reference Code Master List</u> (Item #53)**

Item #53 is described in the Final Pretrial Order as follows:

53.  **Cross-Reference Code Master List.**  Elastimold developed and maintains an internal, proprietary "master list of material standards" which cross-references Elastimold's internal numeric code for given material standards with the actual material.  Elastimold's technical drawings and operating procedures make reference only to the internal numeric code and do not otherwise provide an identity or description of the actual material.  Therefore, to fully exploit Elastimold's proprietary drawings, Luzzi used the Elastimold material standards as a cross-reference.  Luzzi took a copy of Elastimold's cross-reference code master list prior to leaving Elastimold.

(Final Pretrial Order 313.)

Although item #53 is identified with sufficient particularity, as it is part of the record before the Court (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶¶50-51 in Cantine Decl., Ex. 4; R2809-R2810 in Robertson Cert., Ex. 1) and no argument is made that the item is generally known, T&B fails to meet the other elements of the four-part test.

T&B fails to demonstrate that item #53 offers specialized information that is specific enough to be useful to a competitor.  T&B Director of Global Research and Development Borgstrom explained that item #53 is a list of T&B's material standards and "[a] material standard is an internal reference for a given material."  (Borgstrom 2007 Decl. ¶99.)  Borgstrom

74

states that knowing the internal reference number for an item "allows someone to better understand the information provided in T&B/Elastimold technical drawings . . . [and] discloses the vendor or manufacturer of some of the materials T&B Elastimold uses to manufacture electrical connectors." (Borgstrom 2007 Decl. ¶99.) The report consists only of the material standard, a "REV #" and the title of the material that is being referred to; no formulas or other information are given. (R2809-R2810 in Robertson Cert., Ex. 1.) Of note, Richards contends that this Court has already determined that the product drawings Luzzi had in his possession were not protectible confidential information and T&B offers no objection to that statement. (Richards Br. 193 (citing Apr. 26, 2007 Op. 17-24, 49-52, 56, 59-60 (referring to items 27, 33, 37, 73, 80-82, 84)); T&B Br. 93-94.)

Further, the core of T&B's assertion that Richards misappropriated this information stems from Walworth's declaration that he "observed that 13 different documents known to be in Luzzi's possession contain codes on them that are referenced in [item #53]" and that he observed Richards invoices referencing products listed in item #53. (Walworth 2007 Decl. ¶138.) Walworth does not testify as to any personal knowledge that Richards obtained this information from item #53. T&B also offers no proof that Richards' means of obtaining this information was item #53 or that Richards relied on item #53 at all. In addition to these shortcomings, T&B fails to offer item-specific reasoning regarding the third and fourth prongs of the four-part test. (T&B Br. 71.) These failures to satisfy the burden of proof warrant summary judgment on item #53.

**(27) Press Parameter Control Sheet (Item #55)**

Item #55 is described in the Final Pretrial Order as follows:

55. **Press Parameter Control Sheet.** Elastimold had developed an internal press

75

parameter control sheet that it used when operating molds to capture certain data to measure performance.  Luzzi took a copy of this press parameter control sheet and a copy was found among the 600 documents still in Luzzi's possession after he left Elastimold's employ.  Richards developed a similar form for recording the same data.

(Final Pretrial Order 314.)

Item #55 is identified with sufficient particularity, as the actual document that is being alleged confidential was included in answers to interrogatories and is clearly referenced in the Final Pretrial Order.  (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶55 in Cantine Decl., Ex. 4; R2814 in Robertson, Ex. 1.)

However, T&B fails to meet the four-part test.  First, T&B offers no evidence that item #55 is not generally known.  Richards offers Covill's testimony that his mold workers performed similar checks on the machines at Chardon and recorded those checks on similar sheets.  (Covill Supp. Expert Report 21 in Cantine Decl., Ex. 61.)  Second, T&B makes no arguments as to this item containing specialized information beyond what is stated in the Final Pretrial Order.  It further does not explain whether the entry spaces on the form are particular to T&B's products or if they merely reflect standard information that any skilled user of the machines at issue would prudently record.  As stated at the outset of this Opinion, T&B fails to meet the third prong of the test.  The fourth prong of the test, whether the item is current, is also unmet.  T&B only makes general statements that are not specific to item #55, asserting only that item #55 is valuable when it is "coupled with other press information taken by Luzzi" because it "provided defendants with a comprehensive view of Elastimold's press operations."  (T&B Br. 96.)  No statements are made that demonstrate that this item is presently in use.

In short, T&B fails to demonstrate that item #55 is not generally known, as it does not

refute Covill's statement that he used a similar method of recording for similar statistics at Chardon. T&B also fails to show that there is anything specific or protectible about item #55. No evidence is presented to demonstrate how item #55 differs from the type of information that any user of the presses at issue would have to keep, and T&B does not explain <u>how</u> this item gives a competitor insight into Elastimold's press operations. T&B also fails to show that a person with Luzzi's skill would not have developed a sheet like item #55 on his own accord. As such, summary judgment is granted as to item #55.

**(28) <u>Press Selection Cross Reference Chart</u> (Item #62)**

Item #62 is defined as follows in the Final Pretrial Order:

> 62. **Press Selection Cross-Reference And Guide.** Luzzi took from Elastimold a hand-written chart which depicts all of Elastimold[']s presses and cross references the presses with the make of the press and the Elastimold parts that are manufactured in the press. This sheet compliments the other press selection information that Luzzi took and discussed at Topics 40, 43 and 53.

(Final Pretrial Order 316-17.)

Item #62 is identified with sufficient particularity. In its responses to interrogatories, T&B identified item #62 as the "[u]se of specific Elastimold press selection cross-reference and guide[,]" citing R2825. (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶62 in Cantine Decl., Ex. 4.) Although R2852 is a handwritten, untitled, and undated document, there is no question that T&B is claiming it to be confidential.

Regarding the four-part test, T&B offers no information that demonstrates that item #62 is not generally known. (T&B Br. 97.) T&B also offers no affirmative evidence of whether this information is specialized. Richards' witnesses wrote that item #62 would be of no use to anyone outside of T&B. (Covill Supp. Expert Report 23 in Cantine Decl., Ex. 61; Koroluk Supp.

Expert Report 52 in Cantine Decl., Ex. 62; Hervig Supp. Expert Report 13 in Cantine Decl., Ex. 63.)  However, T&B states that this item is valuable when viewed in conjunction with other press information that Luzzi allegedly took and that item #62 shows Elastimold productivity information.  (T&B Br. 97.)  Although T&B does not identify what other information it is referring to in its brief, Borgstrom's 2007 Declaration shows that T&B is referring to "Lewis Press Information (CI 40), Press Loading Summary (CI 43), Press Parameter Control Sheet (CI 55), press selection cross reference chart (CI 62), and work center report (CI 68)" along with "the Polaroid photographs of two T&B/Elastimold 400-ton Lewis presses located in Hackettstown, press #442 and press #445 . . . ."  (Borgstrom 2007 Decl. ¶¶30-31.)  Despite this identification, T&B does not explain how item #62 works in combination with the above-mentioned items to reveal confidential information.  As such, it remains unexplained what specifically about item #62 is being alleged to contain specialized information.  Only general statements that are non-specific to item #62 are made regarding the third and fourth prongs of the four-part test.  (T&B Br. 97.)

Further, although T&B contends that Richards used the information in item #62, its support of this statement falls short.  In support, T&B first cites a memo from Barker to Luzzi and Bier that reports on a trip in which two Lewis presses were examined and recommends that the presses be purchased.  (T&B Ex. 149 in Robertson Cert., Ex. 7.)  Second, T&B refers to a statement by Walworth that he "observed a spread sheet from a Luzzi PC, Bates 107, [that] contains references to Lewis presses to mold the products at issue."  (Walworth 2007 Decl. ¶ 158(n).)  Neither of these documents demonstrate that Richards used item #62, nor do they refute Richards' contention that it independently developed its press information.

In conclusion, summary judgment is granted as to item #62 due to T&B's failure to meet the four-part test.

**(29) <u>Quality Standards for Insulation Molding</u> (Item #66)**

Item #66 is described in the Final Pretrial Order as follows:

> 66.  **Quality Standards For Insulation Molding.**  Elastimold developed internal qualities standards for all of its parts.  Luzzi took these quality standards and use (sic) them at Richards.

(Final Pretrial Order 318.)

Although T&B identifies item #66, its supporting documentation creates a lack of clarity as to what constitutes the item.  In its responses to interrogatories, T&B identified item #66 as "[u]se of specific Elastimold quality standards for insulation molding[,]" identifying R2837-2853 and R3274-3324 as examples.  (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶66 in Cantine Decl., Ex. 4.)  In its response to Richards' Statement of Uncontested Facts, T&B states that it is claiming that the entirety of the 68 pages cited as item #66 is confidential information. (T&B Resp. to Richards' Stat. of Uncontested Facts ¶1146-48.)  Further, it explains that "[t]hese 68 pages constitute a substantial quantity of highly specific, detailed quality standards developed by T&B over time and after substantial testing."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶1148.)  T&B also does not object to the substance of Richards' statement that "[t]he quality standard for insulation molding documents that T&B cites in its interrogatory response . . . consist of three separate documents, a 17 page document written by Luzzi in 1992 (R2837-R2853), a 22 page document written by Luzzi in 1996 and 1997 with handwritten notes (which appears to be an updated version of the 1992 document) (R3301-3324), and a 27 page document written by Luzzi in 1997 (which appears to be an updated version of the 1996 document)

79

(R3275-R3300)."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶1142.)  However, T&B

supports its claim of confidential information with statements that only refer to the most recent

document and treats them as referring to the whole.  (T&B Br. 97; Borgstrom June 16, 2004 Dep.

482:9-484:11 in Robertson Cert., Ex. 16.)  Specifically, T&B states that "while Luzzi collected

the data and was responsible for writing these documents, the data came from many others within

Elastimold" and supports that statement with a quote from Borgstrom that refers solely to the one

document beginning at R3275.  (T&B Br. 97; Borgstrom June 16, 2004 Dep. 482:9-484:11 in

Robertson Cert., Ex. 16.)  What is clear from the above information is that item #66 is a

document or a series of documents authored by Luzzi.

In its brief, T&B makes no attempt to address the four-part test; it merely refutes the

points raised by Richards.  (T&B Br. 97-99.)  The Court's analysis herein draws heavily from

other information provided by T&B.

First, T&B offers no affirmative evidence that demonstrates that item #66 is not generally

known.  Richards offered testimony of two witnesses explaining that they used similar standards

in employment with other companies, and Richards' witness Covill explained that he believed

item #66 overlapped "standards set by the  IEEE."  (Covill Supp. Expert Report 23 in Cantine

Decl., Ex. 61 ("I feel that these standards include a lot of the standards set by the IEEE, these are

very typical of what we used at Chardon . . . ."); Hervig Supp. Expert Report 14 in Cantine Decl.,

Ex. 63 ("[a]t 3M we had similar quality goals, but our quality standards were laid out

differently").)  T&B does not refute, or even acknowledge, this evidence.  (T&B Br. 97-99.)

Second, regarding the level of specificity and the specialized nature of the information,

Richards' witness Koroluk stated that "[t]he referenced pages have no relation to the products at

issue in this case[,]" so he did not understand how the documents were relevant.  (Koroluk Supp. Expert Report 54 in Cantine Decl., Ex. 62.)  This is not addressed by T&B.  (T&B Br. 99-97.) Further, if the standards overlap IEEE standards, a contention that is not refuted by T&B, they cannot be specialized.

Finally, T&B does not address the fourth part of the test, whether the item is current, in its brief.  (T&B Br. 97-99).  However, in its responses to Richards' Statement of Uncontested Facts, T&B asserts that it "has evidence of current value in that it continues to use its internally developed quality standards today."  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶1152.) No further detail is given.

In short, T&B's failure to offer any evidence in support of the four-part test warrants summary judgment on item #66.

**(30) <u>Press Open Times</u> (Item #67)**

Item #67 is identified in the Final Pretrial Order as follows:

67. **Press Open Times.** Elastimold's standard operating procedures contain detailed information as to given parts "press open time" as well as cure time and inject time. The sum of these equals the product cycle time, which in turn determines capacity and productivity.

Luzzi took Elastimold's standard operating procedures just before leaving Elastimold.  Elastimold's standard operating procedures were found in the 600 pages of documents still in Luzzi's possession during discovery in this case.  Luzzi used Elastimold's standard operating procedures in conjunction with the detailed press loading information and the Elastimold sales information to determine what types of presses, the number of presses and cavities Richards would need in order to manufacture 600 Amp connectors for ConEdison.

(Final Pretrial Order 318.)

Item #67 is a moving target due to a shift in what is being described between the Third

Supplemental Answer to Interrogatories and the Final Pretrial Order.  In its response to interrogatories, T&B described item #67 as "[u]se of specific Elastimold press open times" and identified the item as R2862.  (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶67 in Cantine Decl., Ex. 4.)  R2862 identifies a single "open time" of five minutes.  In its brief in opposition to this motion, T&B acknowledges that "the description in the Pretrial Order is more expansive than the original interrogatory answer."  (T&B Br. 99.)  T&B now contends that "there are different press times applicable to the products at issue in this case[,]" all of which are "reflected in SOPs which Luzzi took when he left Elastimold."  (T&B Br. 99-100.)

Furthermore, the description of item #67 lacks sufficient particularity.  Despite alleging multiple different press open times, T&B only identifies one item, R2769, as containing other press open times[2] and does not inform the Court as to the location of other press times within the evidence or identify the different press times.  (T&B Br. 100.)  Other press open times are included alongside the document marked R2769 in Robertson Cert. Ex. 56, but none of these are brought to the Court's attention in T&B's brief (T&B Br. 99-101); the documents are identified only in T&B's Response to Richards' Statement of Uncontested Facts (T&B Resp. to Richards' Stat. of Uncontested Facts ¶1161).  This lack of clarity as to whether T&B is claiming one or many press open times as confidential and the lack of identification of all of the press open times it claims to be confidential demonstrates T&B's failure to describe item #67 with sufficient

---

[2] T&B cited this document as being located in Exhibit One of Mr. Robertson's Certification; however, it is not in Exhibit One but instead is located in Exhibit 56 of that Certification.  (R2769 in Robertson Cert. Ex. 56.)  Adding to this confusion, there are two documents marked R2769 that are referred to by T&B.  One discusses paid leave at Bleema Manufacturing Corporation; the other is T&B Deposition Exhibit 21, which appears to be a collection of SOPs.  (R2769 in Robertson Cert. Ex. 24 (paid leave); R2769 in Robertson Cert. Ex. 56 (T&B Dep. Ex. 21).)

particularity.

As to the four part test, neither party offers any admissible evidence as to whether this item is generally known.  T&B also fails to address the second prong of the four-part test at any point in its brief (T&B Br. 99-102), despite Richards' witnesses Covill, Koroluk, and Hervig all stating that the information in item #67 would be of no use to anyone outside of Elastimold. (Covill Supp. Expert Report 24 in Cantine Decl., Ex. 61; Koroluk Supp. Expert Report 54-55 in Cantine Decl., Ex. 62; Hervig Supp. Expert Report 14 in Cantine Decl., Ex. 63.)  Additionally, no effort is made by T&B to explain how item #67 would not be information reasonably obtained as expertise gained from years of working in this field.  T&B also fails to satisfy the third and fourth parts of the test.

For the reasons stated above, summary judgment is granted on item #67.

**(31) <u>Work Center Report</u> (Item #68)**

Item #68 is described in the Final Pretrial Order as follows:

> 68.  **Work Center Report Including Labor Cost, Variable Cost, Total Cost, And Fixed Cost.**  Elastimold generates detailed reports concerning labor costs, variable costs, total costs and fixed costs for each press, referred to as a work center report. A copy of Elastimold's Work Center Report was found among the 600 pages of Elastimold documents recovered from Luzzi during the course of discovery.  Luzzi used Elastimold's detailed cost information while working at Richards in order to guide the development, benchmark cost efficiency, and price Richards' products against Elastimold.

(Final Pretrial Order 318-19.)

Whether item #68 is described with sufficient particularity is not addressed by T&B or Richards in their briefs.  (<u>See</u> T&B Br. 101; Richards Br. 209-10; Richards Reply Br. 136-138.) However, in its response to interrogatories, T&B identifies item #68 as "[u]se of specific

Elastimold work center report including labor cost, variable cost, total cost, and fixed cost" and cites to R2887.  (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶68 in Cantine Decl., Ex. 4.) In its Responses to Richards' Statement of Uncontested Facts, T&B states that the documents it claims to be confidential are R2887-R2890.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶1172, 1174.)  Despite T&B's failure to brief this issue fully, this information, when read alongside the Final Pretrial Order's language, identifies item #68 with sufficient particularity.

Moving on to the four-part test, T&B and Richards also fail to address whether item #68 is generally known.  (T&B Br. 101; Richards Br. 209-10; Richards Reply Br. 136-138.)  In its Responses to Richards' Statement of Uncontested Facts, T&B states that a search of industry literature by Richards' witness Koroluk did not show any evidence of item #68 being generally known, however, this is not briefed by T&B.  (T&B Resp. to Richards' Stat. of Uncontested Facts ¶1174.)

T&B also does not address the level of specificity and the specialized nature of the information in its brief, nor does Richards.  In its Responses to Richards' Statement of Uncontested Facts, T&B asserts that item #68 is valuable when used in conjunction with items #40 and #43, but does not explain why it would be of use to another company or if the information is transferrable.  (See T&B Resp. to Richards' Stat. of Uncontested Facts ¶1174.) However, this is not addressed at all in T&B's brief.

The fourth prong of the test is also unsatisfactorily addressed by T&B.  T&B asserts that the information was current when it was taken by Luzzi, since it reflects 1997 cost data and Luzzi left in 1998.  (T&B Br. 102.)  This is supported only by the date on the document, which is January 7, 1998.  (R2887 in Robertson Cert, Ex. 1.)  T&B also states that the item has value

based on Luzzi's emailed statement referring to service time that stated that he "absolutely must make Richards competitive with E'mold which is about a 3 to 4 minute[,]" and T&B contends that "service time is a proxy for cost."  (T&B Br. 101-02; Doc. 000062 in Robertson Cert., Ex. 38.)  As a further example of value, T&B cites Bier's deposition testimony that, generally speaking, financial records that disclose profit margin, manufacturing productivity, costing or sales price would be confidential because they could be used against a company by a competitor. (T&B Br. 102; Bier Nov. 2, 2002 Dep. 30:25-32:6, in Robertson Cert., Ex. 14.)  None of the examples cited explain how the information had current value to T&B at the time it was taken by Luzzi or that it was used by Luzzi for the purposes supposed by T&B.

In short, summary judgment is granted on item #68 due to T&B's failure to address the four-part test.  See Dunkin' Donuts Inc. v. Patel, 174 F.Supp.2d 202, 210 (D.N.J. 2001) ("it is not the Court's obligation to sift through the record searching for a genuine issue of material fact. Rather, it is the parties' obligation to show the absence or existence of such an issue."  Id. (citing as an example Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 154 (D.C. Cir.1996)).  Further, it is unclear whether T&B is asserting that item #68 information was used to obtain Con Ed as a customer due to the overall lack of clarity in T&B's argument. However, if this is asserted, it is not a permissible argument, as this Court previously determined that "T&B cannot argue that Richards used T&B's financial information to get Con Ed as a customer, since Con Ed sought out Richards."  (Apr. 26, 2007 Op. 47.)

**(32) QSP 3001 Form (Item #77)**

Item #77 is described in the Final Pretrial Order as follows:

77.  **QSP 3001 Form And/Or Method Of Analysis**.  Included in the 600 pages of

Elastimold documents in Luzzi's during discovery in this case is the first four pages of a QSP 3001 form completion work instruction that is Elastimold's proprietary work instruction for project development. The document provides the following legend: "Confidential property of Elastimold, not to be disclosed to others. ©Elastimold. DO NOT REPRODUCE without written permission. Document must be returned upon demand to Elastimold."

(Final Pretrial Order 324.)

In its brief, T&B fails to address whether item #77 is described with sufficient particularity. (T&B Br. 103-104.) However, in its Third Supplemental Response to Richards' Interrogatories, T&B identifies item #77 as "[u]se of specific Elastimold QSP 3001 Form and/or method of analysis" citing R3234-R3246 for reference. (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶77 in Cantine Decl., Ex. 4.) R3234-R3246 are sample forms, but no method of analysis appears to be within their text. (R3234-R3246 in Robertson Cert., Ex. 1.)

T&B also offers no independent evidence in support of item #77 not being generally known. All T&B cites is "a) the fact that Luzzi stole the information when he left Elastimold; b) none of the patents or literature searched by [Richards'] experts[] to demonstrate that the items at issue in this case were generally known make any reference to this information; and c) T&B developed the form internally." (T&B Br. 104.) This is insufficient to carry the burden as to the first prong of the four-part test.

T&B also fails to address the second part of the test, the level of specificity and specialized nature of item #77. It claims that the item's value is in its "procedure to track ISO compliance and certification" (T&B Br. 104 ); however, T&B fails to identify how that procedure is specialized. Further, T&B fails to show how the forms demonstrate a specialized method of analysis.

86

Regarding the fourth prong of the test, T&B does not address whether the information in item #77 is current; it states that "the value of the information lies in the use of the form's procedure to track ISO compliance and certification." (T&B Br. 104 (citing T&B Stat. of Add'l Facts ¶¶981, 982).)  No evidence is given as to whether the information was current when it was taken from T&B.  This is insufficient to satisfy T&B's burden of proof regarding the test's fourth prong.

Finally, Richards asserts that T&B "fails to allege that Defendants used the information that T&B claims as proprietary and summary judgment is warranted on this ground alone." (Richards Br. 217.)  In support of the contention that evidence of use exists, T&B relies on files from Luzzi's home computer along with statements by Luzzi from his deposition, which T&B classifies as "Luzzi testified he used everything he gathered at Elastimold." (T&B Br. 103.) However, the documents that are referred to in T&B's brief, Documents 000107 and 000096 in Exhibit 38 of Mr. Robertson's Certification, are not explained by T&B.  More importantly, T&B misleadingly characterizes Luzzi's statement from his November 12, 2002 deposition.  When asked "[y]ou felt free to use all of the information that you had gathered from Elastimold, so long as it wasn't confidential, correct[,]" Luzzi responded "[y]es." (Luzzi Nov. 12, 2002 Dep. 127:7-13.)  Then, when asked if he "[withheld] any information that [he] had that [he] obtained during [his] years at Elastimold in the performance of [his] duties for Richards[,]" Luzzi responded "[n]o." (Luzzi Nov. 12, 2002 Dep. 127:18-22.)  This exchange demonstrates that Luzzi only testified to using and sharing non-confidential information.  It does not, as T&B claims, represent that Luzzi shared all of the information that he "gathered at Elastimold."  Because of these failures of proof, T&B does not show that Richards used the information in item #77.

87

T&B makes no attempt to shoulder the burden of proof on the four-part test.  Further, T&B does not effectively refute Richards' contention that it did not use the information in item #77, as the core of T&B's argument relies on a statement that T&B holds out as standing for a proposition that the statement does not support.  As such, summary judgment is granted on item #77.

**(33) Bleed Hold in BSR Insert (Item #79)**

Item #79 is described in the Final Pretrial Order as follows:

79. **Design Criteria For Bleed Hole In BSR Insert.** Within 600 pages of Elastimold documents found in Luzzi's possession during discovery in this case is an Elastimold part drawing for the BSR insert.  Richards' tool engineer, Vitaly Lungin, indicated that it was his practice with Luzzi to use Elastimold drawings in the development of Richards' manufacturing line of 600 Amp connectors.  A comparison of the Elastimold BSR insert drawing with an earlier version of the Richards BSR insert drawing (dated January 20, 1999, two days after Luzzi's arrival), shows the following similarities:

| Richard[s] BSR Insert (R1493) | Product Feature | Elastimold BSR Insert (R3337) |
|---|---|---|
| 2.750 | Outside diameter | 2.750 |
| .750 | Step | .750 |
| R.250 | End Radius | R.250 |
| R.030 | End Radius | R.030 |
| R.060 | Other End Radius | R.060 |
| R.350 | Other End Radius | R.352 |

A later version of the Richards drawing for the BSR insert step of .750 being changed to .755 (R1515).  Finally, an even later draft of the Richards BSR insert shows many of the dimensions from the Elastimold drawing slightly changed from the starting point (R1513).

These drawings evidence Richards' use of confidential, proprietary Elastimold drawings and then slight modifications to the information obtained from

88

the Elastimold drawings, in order to disguise the source.

Elastimold manufactures its BSR inserts using a "double deck" mold. Two separate molds stacked on top of one another in order to double the cavitation. Richards has done likewise.

Elastimold put a hole into the BSR insert in order to allow air to escape from between the insert and the arbor prior to overmolding. Elastimold developed this technique as a result of troubleshooting problems caused by trapped air between the insert and the core. Richards' press processing sheets indicate that Richards experimented with molding BSRs without "piercing" holes in the inserts. These notes evidence that Richards was putting a hole in its BSR inserts in conformity with the Elastimold practice from the very beginning.

(Final Pretrial Order 325-26.)

Although T&B offers a detailed description of item #79 in the Final Pretrial Order, the item is a moving target, since T&B shifts from claiming that the bleed hole alone is confidential information to claiming that Richards copied the entire BSR insert design. In its interrogatory answers, T&B identified item #79 as "[u]se of specific Elastimold design criteria for bleed hole in BSR insert[,]" and cites document R3337. (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶79 in Cantine Decl., Ex. 4.) Item R3337 is an Elastimold drawing of the "BSR Conductive Insert[,]" that includes measurements and the description "drill .125 hole for bleed purposes" with an arrow pointing to a specific point on the drawing. (R3337 in Robertson Cert., Ex. 1.) R3337 does not identify the size of the bleed hole; only the location is noted. (R3337 in Robertson Cert., Ex. 1.) The interrogatory answer is very clear that all that is being claimed as confidential is bleed hole itself; however, in the Final Pretrial Order, T&B appears to claim that Richards misappropriated the entire BSR insert design, citing similar design criteria that are unrelated to the bleed hole. (Final Pretrial Order 325-26.)

T&B also fails to demonstrate that item #79 is not generally known. Richards' witness

Covill testified that Chardon used bleed holes "in the 1980s and 1990s . . . in connection with

[its] 15, 25, and 35 kv load break elbows and also [its] 600 Amp Tee final fill." (Covill Supp.

Expert Report 26 in Cantine Decl., Ex. 61.) Richards' witness Hervig similarly testified that,

during his employment with 3M, that company "used a 'bleed hole' on [its] 5411 splices in the

late 1970s or early 1980s to vent air." (Hervig Supp. Expert Report 17 in Cantine Decl., Ex. 63.)

None of this testimony is refuted by T&B; in its Responses to Richards' Statement of

Uncontested Facts, T&B merely cites other companies that it claims do not use bleed holes.

(T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶1222-23.) In its brief, T&B does not

address these contentions beyond claiming that they are inadmissible under this Court's Daubert

ruling, which, as discussed above, is an incorrect contention. (T&B Br. 106.) Instead, T&B asks

this Court to infer that item #79 is not generally known from a document depicting the bleed hole

being found in Luzzi's possession, Richards' presumed lack of knowledge of bleed holes prior to

dealing with Luzzi, and a lack of information on item #79 surfacing in Richards' experts' patent

and literature search. (T&B Br. 106.) T&B's failure to substantively address Richards'

witnesses' testimony and its request that this Court rely on conjecture falls far short of meeting

its burden of proving that item #79 is not generally known.

In sum, item #79 is a moving target and T&B failed to show that it is not generally

known. Summary judgment on item #79 is therefore granted.

**(34) Troubleshooting Guide For Blisters (Item #88)**

Item #88 is described in the Final Pretrial Order as follows:

88. **Troubleshooting Guide For Blisters.** Elastimold compiled a memorandum
that constituted a "troubleshooting guide" for blisters which are air traps formed
in the product during molding. A copy of Elastimold's troubleshooting guide for

90

blisters was recovered from Luzzi as part of the 600 pages of Elastimold documents that were still in his possession during discovery in this case.

Prior to Luzzi's arrival, Richards and its employees did not have a single day of experience with injection rubber molding.  As a result, Richards had no collective knowledge as to the problem of blisters, air traps, or how to deal with them.  The Elastimold troubleshooting guide for blisters provided Richards with literally decades of know how and experience and troubleshooting in a single memorandum.

(Final Pretrial Order 331.)

Item #88 is identified with sufficient particularity, as T&B shows that Elastimold document R3390-93 contains the information in question.  (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶88 in Cantine Decl., Ex. 4; R3390-93 in Robertson Cert., Ex. 1).

T&B, however, fails to meet the elements of the four-part test.

First, it fails to show that item #88 is not generally known.  Richards claims to have presented information demonstrating "that many details relating to the troubleshooting guide for blisters are shown and/or described in publicly available reference materials[,]" and T&B disputes that the cited documents show what Richards alleges.  T&B also cites Luzzi's "steal[ing] the Technical Practices" and teaching them to Richards and the patents and literature search by Richards' expert as not demonstrating that the item is generally known.  (T&B Br. 108.)  Of note, Luzzi's having taught Richards the Technical Practices is an unsupported assumption by T&B.  Further, although it objects to Richards' evidence, T&B cites no independent evidence that item #88 is not generally known.  Since T&B holds the burden of proof, refuting Richards' evidence alone is insufficient; an affirmative showing must be made.  T&B has therefore failed to demonstrate that item #88 is not generally known.

T&B also fails to show that item #88 is specific, specialized information.  T&B repeats

91

that Richards did not have injection molding experience prior to Luzzi's arrival, Luzzi lacked manufacturing experience related to item #88, and "the materials taken represent a compilation of Elastimold's injection molding experience." (T&B 108-09.) In support of these contentions, T&B relies on general statements in Borgstrom's 2007 Declaration that do not mention item #88. (T&B Br. 109; Borgstrom 2007 Decl. ¶¶30-32.) Furthermore, in its Response to Richards' Statement of Uncontested Facts, T&B asserts that the interrogatory answers' identification of R3390-95 demonstrates "the specialized nature of the item or how it differs from that used by competitors." (T&B Resp. to Richards' Stat. of Uncontested Facts ¶¶1283.) First, only R3390-93 is identified in interrogatories; R3394-95 is not mentioned in relation to item #88. Further, R3390-93 explains causes of blisters (R3394-95 discusses air traps); it does not highlight how Elastimold practices differ from other companies' practices, nor does it explain how it is a specialized item. (R3390-95 in Robertson Cert., Ex. 1.) No further explanation of the documents that would shed light on this question is highlighted for the Court. This demonstrates a complete lack of proof by T&B. (See T&B Br. 109; Resp. to Richards' Stat. of Uncontested Facts ¶¶1273-87.)

Regarding the fourth part of the test, whether the information is current, T&B only makes general statements that are not specific to item #88. (T&B Br. 107-09.) Additionally, T&B does not refute the testimony of Higgins, an Elastimold employee, who stated that he had never seen item #88 before and did not use it when he had problems with blisters. (Higgins Dec. 18, 2003 Dep. 963:23-964:15; 967:17-968:7 in Cantine, Ex. 48.) Higgins' testimony questions the currency and value of item #88 to Elastimold, a question that T&B did not address.

Finally, T&B fails to present evidence that Richards actually used item #88. In an

attempt to demonstrate that Richards used the information, T&B cites Walworth's declaration

explaining that a notation on a Richards document recording a December 1999 trial for molding

where blisters appeared described the source of those blisters as "believed from pre-pack[.]"

(R2409 in Walworth 2007 Decl., Ex. 1; T&B Br. 108.)  Based on this notation, T&B asserts that,

"[g]iven the fact that Richards had no previous injection molding experience to form the basis of

solving these blister problems, T&B is entitled to an inference that its information was used."

(T&B Br. 108.)  Given that T&B holds the burden of proof, no such inference is proper.  T&B

therefore fails to show that Richards actually used item #88.

T&B fails to offer evidence in satisfaction of the four-part test and fails to show that

Richards used the information in item #88.  Summary judgment is granted on this item.

### (35) Cavity Mold Design Criteria (Item #89)

Item #89 is described in the Final Pretrial Order as follows:

89. **Cavity Mold Steel Design Criteria.**  Elastimold's Standard Technical Practices
– Rubber Mold Design, provides: "Cavities shall be made of H13 steel hardened to
Roc 50-52°C.  Cavity and mandrills will be finished to 8-18."  A copy of
Elastimold's Standard Technical Practices – Rubber Mold Design was recovered
from Luzzi as part of the 600 pages of Elastimold documents that were still in his
possession during discovery in this case.

Richards used Elastimold's Standard Technical Practices – Rubber Mold
Design memorandum as a benchmark against which Richards was able to beat
Elastimold with respect to cost.  Richards purchased a less expensive grade of steel
to make its molds out of.

(Final Pretrial Order 331.)

T&B's argument on item #89 is that Richards knew what type of steel Elastimold used

and then used that information to undercut T&B by using a different type of steel.  T&B does not

assert that Richards uses or used the same type of steel as Elastimold.  Although T&B asserts that

the information was understood to be confidential within Elastimold, it fails to make the connective nexus that Richards actually used the information in item #89 in determining what type of steel to use. The Court finds this argument to be entirely unpersuasive and falling substantially shy of meeting T&B's burden of proof.

Moving on to the sufficient particularity standard and the four part test, T&B is claiming that the following is confidential information: cavities made of "H13 steel hardened to Roc 50-52°C. Cavity and mandrills will be finished to 8-18." (Final Pretrial Order 331; R3464 in Robertson Cert., Ex. 1.) This description is sufficiently particular.

However, T&B fails to offer sufficient evidence to satisfy the four-part test. T&B fails to demonstrate that item #89 is not generally known due to its presenting no evidence on the issue. Richards' expert Covill testified that he used H13 steel at similar temperatures "in his years of experience" in the manufacture of "cavity blocks, inserts and cores for 15 kv, 25 kv and 35 kv load break elbows, bushing inserts, junctions and 600 AMP Tee products." (Covill Supp. Expert Report 29 in Cantine Decl., Ex. 61.) He also stated that he used the same materials during the 1960s and 1970s in the automotive industry and knew the materials to be used by machine shops that he dealt with during his career. (Covill Supp. Expert Report 29 in Cantine Decl., Ex. 61.) Richards' witness Koroluk stated that he "used H-13 steel for cavity inserts for bushing and multi-tap molds for General Electric . . . [and] also used D2 Steel (HT43/45RC), which is an equivalent to H-113 steel, for Lapp Insulator Division." (Koroluk Supp. Expert Report 66-67 in Cantine Decl., Ex. 62.) T&B only states that Richards incorrectly asserts that the information in item #89 appears in industry literature, that Luzzi stole the papers containing item #89, and that Barker testified that he would not share information regarding the type of steel Elastimold uses

94

with a competitor.  (T&B Br. 110.)   None of this information refutes Covill and Koroluk's testimony, nor does T&B offer independent evidence demonstrating that item #89 is not generally known.  T&B then fails to address the second part of the test, the level of specificity and specialized nature of the information.  As to the fourth part of the test, T&B only makes general statements, an insufficient evidentiary offering from the holder of the burden of proof.

Based on the multiple failures of proof detailed above, summary judgment is granted on item #89.

(36) **Hot Injection Runners** **(Item #90)**

Item #90 is described in the Final Pretrial Order as follows:

90.  **Hot Injection Runner Mold Design.**  A hot runner system is a mold which maintains the runners at a temperature in which the compound will cure.  The more modern and efficient technique is to employ a "cold runner system" which maintains the runners at temperatures below the curing temperature.  Cold runners are more efficient because less compound is wasted.

Because Elastimold has been manufacturing 600 Amp connectors for so long, all of its Lewis presses utilize hot runner design.  As a result, all of Elastimold's operating procedures are for Lewis presses utilizing a hot runner design.  Richards chose to utilize the antiquated, inefficient hot runner injection design into its used, antiquated Lewis presses.  Richards made these decisions in order to create a knock-off manufacturing line of the Elastimold line instead of independently developing its own manufacturing line using modern equipment and modern practices.

(Final Pretrial Order 332.)

T&B fails to describe item #90 with sufficient particularity.  In its answers to interrogatories, T&B identified item #90 as "[u]se of specific Elastimold hot injection runner mold design[,]" citing R3087, R3095 and T&B Exhibit 44 as examples.  (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶90 in Cantine Decl., Ex. 4; R3087, R3095 in Robertson, Ex. 1; T&B Ex. 44 in Robertson, Ex. 2.)  However, in its responses to Richards' Statement of

95

Uncontested Facts, T&B objected to the statement that "use of a hot injection runner design is an item of confidential information[,]" and claimed instead that the item of confidential information was "its use of a hot injection runner mold design to manufacture the products at issue." (T&B Resps. to Richards' Stat. of Uncontested Facts ¶1311.) Based on the Final Pretrial Order, the answers to interrogatories, the responses to Richards' Statement of Uncontested Facts, and the exhibits noted, the details of the hot runner design that T&B is claiming as confidential are unclear.

T&B also fails to satisfy the four-part test. First, it fails to demonstrate that item #90 is generally known, as it makes no attempt to refute Richards' witnesses' statements that they used item #90 in prior employment, nor does it offer independent evidence that item #90 is not generally known. (See T&B Br. 112-14.) Richards' witness Covill wrote that, "at Chardon (in the 1980s and 1990s) we used hot injection runners on all of our rubber molded products, such as the 600 Amp Tee." (Covill Supp. Expert Report 30 in Cantine Decl., Ex. 62.) Richards' witness Koroluk wrote that he "used hot runner plates in molds to produce all types of multi-cavity molds such as Load Break Bushing, Multitaps and Stress Cones at Burndy, Kearney and General Electric, just to name a few products that are related to this issue." (Koroluk Supp. Expert Report 68 in Cantine Decl., Ex. 62.) Referring to his experience at 3M, Richards' witness Hervig stated that "I believe that all of our molds for splices in the 1970s and 1980s were hot runners. (Hervig Supp. Expert Report 18 in Cantine Decl., Ex. 63.)

Regarding the second prong of the test, T&B does not address whether item #90 is specialized; it only asserts that Barker drew the item for Richards. No other argument is made on this issue.

Although the third prong of the test, the employer/employee relationship and the circumstances under which the employee was exposed to the information, is not being discussed on an item-by-item basis in this Opinion, an exception is warranted regarding this item.  T&B asserts that Barker would not have shared information regarding item #90 with an Elastimold competitor "absent Luzzi's deception[,]" but the citation to the record does not support the allegation of deception.  Barker explains that he only discussed runners "in a general format, not for specific product[,]" and alleges no deception.  (T&B Br. 113; Barker Apr. 6, 2004 Dep. in Robertson, Ex. 19.)  T&B also states that there is a confidentiality legend on EST824, a document showing an Elastimold insulation drawing, but T&B does not explain how item #90 and EST824 relate.  (T&B Br. 113; EST824 in Robertson Cert., Ex. 86.)  T&B's other arguments are general to Elastimold's practices.  (T&B Br. 113.)  T&B therefore fails to satisfy the third part of the test.

T&B's explanation of current value is only that Elastimold still uses item #90; its other argument is that Elastimold "spent millions of dollars to perfect its process" is not specific to item #90.  (T&B Br. 113-14.)  These arguments are insufficiently specific to satisfy the fourth prong of the test.

In sum, T&B completely fails to meet the four-part test or to identify the item with sufficient particularity.  Further, T&B's asserts that "the hot runner design at issue was drawn for Richards by Barker (under false pretenses)[,]" but T&B's citation only demonstrates that Barker drew T&B Deposition Exhibit 44; there is no citation to support the allegation of false pretenses.  (T&B Br. 112.)  This is an impermissible inference to make without corresponding evidentiary support.  Summary judgment is granted on item #90.

(37) **Use of Silicone** **(Item #91)**

      Item #91 is described in the Final Pretrial Order as follows:

    91.  **Process Criteria For Use of Silicone.**  Elastimold has developed detailed instructions for use of silicone in the manufacture of 600 Amp connectors and associated epoxy parts with molded flanges.  A copy of an Elastimold operations work instruction concerning the use of silicone on epoxy flange molding instructions and bond verification was recovered from Luzzi as part of the 600 pages of Elastimold documents that were still in his possession during discovery in this case.  Likewise, a copy of Elastimold's standard operating procedures for the presses that manufacture 600 Amp connectors was recovered from Luzzi as part of the 600 pages of Elastimold documents still in Luzzi's possession during discovery in this case.  The operating instruction and the standard operating procedures provide detailed instructions as to the use and application of silicone.

    Richards has implemented these same instructions in its use of silicone in the manufacture of 600 Amp connectors.

(Final Pretrial Order 332-33.)

      The description of item #91 is not sufficiently particular, as T&B fails to explicitly identify what aspects of the use of silicone it is claiming to be confidential, since a reader would have to scour the examples provided to know what T&B is seeking to protect and since T&B named uses in its brief that were not previously highlighted.  Specifically, in its answers to interrogatories, T&B identified item #91 as "[u]se of specific Elastimold process criteria for use of silicone[,]" citing R3098, R3094, and R3102 as examples.  (Third Supp. Resp. to Richards' Interrog. No. 10 at ¶91 in Cantine Decl., Ex. 4; R3098, R3094, R3102 in Richardson Cert., Ex. 1.)  R3089 refers to silicone under its "start up operations" in the instruction, "spray light coat of silicone mold release on mandrel."  (R3098 in Richardson Cert., Ex. 1.)  R3094 makes two references to silicone.  First, under the "mold loading procedure" after explaining that the cores must be cleaned after every heat, the document notes "do not use silicone due to insert stretch[.]"

(R3094 in Richardson Cert., Ex. 1.)  Second, although silicone is not mentioned in the document, in its Responses to Richards' Uncontested Statement of Facts, T&B asserts that silicone is referred to with the statement "lightly spray rings on jackets with mold release to help it seat (sic) in the cavity.  This can also be done ahead of time."  (R3094 in Richardson Cert., Ex. 1; T&B Resp. to Richards' Stat. of Uncontested Facts ¶1330.)  R3102 contains the statement "Note: Do not silicone the mandrels!  Silicone lines will appear where the rubber knits together.  When this occurs, the parts are scrap!"  (R3102 in Richardson Cert., Ex. 1.)  In the Final Pretrial Order, T&B describes item #91 as "detailed instructions for use of silicone in the manufacture of 600 Amp connectors and associated epoxy parts with molded flanges[.]"  In its brief, however, T&B describes this item as being for more than mold release, which alone would duplicate parts of item #23: "in addition to aiding part removal, T&B uses silicone to promote jacket stretch, to ease the removal of flash and to promote flow during injection."  (T&B Br. 114-15.)  T&B also refers to R3218 in its brief as instructing "[n]o silicone spray or other release agents are to be used at or around the flange molding press[,]" but that document is not referenced in the Final Pretrial Order nor in the answers to interrogatories.  All of the detail as to what is being protected comes from parts of documents that are referenced in T&B's answers to interrogatories and in its brief.  They are not alluded to in the Final Pretrial Order, nor are they explained or identified beyond naming the page numbers on which they are written in the answers to interrogatories.

T&B offers no item-specific affirmative evidence as to any of the parts of the four-part test.  (See T&B 115.)  Based on T&B's failure to identify the item with sufficient particularity and its failure to provide evidence in satisfaction of the four-part test, summary judgment is granted on item #91.

D.      **Conceded and Combined Items**

In addition to the items alleged to be confidential that are discussed above, certain items were either conceded by T&B in its brief or were combined with other items, despite having been identified and discussed separately in the Final Pretrial Order and other documents.  T&B conceded the following thirteen items:

**Item 19** – **Tightly Registered Core Tolerances** (T&B Br. at 54, 116);
**Item 23** – **Mold Release By Wiping With Rags** (T&B Br. 62, 116);
**Item 34** – **Use of Pull Knobs** (T&B Br. 62, 116);
**Item 39** – **Purging Rubber Between Each Heat** (T&B Br. 77);
**Item 47** – **Grind Masks For I-Y-H-U** (T&B Br. 88, 116);
**Item 48** – **Scalpels In Trimming Rubber Flash From Parts** (T&B Br. 88, 116);
**Item 56** – **Calculation For Cavity Pressure With Example Given For 400-Ton Lewis Press** (T&B Br. 96, 116);
**Item 57** – **Cross-Reference Table For Cable Diameter Ranges And Housings And Size Designations** (T&B Br. 96, 116);
**Item 61** – **Oven Time Guideline And Supporting Data** (T&B Br. 96, 116);
**Item 76** – **Epoxy Bushing And Flange Molding Process Information** (T&B Br. 103, 116);
**Item 86** – **Practice of Masking Metal Inserts Being Painted To Avoid Sticking During Molding** (T&B Br. 107, 116);
**Item 87** – **Use of Plastic Liners as a Moisture Barrier** (T&B Br. 107, 116); and
**Item 92** – **Use of Elbow Cavities Cut Directly In Steel** (T&B Br. 116).

T&B also admitted that the following were not separate items of confidential information, and addressed them as single items in its brief in opposition to Richards' Motion for Partial Summary Judgment.  As a result, discussion of eight items from the Final Pretrial Order was combined and reduced to three items in T&B's brief.  The combined items are:

(a)      **Item 16** – **Anti-Rotation Technique for Cores** and
          **Item 46** – **A 2-Bolt Mounting System For BSR Cores** (T&B Br. 45-48, 88);
(b)      **Item 18** – **Sprue Drop Configurations For Y-H Molds** and
          **Item 29** – **Specific Drop Designs for H and Y Molds** (T&B Br. 51-53); and
(c)      **Item 20** – **Elastimold's Peripheral Sprue Bushing**,

**Item 28 – <u>Specific Peripheral Sprue Bushings Dimensions</u>,**
**Item 41 – <u>Mounting Screw System On Peripheral Sprue Bushings</u>,**
and
**Item 69 – <u>Sprue Bushing Design on BLR Insulation Mold Including</u>**
**<u>Bottom of Bushing At Top of Trunk Runner</u> (T&B Br. 54-**
**57).**

In sum, after reviewing all of the items on which Richard seeks summary judgment and applying the law of the case as described by this Court in its April 26, 2007, April 3, 2006, and October 7, 2005 Opinions, this Court finds that T&B failed to meet its burden of proof and grants summary judgement on all of the items at issue.

**E.     T&B's Counterclaims**

In addition to the claims over individual items of confidential information, still remaining in this case are five of six counterclaims filed by T&B in its First Amended Counterclaim, dated May 3, 2003.  (T&B First Amended Counterclaim in Cantine Decl., Ex. 41.)  Count III of T&B's Counterclaim was already dismissed by this Court in its April 3, 2006 Order.  The remaining counterclaims are as follows:

Count I:    Breach of Contract Against Glenn Luzzi
Count II:   Breach of Duty of Loyalty Against Glenn Luzzi
Count IV:  Tortious Interference with Prospective Advantage Against Richards
Count V:   Misappropriation of Trade Secrets Against Luzzi and Richards
Count VI:  Unjust Enrichment Against Richards

(<u>Id.</u> at 12-18.)  Counts I, II, V and VI are premised on the misappropriation of trade secrets and/or confidential information.  No trade secret or confidential information allegations remain against Richards.  Counts I, II, V and VI of T&B's Counterclaims are therefore dismissed.  Count IV is a claim that Richards tortiously interfered with T&B's prospective advantage with Con Edison.  In its April 26, 2007 Opinion, the Court found that it is "undisputed that it was Con Ed that

approached Richards, as early as 1997, seeking to have Richards produce a competing line of 600-amp products" and that "T&B cannot argue that Richards used T&B's financial information to get Con Ed as a customer, since Con Ed sought out Richards[.]" (Apr. 26, 2007 Op. 47.) This bar extends to T&B's argument in Count IV of its Counterclaim that Richards tortiously interfered with its prospective advantage with Con Edison. Count IV of T&B's Counterclaim is therefore dismissed.

### F.   Conclusion Regarding Summary Judgment

In general, a review of T&B's confidential information claims shows that those claims appear to be premised on the proposition that, upon leaving Elastimold and with Elastimold's releasing him from his confidentiality agreement, Luzzi was required to erase all of the technical expertise he obtained over the course of approximately 20 years of hands-on experience in the industry. Unfortunately for T&B, the New Jersey Supreme Court in Whitmyer, 58 N.J. at 33, makes clear that there is no such requirement. An employee leaving an employer is entitled to use the basic expert abilities that he or she has acquired in the field. While the Court recognizes that Luzzi appears to have departed Elastimold's employ with a number of documents that should have remained with his former employer and that it is indeed possible that he and Richards made some improper use of this material, T&B has so overwhelmed the record in this case with arguments and submissions that have been unsupported by any real evidence that, at this point, it is impossible for this Court to discern whether or not, buried somewhere within the huge haystack, there might actually be some germ of a claim. If there is such a needle, suffice it to say, Plaintiff has failed to point to the evidence that would support it.

## V.   CONCLUSION

For the reasons stated above, T&B's motion for reconsideration of this Court's April 3, 2006 Daubert Order limiting the testimony of Van T. Walworth and this Court's April 26, 2007 Order granting partial summary judgment is **DENIED**.  T&B's cross-motion to strike evidence proffered by Covill, Koroluk, and Hervig and Richards' Motion to Exclude the 2006 and 2007 Declarations of Van T. Walworth are both **GRANTED IN PART** and **DENIED IN PART**.  As to Richards' motion for partial summary judgment, Richards has shown, pursuant to Federal Rule of Civil Procedure 56(c), "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Richards has pointed to the absence of evidence establishing that these items of information are protectible as confidential information in which T&B has a legitimate secrecy interest, and T&B has failed to offer actual evidence that raises material factual disputes.  Richards motion for partial summary judgment is **GRANTED** in its entirety.  This and prior Opinions resolve all of the issues raised in T&B's Counterclaims, which, as a result are dismissed in their entirety.  An appropriate form of order will be filed together with this Opinion.

　　s/ Stanley R. Chesler　　
STANLEY R. CHESLER
United States District Judge

DATED: June 17, 2008

103